# EXHIBIT B

Case 1:05-cv-02244-HHK    Document 23-3    Filed 07/02/2007    Page 1 of 11

Page 1

1  UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLUMBIA
3
4  - - - - - - - - - - - - -x
5  PETER M. MACE,              :
6       Plaintiff,             :
7    vs.                       : Case No. 1:05CV02244 (HHK)
8  LARRY A. DOMASH,            :
9       Defendant.             :
10 - - - - - - - - - - - - -x
11
12       Deposition of PETER M. MACE
13              Washington, D.C.
14       Wednesday, February 21, 2007
15                9:44 a.m.
16
17
18
19
20 Job No.: 1-97081
21 Pages: 1 - 254
22 Reported by: Sarah M. Bickel

Page 38

1   Q  Go ahead.
2   A  Thank you. Our argument is that we were
3   to do our utmost to create IFA and that Larry would
4   then, through Domash & Associates, have the ability
5   to run the money. So in that sense, as this reflects
6   upon his skill and the skill of the people he worked
7   with at Gofen and Glossberg which he no longer works
8   with, it is related.
9   Q  Okay. Before we move on to the contract,
10  did IFA ever create any organizational charts?
11  A  Yes.
12  Q  Were those destroyed?
13  A  Well, some were destroyed but you have in
14  the file some of the charts.
15  Q  Let's put it this way. You've produced
16  whatever organizational charts still exist?
17  A  Yes.
18  Q  Am I correct that you claim to have
19  entered into a contract with Mr. Domash in April
20  1999?
21  A  Yes, that's correct.
22  Q  Please explain the formation of that

Page 39

1   contract that you're existing alleged between you and
2   Mr. Domash?
3   A  It's laid out in the interrogatories.
4   There was a telephone conversation. I told Larry
5   that I was going to have to stop helping him in his
6   personal and legal matters and stop working on the
7   IFA because I needed to get a paying job. And I told
8   him that I only had -- well, I hadn't really -- the
9   only thing I had that was of value was a book
10  collection and excellent credit history.
11      And Larry said to me that if I would use
12  my credit to continue helping him to move and to move
13  IFA forward so that it would it be a platform for
14  Domash & Associates, that he would reimburse me for
15  those reasonable expenses that I incurred for living
16  expenses, for expenses in helping him.
17      I also mentioned that I was supporting a
18  cousin of mine in California and her two children.
19      And he said that was not a problem either.
20      That's the agreement that's laid out in
21  the document you'll find.
22  Q  Do you remember anything else about that

Page 40

1   discussion?
2   A  I remember that it was a very positive
3   conversation. One of the most positive that I think
4   I ever had with Larry. And I also remember that he
5   was exceedingly anxious not to have me step aside
6   from helping him or from helping him in his personal
7   or legal issues, or helping him step aside from the
8   issue of IFA because I have -- he viewed it as being
9   the best opportunity he had to create Domash &
10  Associates, which was a company that he wanted to
11  form himself or perhaps with some other learned
12  people in his field.
13  Q  Anything else in that discussion between
14  you and Mr. Domash in April 1999?
15  A  I asked him if he wanted it memorialized,
16  if he wanted, you know, written down or if he wanted
17  me to follow some reporting requirement to him with
18  the expenses. And he was very cavalier about that
19  whole issue and blew it off. And said that he had
20  the same arrangement with George Graham, and that he
21  owed George Graham $50,000. But he was quite
22  confident that without question he'd have no problem

Page 41

1   in paying this.
2   Q  Anything else said during that discussion?
3   A  I'd have to go back and look at the
4   record, but that's what comes to mind immediately.
5   Q  Okay. Sitting here today, do you recall
6   anything else said in that discussion other than what
7   you put in the interrogatories and what you've
8   testified about here today?
9   A  No, I believe that there may be something
10  else in the materials in the file, but I don't have a
11  photographic memory, Larry does. And I'll stand with
12  that.
13  Q  You claimed that you had exhausted your
14  personal resources at that time?
15  A  Yes.
16  Q  How much money had you already expended on
17  IFA?
18  A  Well, in terms of my time, several
19  hundreds of thousands of dollars I had in inheritance
20  that we had used that Larry knows about.
21  Q  So you had spent several hundred thousand
22  dollars?

