# EXHIBIT A

Page 1

1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF COLUMBIA

3

4      - - - - - - - - - - - - - x

5      PETER M. MACE,             :

6           Plaintiff,             :

7        vs.                       : Case No. 1:05CV02244 (HHK)

8      LARRY A. DOMASH,            :

9           Defendant.             :

10     - - - - - - - - - - - - - x

11

12           Deposition of PETER M. MACE

13                Washington, D.C.

14           Wednesday, February 21, 2007

15                   9:44 a.m.

16

17

18

19

20     Job No.:  1-97081

21     Pages:  1 - 254

22     Reported by:  Sarah M. Bickel

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 44

1    Q  Well, I'm talking about in April 1999.  At
2  that point, he hadn't made any promotions to repay
3  you, had he?
4    A  Other than to say in April of '99 that I
5  should go forward with this and he would repay me,
6  yes.
7    Q  At that time, did you take any steps to
8  verify his financial wherewithal?
9    A  No, I had no reason to think that he could
10 not meet it.  He said that he could.  He said that he
11 could with ease, and he was simply waiting for the
12 dust to settle on his child custody and divorce
13 matters and he thought that IFA would be a success, a
14 very large success.
15   Q  Was it understood then that he wouldn't
16 repay you until, as you put it, the dust settled on
17 his divorce proceedings?
18   A  I think that we -- I think that that's a
19 fair thing to agree to.  We were trying to give him
20 as much latitude as good reason and compassion
21 could.  He had great weights on his shoulder and he
22 was trying to deal with very serious issues.  And

1   being -- was being used by 9/28/2001.
2          Q   Were you concerned about the amount of
3   money?
4          A   I was not overly concerned, but I was -- I
5   was certainly aware of it.  I wouldn't say it was
6   something that I would ignore.
7          Q   Did you feel Mr. Domash had reimbursed you
8   by this point?
9          A   Over time, especially in 2002, we came to
10  believe that he was in a position to do that.
11         Q   When did that happen?
12         A   As I said, sometime in 2002.
13         Q   Do you remember when in 2002, best
14  estimate?
15         A   The triggering event for the -- the real
16  question arose in December or January of 2002 when he
17  bought a motor boat.
18         Q   Do you mean December 2001, January 2002?
19  You said December --
20         A   Thank you.  Thank you.  January -- right.
21  December of 2001, January of 2002 when he bought a
22  speedboat.  And originally, he had said to me that he

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 122

1  Q  Begins, "There's a part of this story that
2  you knew about and I didn't, and a part of this story
3  that Gene and I have just uncovered that you need to
4  be apprised of."  Do you know what that was about?
5  A  No, I honestly don't remember what that
6  might have been other than a reference to the boat.
7  Q  It continues "That Larry may have been,
8  quote, somewhat less than forthcoming, end quote, is
9  an understatement."
10  A  Uh-huh.
11  Q  Then in capital letters, it says, "This
12  crap is going to stop.  Do nothing" -- "nothing" is
13  underlined -- "until we speak."  What was this
14  referring to?
15  A  I'm not sure.  The only thing I can tell
16  you is I think that it has to do with the issue about
17  the motorboat and about, as I said earlier, his
18  acquiring this vessel.
19  Q  The next sentence reads, "He has put
20  everything at risk."  Was he referring to Larry?
21  That's Mr. Domash?
22  A  I think that I was referring to Larry.

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 123

1   He, Larry, has put everything at risk.
2        Q   What did you mean by that?
3        A   I think that it was a reference to his
4   conduct with regard to the rest of us.
5        Q   What had he put at risk?
6        A   His good name, I think his -- the regard I
7   think that we held for him.
8        Q   How does that relate to the fact that you
9   wrote "this crap is going to stop" related to a
10  motorboat?
11       A   In the file there is a letter from
12  Dr. Graham to Larry asking Larry to begin to repay
13  him. And Dr. Graham received no response from Larry
14  with regard to that correspondence and follow up
15  correspondence for several months. I did not know at
16  this time that Dr. Graham had sent that letter. I
17  didn't find out about it until the summer of 2002.
18       Q   So what was --
19       A   And I think -- I'm sorry.
20       Q   So what were you so concerned about --
21       A   I think what I was concerned about was
22  Larry not being straightforward with us. I mean, you

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 124

1   know, you can't say that you don't have it when
2   you're going off and buying a speedboat. Beyond
3   that, I'd really have to think about -- and I'd be
4   happy to. I'd have to think more about the context
5   of this.
6        Q  Under the contract that you entered into
7   with Larry, should he have reimbursed you before he
8   went out and bought a speedboat?
9        A  You have to give me the question again.
10  Ive had the dust settled and the case and then his
11  whole life. And had the company been up and running
12  yet? And the answer to that is apparently no. I
13  mean, would I have bought a speedboat? No. But
14  that's me and that's not within the context of the
15  agreement that he and I had.
16       Q  So why are you writing letters about him
17  buying a speedboat if it has nothing to do with the
18  contract that you entered into with him?
19       A  I think it's indignation and I think it's,
20  again, frustration in that I had a difficult time
21  understanding what he was at that moment about. I
22  mean, why did George have -- I don't know why George