Page 90

1 contract?
2     MR. TREVELLINE: Objection, asked and
3 answered.
4     Go ahead and answer it.
5     THE WITNESS: Go ahead and answer it?
6     MR. TREVELLINE: Yes.
7     THE WITNESS: Was there a specific
8 triggering event? No, there was not a specific
9 triggering event. We could have been
10 successful if -- I don't mean to cut you off -- I
11 mean, we could have been successful in acquiring
12 funding. He could have been successful in the people
13 he was talking to in acquiring funding.
14     (Mace Exhibit No. 5 was marked for
15 identification and retained by counsel.)
16     BY MR. BROOKS:
17     Q I'm showing you, sir, what's been marked
18 as Exhibit Mace 5 and it's Bates-numbered Mace 000004
19 through 000010. I ask you if you recognize this
20 document.
21     A Yes, Mr. Brooks, I do recognize this.
22     Q And what is it?

Page 91

1     A It's a letter that I wrote on the 26th of
2 December of 2002 to George Graham discussing our
3 rather startled views of Larry's letter of
4 November 24th of the same year.
5     Q Is this a true and accurate copy of that
6 letter?
7     A Well, this is, but eight pages long --
8     Q As far as you know.
9     A Yes, sir, it appears to be.
10     Q In the one you actually sent to him, would
11 you have signed it or did you not typically signed
12 letters that you sent to Dr. Graham?
13     A No, I -- I would have signed it sir, yes.
14     Q Okay. Any reason to believe other than
15 the lack of signature, this is different than the
16 actual letter that was sent?
17     A No, there's no reason to believe that.
18     Q Okay. Turning your attention to the
19 fourth page of this which has been Bates-labeled
20 Mace 000007 -- sorry. By this I mean Mace Exhibit 5.
21     A Yes, on page 4, sir.
22     Q Turning your attention to the third

Page 92

1 paragraph of that letter, towards the bottom it says
2 "By the time of the big trial of October 30, 31 and
3 November 1, 2000, he owed me $75,000."
4     Did I read that correctly?
5     A That is what the letter says, that is what
6 you read, yes.
7     Q Is the "he" referring to Larry Domash?
8     A Yes.
9     Q The letter continues, "How do I know,
10 because we talked about it just a day or two prior to
11 going to court and he had no difficulty with it at
12 all."
13     Did I read that correctly?
14     A You did, indeed.
15     Q Please describe for me the conversation or
16 conversations you had with Mr. Domash about this
17 $75,000.
18     A I'd be happy to. This was the amount of
19 money that was outstanding up to that point and I
20 mentioned it to him because, again, I wanted just to
21 keep him apprized of kind of where we were with this,
22 and because I was hoping that shortly thereafter we

Page 93

1 would be paid. And again, he didn't respond to it
2 specifically other than to joke that -- and this I
3 remember vividly that, you know, maybe he would give
4 me his daughter, Elizabeth in exchange for it. And
5 he said that he loves his daughter, he said that
6 in -- in good jest.
7     And he went right on with his conversation
8 about what was going to take place at that -- at that
9 legal proceeding. He didn't -- he -- it's
10 representative of a -- of a pattern of behavior where
11 he doesn't really focus on what I'm asking him to
12 focus on.
13     Q What were you asking him to focus on at
14 that time?
15     A I was asking him to pay heed to the fact
16 that this was $75,000. This was credit card debt.
17 This is where I was at that moment.
18     Q Okay. You had spent $75,000 from
19 April '99 until on or about November 1st, 2000?
20     A Yes.
21     Q What had you spent the money on?
22     A I spent the money on my living expenses,

Page 94

1  pushing IFA forward, helping him and supporting my
2  cousin in California, the same -- same areas that we
3  enumerated in the agreement.
4      Q  Do you have a breakdown of how much you
5  spent on each of those areas?
6      A  That breakdown is being prepared right now
7  by an accountant which you obviously will get a copy
8  of.
9      Q  Was the $75,000 overdue at that point?
10     A  No, it was not overdue.  No one was -- no
11 one was -- Larry was so highly stressed that it would
12 have been immoral to pester him with this kind of
13 thing.
14     Q  I understand it would have been immoral,
15 but under the contract, was it overdue?
16     A  No, it was not overdue under the contract.
17         (Mace Exhibit No. 6 was marked for
18 identification and retained by counsel.)
19         BY MR. BROOKS:
20     Q  Sir, I'm now showing you what's been
21 marked as Mace Exhibit 6 and Bates-numbered
22 Mace 000020 and 000021.  Do you recognize this