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 181

1  A  I think I was and I think I was very
2  startled that they had done that. We hadn't had any
3  problems and I think -- if I remember correctly,
4  later what ended up happening is that somebody in the
5  bank had made an innocent mistake and that they
6  reopened the account.
7  Q  But you forwarded this to George to let
8  him know that this had occurred?
9  A  Yes, there was a note to that.
10  Q  And the note says, "George, if we don't
11  put a stop to this, it threatens to jeopardize all
12  the good we can accomplish. Damn Larry and his
13  selfishness and deceit."
14      Were you referring to Larry Domash?
15  A  I was indeed.
16  Q  What did you mean by "his selfishness and
17  deceit"?
18  A  I mean that Larry Domash would, for
19  example, claim to take steps to represent our
20  interest with every employer that I knew that he had
21  up until his letter of the 24th of November of 2002
22  and yet we would never get any feedback from that.

Page 182

1  I'd get a phone call from Larry and he'd be
2  enthusiastic about what Susquehanna was doing and how
3  they were interested in putting together an insurance
4  company.  It's this constant drumbeat of not getting
5  him to live up to his idea of what you refer to as a
6  dual track system of -- we would try to get the
7  company up and running, he would try to get the
8  company up and running.
9          In the meantime, the clock is running,
10 and, you know, time is dear and time is precious and
11 we're getting more and more stretched.  That's what I
12 believe this is about.
13     Q  What does any of that have to do with the
14 fact that your credit card got closed?
15     A  I don't know.  I don't know -- as I say, I
16 think that it was reopened.  I think it was an
17 innocent mistake.
18     Q  But when you wrote this to Dr. Graham, you
19 didn't know that?
20     A  When I wrote this and sent this, I'm
21 assuming that I sent it sometime near the 9th of
22 November of 2002.  I didn't know that.

1    Q   And so you're referencing that --

2    A   It's frustration.  That's exactly what it
3  is.  It's acute frustration and not being able to
4  have him respond to what we're trying to urge him to
5  respond -- to come back to us, get well and let's all
6  go on together.

7    Q   What does that have to do with First USA
8  Bank closing your account?

9    A   It has a lot to do with it in the sense
10 that Larry wasn't doing anything that was concrete on
11 his end to try to move us all forward, that, you
12 know, we would get phone calls about these different
13 institutions that he was contacted and that was
14 wonderful and I was grateful for that.  But just the
15 whole thing would just kind of collapse.

16   Q   As of November 9, 2002, when was the last
17 time you had even spoken to Mr. Domash?

18   A   It had been several months and we had been
19 trying to get him back on track.

20   Q   So what did he do in those several months
21 that you considered deceitful?

22   A   It wasn't those several months, it was

1  sometime before that when he wasn't really putting
2  his efforts forward in trying to get us launched.
3      Q   This is a direct response to getting your
4  credit card shut down?
5      A   Yes.
6      Q   The deceit you're talking about is that
7  Mr. Domash had promised to reimburse you for the
8  credit card?
9      A   Mr. Domash had agreed to reimburse a
10 number of people for a number of things.
11     Q   Including you?
12     A   Including me.
13     Q   And he hadn't done it as of November 9,
14 2002?
15     A   And he hadn't done it as of November 9,
16 2002 --
17     Q   And you considered that deceitful?
18     A   I consider Larry's conduct, about not
19 really putting his shoulder to the wheel, deceitful.
20     Q   Part of that conduct was not paying you
21 back?
22     A   That was a portion of it.

1  saying you knew for a while it was 8,000 square feet
2  but you're not sure you learned that he made a tidy
3  profit?
4       A    Yes.  I thought he was living in an
5  apartment.  I just didn't know.
6       Q    Did he tell you that he made the tidy profit
7  during a phone conversation?
8       A    I can't answer that, sir.  I don't know.  He
9  could have said that to me in one of the trips that I
10 took.
11      Q    But either over the phone or in person?
12      A    Yes.  Over the phone or in person.  I
13 never -- I have no recollection of ever having
14 received anything in writing from Larry about this.
15      Q    Sir, yesterday I believe you testified that
16 the contract didn't have a provision one way or
17 another about whether you had to send Mr. Domash your
18 credit card statements, is that correct?
19      A    Yes.  That's true.
20      Q    Did you in fact ever send Mr. Domash any
21 credit card statements?
22      A    No.  I did not, sir.

1   Q   Did you send him any other sort of breakdown
2   in writing of the alleged amount of money that he owed
3   you?
4   A   No, I did not. No, I did not.
5   Q   At some point Mr. Domash gave you power of
6   attorney?
7   A   Yes, he did.
8   Q   Did you ever do anything for Mr. Domash in
9   that regard, pursuant to that power of attorney?
10  A   Yes, I did.
11  Q   What did you do for him?
12  A   We used it with Tim Hughes who helped Larry
13  deal with an issue about a dispute over a payment that
14  was allegedly due to some attorneys that Larry was
15  working with.
16  Q   When was that?
17  A   I don't recall, sir. I'd have to go back
18  and look at the date of that. And we also used it
19  with I believe Val Diviacchi. And that was to help
20  Larry on another legal matter also.
21  Q   Anything else?
22  A   Off the top of my head, I don't believe so.