Page 95

1  document?
2      A  Thank you.
3         Yes, Mr. Brooks, I do recall this.
4      Q  What is it?
5      A  This is a letter that Steve Killion, the
6  man who has spoken with Larry and an employee of a
7  firm called "BEK TEK," wrote concerning some of his
8  thoughts about this case.  Mr. Killion is a former
9  senior FBI special agent and he is the man who did
10 the tape recording analysis for Mr. Domash that his
11 attorney, Mr. Walsh, at one point had asked for.
12     Q  Did -- did you ask Mr. Killion to send
13 this letter on your behalf?
14     A  I asked Mr. Killion to put some of his
15 thoughts down on paper.
16     Q  Why?
17     A  Because I thought that they were important
18 to have been recorded.
19     Q  Did you help him draft this in any way?
20     A  No.
21     Q  If I can, turning your attention to the
22 second page, the last paragraph on the page.

Page 96

1      A  Yes, sir, the last paragraph.
2      Q  It reads "With regard to Mr. Domash's
3  financial obligations to you, vis-a-vis BEK TEK, I am
4  directly aware of a March 2001 delinquent obligation
5  of approximately $2900 for work done by BEK TEK on
6  Mr. Domash's behalf.  You personally covered this
7  obligation with a series of payments from your own
8  funds.  You indicated to me at the time that this
9  BEK TEK obligation was only the latest in
10 Mr. Domash's pattern of unmet responsibilities to
11 financially reimburse you for your efforts to support
12 and assist him."
13         Did I read that correctly?
14     A  You did, indeed.
15     Q  Did you, in fact, have a conversation with
16 Mr. Killion in March 2001 where you indicated to him
17 that Mr. Domash's obligation to BEK TEK was only the
18 latest in his pattern of unmet responsibilities to
19 financially reimburse you for your efforts to support
20 and assist him?
21         THE WITNESS:  Would please play that back?
22         (The reporter read the requested portion

Page 97

1  of the record.)
2         THE WITNESS:  I am not familiar with using
3  that verbiage.  You need to ask Mr. Killion that.
4         BY MR. BROOKS:
5      Q  Did you have a conversation with
6  Mr. Killion using words to that effect?
7      A  Mr. Killion knew that just as Larry owed
8  BEK TEK some $5,000, that Larry owed me money.
9      Q  But did you have a conversation in
10 March 2001 with Mr. Killion about Larry having unmet
11 responsibilities to you?
12     A  I would say that I had a conversation
13 about ongoing responsibilities to me, yes.
14     Q  Okay.  So Mr. Killion is wrong when he
15 says that you had a conversation with him about unmet
16 responsibilities?
17     A  No, I am not saying that he's wrong.  I'm
18 saying that his turn of phrase is what it is on this
19 page.
20     Q  Well, sitting here today, do you feel that
21 Mr. Domash had a pattern of unmet responsibilities to
22 financially reimburse you as of March 2001?

Page 98

1   A  I think Mr. Domash had responsibilities to
2  reimburse me that had not yet been finalized. He had
3  not yet paid me in 2001. In 2000, he hadn't paid
4  BEK TEK for that matter either.
5      Q  How much did Mr. Domash owe you at that
6  time?
7      A  Mr. Brooks, I don't know the answer to
8  that, but I would get you the answer to that when the
9  accounting report is completed.
10     Q  How long had whatever amount of money that
11 he owed you been overdue?
12     A  I wouldn't use the word "overdue." He
13 simply hadn't made the payment yet. These were still
14 outstanding sums.
15     Q  Do you know what Mr. Killion is referring
16 to when he says that you had a conversation with him
17 about Mr. Domash having a pattern, focus on the word
18 "pattern," of unmet responsibilities?
19     A  I think the person who needs to answer
20 that question is Steve Killion. Again, I didn't
21 write this, Mr. Killion did.
22     Q  Right, but he's writing about something

Page 99

1  you told him.
2      A  But he's writing it. He's choosing the
3  words. I'm not trying to speak for Mr. Killion. I'm
4  not trying to be obtuse, but, I mean, feel free to
5  ask him.
6      Q  After March 2001, did you continue to
7  spend money for which you're now claiming Mr. Domash
8  was supposed to reimburse you?
9      A  Yes, I did.
10     Q  Why?
11     A  Because we were still operating in good
12 faith on the understanding that we would be repaid
13 and we were trying in March of 2001 to move the
14 project forward. We had very cordial relationships
15 with a large number of -- of people at that time.
16     Q  If, in fact --
17     A  Very --
18     Q  If, in fact, Mr. Domash had a pattern of
19 unmet responsibilities to financially reimburse you,
20 would you have continued spending money hoping for
21 reimbursement from him?
22     A  If he had written me in March of 2001 and

Page 100

1  had said what he said in his letter of November of
2  2002, the answer to your question would be no.
3      Q  That wasn't my question.
4      A  Well, that's my answer.
5      Q  Respectfully, sir, under the rules, you
6  need to respond to the question.
7      A  Let me try again.
8      Q  Okay.
9         Miss, would you play that back, please.
10        (The reporter read the requested portion
11 of the record.)
12        THE WITNESS: If he had a pattern of unmet
13 responsibilities, the answer to your question would
14 be that I would have no reason to continue that.
15        BY MR. BROOKS:
16     Q  Thank you.
17     A  You're very welcome, sir. Now, I
18 apologize if I seemed abrupt. I wasn't trying to be
19 impolite.
20     Q  No, not at all.
21        (Mace Exhibit No. 7 was marked for
22 identification and retained by counsel.)

Page 101

1      BY MR. BROOKS:
2      Q  Sir, I'm showing you what's been marked as
3  Exhibit Mace 7. Do you recognize this document? For
4  the record, sir, this is also Bates number
5  Graham 0671.
6      A  Yes, I do remember this.
7      Q  Okay. And is it a -- is it fair to say
8  that it's a copy of your MBNA America credit card
9  bill with a closing date of 8/7/01 and it also has a
10 handwritten note from you to Dr. Graham?
11     A  Yes, that's accurate.
12     Q  The handwritten note says "9/28"?
13     A  It does, Mr. Brooks.
14     Q  Do you know whether that was 9/28/2001?
15     A  I don't know that, Mr. Brooks, but I would
16 suggest that that is 2001 date, yes.
17     Q  The note says "Dear George, we need to
18 speak about this." What did you need to speak about?
19     A  We needed to speak about the amount of
20 money that was outstanding since George was the
21 person who was kind of heading the band at that time.
22 And my understanding is that George did, in fact, at

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 206

1  A  Uh-huh. And sent it onto him.
2  Q  Do you have records of that somewhere?
3  A  No.
4  Q  How come you don't have records of that?
5  A  I don't have records of that. I mean, I
6  don't have records of anything going much in that
7  area. We were just to take possession of the
8  documents and bring them to Mr. Walsh and see that
9  Chris got paid and that was done.
10 Q  Have you looked for any of the your bank
11 records pursuant this case?
12 A  Yes, that's what the accountant is doing
13 now.
14 Q  Those are credit card records. I'm
15 talking about your bank records which reflect --
16 A  There are some bank records and if
17 anything comes up, I can show you that.
18 Q  Does the accountant have any documents
19 that I don't have or does he just have what's been
20 produced?
21 A  No, I think he has what's been produced.
22 He's putting another some kind of order that makes

Page 207

1  sense.
2  Q  Because I've requested in this case, you
3  know, your bank records going back and I've received
4  virtually nothing. I just want to make sure --
5  A  I don't believe that there's anything that
6  you don't have but I'll be seeing him next week so I
7  can make an inquiry.
8  Q  Have you taken any steps with the bank to
9  get your old records?
10 A  There aren't any records to get. I mean,
11 we would have sent him cashier's check, I'm sure, for
12 $25,000.
13 Q  There would be some record of your bank
14 account being minus $25,000 or --
15 A  I don't know. Bank of America doesn't
16 keep very -- I can ask a banker at the Bank of
17 America about that, I'd be happy to.
18 Q  How did it work, did Mr. Domash send you
19 this check, you deposited it and then you sent out a
20 cashier's check to Mr. Rush?
21 A  That's my recollection.
22 Q  This check came in on 9/14/00. Do you

Page 208

1  remember when Mr. Rush handed you the report?
2  A  No, but Mr. Walsh would know because
3  Mr. Walsh got the material.
4  Q  Did you personally hand deliver it to
5  Mr. Walsh?
6  A  I'm going to say that we did, yeah.
7  Q  "We" being who?
8  A  Well, I did. Now, if he didn't get it
9  himself, then John Hagen, his assistant, would have
10 gotten it but I think that Mr. Walsh got it. If I
11 remember correctly, it was two volume -- two-bound
12 volumes about that size (indicating).
13 Q  Was that given to Mr. Walsh or to his
14 assistant before Larry's scheduled trial at the end
15 of October and beginning of November in the year
16 2000?
17 A  I believe so.
18 Q  Do you ever get any feedback on whether
19 that report was successful in any way?
20 A  No, I'm not trying to be obtuse about it
21 but my instructions were, you know, not to inquire
22 into the report, not to look at the report, not to

Page 209

1  discuss the report. My -- it was just set in motion
2  and be sure that it was done and then get whatever
3  the report was to the proper authorities.
4  Q  During this time period pursuant to the
5  contract, you say you had with Mr. Domash, you paid
6  certain of his expenses, correct?
7  A  Some, yes.
8  Q  Why didn't you pay this one?
9  A  Why didn't I pay this one. Good question.
10 I don't know. He paid it. I can't tell you why. He
11 just said to -- that he would pay it and send it off.
12 Would you like me to ask the Bank of America about
13 this? I would be happy to do it.
14 Q  I would. I would like you to do that.
15 A  Okay. I will. Can I make a note to that
16 effect?
17    Thank you very much.
18    (Mace Exhibit No. 21 was marked for
19 identification and retained by counsel.)
20    BY MR. BROOKS:
21 Q  Sir, I'm now showing you what's been
22 marked as Exhibit Mace 21 and Bates numbers

DEPOSITION OF PETER M. MACE - VOLUME II
CONDUCTED ON THURSDAY, FEBRUARY 22, 2007

Page 255

1                    VOLUME II

2          UNITED STATES DISTRICT COURT

3          FOR THE DISTRICT OF COLUMBIA

4  ----------------------------------x

5  PETER M. MACE,                    :

6           Plaintiff                :   Case No.

7       v.                           :   1:05CV02244 (HHK)

8  LARRY A. DOMASH,                  :

9           Defendant                :

10 ----------------------------------x

11

12      Deposition of PETER M. MACE - VOLUME II

13              Washington, D.C.

14         Thursday, February 22, 2007

15                 2:00 p.m.

16  Job No.:  1-97084

17  Pages: 255 - 372

18  Reported by:  Alda Mandell, RPR

Page 268

1   A   When did Larry -- well, clearly Larry --
2   from this he had left Susquehanna Partners in
3   Pennsylvania.
4   Q   And when had he done so?
5   A   I'm sorry. I can't tell you, sir. I would
6   have to look at the notes. I don't remember. So he
7   would have been -- he would have been in New York.
8   Q   Would you agree that happened before
9   January 1st, 2002?
10  A   Yes, sir. I would.
11  Q   Thank you.
12  A   But it was not something that -- I learned
13  of this -- my recollection is that I learned of this
14  quite late.
15  Q   Well, I'm sorry, sir. Does it not say just
16  before he left he told me it covered 8,000 square
17  feet?
18  A   Yes. It does say that. And then after he
19  got to New York he told me he'd sold it and made a
20  tidy profit. I'm not trying to be argumentative. I
21  think that they were two different --
22  Q   I understand what you're saying. You're

Page 269

1   saying you knew for a while it was 8,000 square feet
2   but you're not sure you learned that he made a tidy
3   profit?
4   A   Yes. I thought he was living in an
5   apartment. I just didn't know.
6   Q   Did he tell you that he made the tidy profit
7   during a phone conversation?
8   A   I can't answer that, sir. I don't know. He
9   could have said that to me in one of the trips that I
10  took.
11  Q   But either over the phone or in person?
12  A   Yes. Over the phone or in person. I
13  never -- I have no recollection of ever having
14  received anything in writing from Larry about this.
15  Q   Sir, yesterday I believe you testified that
16  the contract didn't have a provision one way or
17  another about whether you had to send Mr. Domash your
18  credit card statements, is that correct?
19  A   Yes. That's true.
20  Q   Did you in fact ever send Mr. Domash any
21  credit card statements?
22  A   No. I did not, sir.

Page 270

1   Q   Did you send him any other sort of breakdown
2   in writing of the alleged amount of money that he owed
3   you?
4   A   No, I did not. No, I did not.
5   Q   At some point Mr. Domash gave you power of
6   attorney?
7   A   Yes, he did.
8   Q   Did you ever do anything for Mr. Domash in
9   that regard, pursuant to that power of attorney?
10  A   Yes, I did.
11  Q   What did you do for him?
12  A   We used it with Tim Hughes who helped Larry
13  deal with an issue about a dispute over a payment that
14  was allegedly due to some attorneys that Larry was
15  working with.
16  Q   When was that?
17  A   I don't recall, sir. I'd have to go back
18  and look at the date of that. And we also used it
19  with I believe Val Diviacchi. And that was to help
20  Larry on another legal matter also.
21  Q   Anything else?
22  A   Off the top of my head, I don't believe so.

Page 271

1   I felt -- this was something that he asked me to have.
2   It was never something that I asked him to give me.
3   Q   Was there an understanding between the two
4   of you that you would be paid for your role in taking
5   over his power of attorney for Mr. Domash?
6   A   No. Not at all. I never would have
7   accepted money for something like that.
8   Q   Mr. Mace, you've been in the business world
9   ever since you graduated from law school, is that
10  correct?
11  A   Business world ever since I graduated law
12  school. Well, for a few years I was doing other kinds
13  of work before I got involved in the insurance
14  business.
15  Q   Okay. Well, do you consider yourself fairly
16  experienced in the insurance business?
17  A   I do consider myself fairly experienced. I
18  consider myself knowledgeable about some aspects of it
19  and experienced in the agency side of the business and
20  in being knowledgeable about the human sales aspect of
21  the business. The business is highly fragmented.
22  Q   So what areas specifically are you

Page 272

1 experienced in?
2  A  In issues of product development in some
3 areas. In issues of working with field forces and
4 developing field forces. That was part of what I did.
5  Q  Anything else?
6  A  Anything else. No. I think that -- I think
7 that that's the strength that I brought to the effort.
8  Q  In all of the time that you've been in the
9 insurance business, are you aware of anyone else
10 entering into a reimbursement contract like the one
11 that you say you entered into with Mr. Domash?
12  A  I am not someone who deals with people like
13 Mr. Domash very often and my relationship was to get
14 this up and running.
15  Q  What do you mean when you say people like
16 Mr. Domash?
17  A  Larry has a financial background which I
18 don't have.
19  Q  Mr. Mace, turning to the year 1999, did you
20 have an effective license to sell insurance at that
21 point in time?
22  A  1999. I don't think I was selling insurance

Page 273

1 at that point in time. I think my efforts were -- I'm
2 almost certain that I was not. My efforts were
3 focused on this project.
4  Q  My question was did you have an effective
5 license to sell insurance at that time?
6  A  And I thought -- excuse me. I thought I
7 answered it. I don't believe that I was licensed to
8 sell insurance in 1999 at that particular time.
9  Q  Would the same go for the years 2000 to the
10 present?
11  A  Yes. I think that's true.
12  Q  In the year 1999 did you have an effective
13 and valid license to engage in investment sales
14 activities?
15     THE WITNESS: Could you please repeat the
16 question?
17     (The Court Reporter read the last question.)
18  A  Not that I was aware of. No.
19 BY MR. BROOKS:
20  Q  And the same holds true for the years 2000
21 to the present?
22  A  Yes, sir.

Page 274

1  Q  Mr. Mace, you were married when the alleged
2 contract was formed?
3  A  I was married?
4  Q  Yes. At that time?
5  A  Yes.
6  Q  And for 1998 you filed a joint tax return?
7  A  Uh-huh. I'm sure we did.
8  Q  Do you recall approximately what your
9 household income was for 1998?
10  A  No, I do not.
11  Q  In 1998 did you have any joint checking,
12 savings or any asset accounts?
13  A  I don't believe we did. Or if there was
14 one, there may have been three or four dollars in it.
15  Q  Did you or your wife have anything
16 individually?
17  A  Our finances were completely separate. As
18 far as I recall, that's the case.
19  Q  When you entered into this contract, you
20 stated that you had exhausted your own financial
21 resources?
22  A  Yes.

Page 275

1  Q  Were you speaking just of your own and not
2 your wife's financial resources?
3  A  I was speaking of my own and not my wife's.
4 My wife and my financial -- our financial worlds are
5 completely apart.
6  Q  Other than the fact that you filed a joint
7 tax return?
8  A  That's correct. We're married and that was
9 what the advice of the accountant was.
10  Q  Do you know what your wife's net worth was
11 in 1998?
12  A  No, I don't.
13  Q  Was it more than yours was?
14  A  Oh, yes.
15  Q  In 1998 did you own your home or rent it?
16  A  The home was owned.
17  Q  By whom?
18  A  1998 I believe -- I believe by my wife I
19 believe. Yes. I certainly didn't own it.
20  Q  Whose name is the house in now?
21  A  My wife's.
22  Q  Has it always been that way?

DEPOSITION OF PETER M. MACE - VOLUME II
CONDUCTED ON THURSDAY, FEBRUARY 22, 2007

Page 344

1   A   April '99 through -- no, I did not.
2   Q   In some of the documents you produced there
3   have been cashier's checks?
4   A   Yes.
5   Q   Were the funds from those also cash advances
6   from credit cards?
7   A   They were.
8   Q   Did most of your credit cards have higher
9   interest rates for cash advances than they had for
10  normal purchases?
11  A   Some did. But you'll get all of that in the
12  report.
13  Q   That's a pretty expensive way to spend
14  money. Would you agree?
15  A   Well, it certainly isn't the preferred way
16  to do it but it's the only way I had.
17  Q   We talked yesterday about the Bek Tek
18  report?
19  A   Yes.
20  Q   Do you know what I'm referring to?
21  A   Absolutely.
22  Q   Were you aware that that was never used in

Page 345

1   Mr. Domash's litigation?
2   A   Was I aware that it was never used in the
3   litigation. I was -- I believe the report showed no
4   irregularities in the tape recordings and now that
5   you've mentioned it, I do think that someone said to
6   me that there had been I'll say no need to use it.
7   But I could be mistaken about that. Perhaps they said
8   to me that it was just not used. I know that it was
9   thought to be -- at the time the request was made, it
10  was thought to be important. But I listened to one or
11  two of the tapes and it was beyond me as to -- clearly
12  someone who was much more knowledgeable and had the
13  scientific equipment needed to do this than someone
14  like myself.
15  Q   What is your current credit card debt?
16  A   A couple of hundred thousand dollars. I can
17  find out exactly. It will be in the report.
18  Q   Have you settled with any of the
19  insurance -- sorry -- with any of the credit card
20  companies on this debt?
21  A   No.
22  Q   Are you currently paying off your credit

Page 346

1   card debt from the income you've got from your
2   employment?
3   A   Yes.
4   Q   Have you ever borrowed --
5   A   I'm sorry.
6   Q   Go ahead.
7   A   What we did was we wrote the companies and
8   in a sense are flying a holding pattern. And I'm
9   making minimal good faith payments but not paying the
10  amounts down. I'm just -- they've accepted the fact
11  that I'm making these regular payments.
12  Q   Has the interest stopped accruing? Have
13  they agreed to do that?
14  A   I believe they have. Yeah.
15  Q   You said we wrote to them. Who is we?
16  A   Well, I wrote to them.
17  Q   Is anyone assisting you in that process?
18  A   Well, the person that assisted me in the
19  process was a man named Dan Sullivan who was an
20  attorney -- is an attorney for Leclair Ryan. I
21  believe you have that correspondence.
22  Q   Yeah. I just don't want to get into any

Page 347

1   conversations you had with him.
2   A   You don't.
3   Q   No. Those are privileged. I don't want you
4   to give up any privileges.
5   A   Can I just point out one thing?
6   Q   You can give up a privilege. I want you to
7   at least be aware that you're doing it when you decide
8   to do it.
9   A   Well, thank you. I was just going to say,
10  sir, that, you know, I believe you have that
11  correspondence and perhaps I'm wrong.
12  Q   No. I think I do.
13  A   Okay.
14  Q   How much are you currently paying off a
15  month?
16  A   I'm going to say $800 a month? $900 a
17  month?
18  Q   Rather than just trying to pay off in good
19  faith, have you tried to get them to write off any of
20  that debt for you?
21  A   Not at this point. No. That's not what the
22  correspondence says.