# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x

PETER M. MACE,                 :

    Plaintiff,             :

  vs.                          : Case No. 1:05CV02244 (HHK)

LARRY A. DOMASH,               :

    Defendant.             :

- - - - - - - - - - - - - x

Deposition of PETER M. MACE

Washington, D.C.

Wednesday, February 21, 2007

9:44 a.m.

Job No.: 1-97081

Pages: 1 - 254

Reported by: Sarah M. Bickel

**37**

BY MR. BROOKS:
Q Mr. Mace, I think you said during the break you wanted to add something to one of your answers, I believe?
A I did, sir. You had asked me if Gene Sierzant had any materials. I want to make it very clearly, I'm not interested in misleading you. He did have a -- what I will refer to as a jumble of material, which he shoved into my hands two or three days ago, which I have not had a chance to take a look at. I'm in possession of whatever remnants there may have been of his collection of documents. So I'll take at look at that this weekend and try to make some sense of that.
Q I assume you intend to produce those pursuant to the document request that have been --
A Yes, absolutely. The other thing I wanted to touch on, when you talked about this being related to the cause of action --
Q For the record, when you say this, you're speaking of Mace Exhibit 1?
A I am.

**38**

Q Go ahead.
A Thank you. Our argument is that we were to do our utmost to create IFA and that Larry would then, through Domash & Associates, have the ability to run the money. So in that sense, as this reflects upon his skill and the skill of the people he worked with at Gofen and Glossberg which he no longer works with, it is related.
Q Okay. Before we move on to the contract, did IFA ever create any organizational charts?
A Yes.
Q Were those destroyed?
A Well, some were destroyed but you have in the file some of the charts.
Q Let's put it this way. You've produced whatever organizational charts still exist?
A Yes.
Q Am I correct that you claim to have entered into a contract with Mr. Domash in April 1999?
A Yes, that's correct.
Q Please explain the formation of that

**39**

contract that you're existing alleged between you and Mr. Domash?
A It's laid out in the interrogatories. There was a telephone conversation. I told Larry that I was going to have to stop helping him in his personal and legal matters and stop working on the IFA because I needed to get a paying job. And I told him that I only had -- well, I hadn't really -- the only thing I had that was of value was a book collection and excellent credit history.
And Larry said to me that if I would use my credit to continue helping him to move and to move IFA forward so that it would it be a platform for Domash & Associates, that he would reimburse me for those reasonable expenses that I incurred for living expenses, for expenses in helping him.
I also mentioned that I was supporting a cousin of mine in California and her two children.
And he said that was not a problem either.
That's the agreement that's laid out in the document you'll find.
Q Do you remember anything else about that

**40**

discussion?
A I remember that it was a very positive conversation. One of the most positive that I think I ever had with Larry. And I also remember that he was exceedingly anxious not to have me step aside from helping him or from helping him in his personal or legal issues, or helping him step aside from the issue of IFA because I have -- he viewed it as being the best opportunity he had to create Domash & Associates, which was a company that he wanted to form himself or perhaps with some other learned people in his field.
Q Anything else in that discussion between you and Mr. Domash in April 1999?
A I asked him if he wanted it memorialized, if he wanted, you know, written down or if he wanted me to follow some reporting requirement to him with the expenses. And he was very cavalier about that whole issue and blew it off. And said that he had the same arrangement with George Graham, and that he owed George Graham $50,000. But he was quite confident that without question he'd have no problem

Case 1:05-cv-02244-HHK   Document 36-3   Filed 10/31/2007   Page 4 of 7
DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

14 (Pages 53 to 56)

Page 53

1  Q When did he talk to Larry about it?
2  A Perhaps the summer or the spring of 2000.
3  Q But he knew about it well before then?
4  A Yes.
5  Q Were there any other parties to this
6  contract?
7  A No.
8  Q Did the parties --
9    MR. TREVELLINE: Objection, it's not
10 clear. It's vague what you mean by other parties.
11   BY MR. BROOKS:
12 Q Did the parties to the contract change
13 over time?
14 A No.
15 Q Had you ever entered into a reimbursement
16 contract like this before?
17 A Never.
18 Q Have you since?
19 A No.
20 Q As of April 1999, had you entered into any
21 contracts on behalf of IFA?
22 A We had an agreement between ourselves and

Page 54

1  our actuaries that they would be reimbursed.
2  Q Was that a written agreement?
3  A No.
4  Q Who were your actuaries?
5  A John Miller, Miller Newburg, Kansas City.
6  Q As of April 1999, did IFA have any written
7  contracts whatsoever?
8  A I don't believe so.
9  Q Other than what you've already testified
10 to, when you formed this contract with Mr. Domash,
11 were there any other specific contractual terms that
12 you discussed?
13 A No, I think what's in the file and what
14 I've said to you as I remember it at this moment
15 complete.
16 Q Under the contract, what was the payment
17 schedule?
18 A There was no payment schedule. Larry had
19 been a very wealthy man. Larry, we believe was and
20 is a very wealthy man and he said repeatedly, he
21 would have no problem meeting those obligations. If
22 IFA had been successful, it would have been an

Page 55

1  astronomical amount of money that would have been
2  coming to him.
3  Q So there was no date that the first
4  payment was due?
5  A No.
6  Q Was there any agreement with respect to
7  how often payments were due?
8  A No, there was not.
9  Q What kind of penalties did the contract
10 call for if Mr. Domash was late with a payment?
11 A Absolutely none. This was conversation
12 between two men who Larry had described to me as a
13 friend and a brother, you know. There was nothing
14 like that.
15   MR. TREVELLINE: I need to take a break
16 and get more water.
17   (Off the record.)
18   THE WITNESS: I'd like to clarify
19 something because I don't want you misled. As I said
20 earlier, IFA is not suing Mr. Domash, I am suing
21 Mr. Domash, the issue at hand is the arrangement
22 between Mr. Domash and myself.

Page 56

1    BY MR. BROOKS:
2  Q Thank you. Under the contract between you
3  and Mr. Domash, is there an outstanding dollar amount
4  at which you were able to demand full payment?
5  A That was never discussed.
6  Q How often did the contract require you to
7  submit information regarding your expenditures to
8  Mr. Domash?
9  A When the contract was entered into, I
10 asked Larry if he wanted this memorialized, if he
11 wanted this written down, and he said at that time
12 there was no need to do that. That this was between
13 us. In the subsequent occasions that that issue
14 arose or when I asked him if he wanted an accounting,
15 most notably at that meeting in Milwaukee, he just
16 dismissed it.
17 Q So is it fair to say that the contract did
18 not require you to submit information regarding your
19 purchases to Mr. Domash?
20 A Yes.
21 Q That's fair to say?
22 A That is accurate.

Case 1:05-cv-02244-HHK   Document 36-3   Filed 04/01/2007   Page 5 of 7
DEPOSITION OF PETER MACRIS
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

16 (Pages 61 to 64)

Page 61

1  have been outside the parameters of this contract?
2      A  Yes.
3      Q  What was the limit in terms of dollars
4  that you were allowed to spend under this contract?
5      A  It was discussed that I had in excess of
6  $200,000 available in credit cards. There was never
7  an upper ceiling.
8      Q  When you say "it was discussed," you mean
9  you told Mr. Domash I have $200,000 in credit?
10     A  It was actually more than that, but yes.
11     Q  Was there a monthly limit under the
12 contract that you could spend?
13     A  A monthly limit was never discussed.
14     Q  Any other limits discussed?
15     A  I recall no break in that regard. These
16 were to be reasonable expenses. And again, he
17 trusted my judgment to get the job done.
18     Q  He told you that?
19     A  Oh, many times.
20     Q  Did the contract have a termination date?
21     A  The contract carried no termination date
22 with it, but it was understood that when his personal

Page 62

1  business relationships stabilized, he would reimburse
2  us.
3      Q  How was that understood?
4      A  He had discussed that with me.
5      Q  When?
6      A  In April of '99 and in subsequent dates.
7      Q  What are those subsequent dates?
8      A  There -- in the record there are letters
9  from George Graham, Darryl Wright, Steve Killion and
10 their -- he had said repeatedly on a number of
11 instances and those -- those letters carry the dates
12 that you're referring to, both in telephone messages
13 he had left and in statements he made to me and to
14 other people, that payment would be made. I -- just
15 specifically to answer your question again, I
16 remember in the summer or in the fall of 2000 him
17 saying in a meeting that he would make those
18 payments.
19     Q  Other than the dates that you've testified
20 in about -- that you've testified about and that are
21 referenced in the material you provided by way of
22 letters from Mr. Wright, Mr. Killion and Dr. Graham,

Page 63

1  are there any other times that you remember
2  Mr. Domash promising that he would pay you when his
3  personal life or divorce proceedings stabilized?
4      A  There were messages that he left on our
5  telephone answering machine assuring us that
6  payment -- payments would be due.
7      Q  When did he leave those messages?
8      A  Throughout the course of the relationship.
9      Q  But first of all, when you say "our
10 telephone answering machine," you mean IFA's?
11     A  Yes.
12     Q  When was the first time he left such a
13 message?
14     A  It's just an estimate. I'd say within 60
15 days of the agreement being reached.
16     Q  How many other messages would you say he
17 left?
18     A  Many.
19     Q  How many?
20     A  From April of '99 to let's say June of
21 2002 he must have touched on this issue at least 10
22 or 12 times.

Page 64

1      Q  Other than those 10 or 12 times and what
2  you've already testified about, any memory of him
3  touching upon the subject?
4      A  Other than the meetings where he mentioned
5  it which is in your file (indicating).
6      Q  Getting back to the contract, I understand
7  that it didn't have a termination date. How were you
8  permitted to terminate the contract?
9      A  I had no specific instructions from Larry
10 about that. I mean, you know, he was to succeed in
11 finding money for us or we were to succeed in finding
12 money for us, or his situation stabilized in a few
13 years or a few months, that would have triggered.
14     Q  So you never discussed with Mr. Domash
15 what steps needed to be taken to terminate the
16 contract?
17     A  Well, it was understood in the answer I
18 gave you just a moment ago that that would have been
19 the way it would have been terminated.
20     Q  I'm sorry. I'm confused. How would it
21 have been terminated?
22     A  If -- it would have been terminated if

**Page 255**

VOLUME II
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-----------------------------------x
PETER M. MACE,                    :
           Plaintiff              :   Case No.
     v.                           :   1:05CV02244 (HHK)
LARRY A. DOMASH,                  :
           Defendant              :
-----------------------------------x

Deposition of PETER M. MACE - VOLUME II
Washington, D.C.
Thursday, February 22, 2007
2:00 p.m.
Job No.: 1-97084
Pages: 255 - 372
Reported by: Alda Mandell, RPR

**Page 256**

Deposition of PETER M. MACE, held at the offices of:

       EMPLOYMENT LAW GROUP
       888 17th Street, Northwest
       Suite 900
       Washington, D.C. 20006
       (202)331-2883

Pursuant to agreement, before Alda Mandell, Registered Professional Reporter and Notary Public of the District of Columbia.

**Page 257**

APPEARANCES

ON BEHALF OF PLAINTIFF:
    MICHAEL J. TREVELLINE, ESQUIRE
    1823 Jefferson Place, Northwest
    Washington, D.C. 20036-2504
    (202)737-1139

ON BEHALF OF DEFENDANT:
    DOUGLAS S. BROOKS, ESQUIRE
    KELLY, LIBBY & HOOPES
    175 Federal Street
    Eighth Floor
    Boston, Massachusetts 02110
    (617)338-9300

Also Present: LARRY A. DOMASH

CONTENTS
EXAMINATION OF PETER M. MACE                PAGE
    By Mr. Brooks                            259

**Page 258**

EXHIBITS
(Attached to the Transcript)

| DEFENDANT'S | | PAGE |
|---|---|---|
| 25 | Fax - 5/13/02 - Brett to Stein | 308 |
| 26 | Letter - 5/24 - Brett to Larry | 312 |
| 27 | Organizational Chart | 328 |
| 28 | Document Bates stamped Graham 1776 | 331 |
| 29 | Letter - 5/14/02 - Mace to MBNA | 338 |
| 30 | Letter - 6/16/00 - McSweeny to Mace | 348 |
| 31 | IFA's Financial Team | 354 |
| 32 | Complaint | 361 |

**Page 267**

1   A   I mean he needs to -- he needs to address
2   his responsibilities and he needs to go back and get
3   the kind of care that he talked to George Graham about
4   getting.
5   Q   But what does folding under pressure mean?
6   A   It means that we had to confront him about
7   his behavior.
8   Q   Okay. If I can turn your attention to the
9   first paragraph in the PS section.
10  A   Yes, sir.
11  Q   The third line down beginning with the
12  sentence that reads, just before he left he told me it
13  covered 8,000 square feet. After he got to New York
14  he told me he had sold it and made a tidy profit. Did
15  you know about this? Where did he get the money to
16  buy an 8,000 square foot home? Were you referring to
17  Mr. Domash on that?
18  A   I was indeed. Yes, I was, Mr. Brooks.
19  Q   When did you find out all of this
20  information that I just read onto the record?
21  A   I couldn't tell you, sir. I don't recall.
22  Q   Well, when --

**Page 268**

1   A   When did Larry -- well, clearly Larry --
2   from this he had left Susquehanna Partners in
3   Pennsylvania.
4   Q   And when had he done so?
5   A   I'm sorry. I can't tell you, sir. I would
6   have to look at the notes. I don't remember. So he
7   would have been -- he would have been in New York.
8   Q   Would you agree that happened before
9   January 1st, 2002?
10  A   Yes, sir. I would.
11  Q   Thank you.
12  A   But it was not something that -- I learned
13  of this -- my recollection is that I learned of this
14  quite late.
15  Q   Well, I'm sorry, sir. Does it not say just
16  before he left he told me it covered 8,000 square
17  feet?
18  A   Yes. It does say that. And then after he
19  got to New York he told me he'd sold it and made a
20  tidy profit. I'm not trying to be argumentative. I
21  think that they were two different --
22  Q   I understand what you're saying. You're

**Page 269**

1   saying you knew for a while it was 8,000 square feet
2   but you're not sure you learned that he made a tidy
3   profit?
4   A   Yes. I thought he was living in an
5   apartment. I just didn't know.
6   Q   Did he tell you that he made the tidy profit
7   during a phone conversation?
8   A   I can't answer that, sir. I don't know. He
9   could have said that to me in one of the trips that I
10  took.
11  Q   But either over the phone or in person?
12  A   Yes. Over the phone or in person. I
13  never -- I have no recollection of ever having
14  received anything in writing from Larry about this.
15  Q   Sir, yesterday I believe you testified that
16  the contract didn't have a provision one way or
17  another about whether you had to send Mr. Domash your
18  credit card statements, is that correct?
19  A   Yes. That's true.
20  Q   Did you in fact ever send Mr. Domash any
21  credit card statements?
22  A   No. I did not, sir.

**Page 270**

1   Q   Did you send him any other sort of breakdown
2   in writing of the alleged amount of money that he owed
3   you?
4   A   No, I did not. No, I did not.
5   Q   At some point Mr. Domash gave you power of
6   attorney?
7   A   Yes, he did.
8   Q   Did you ever do anything for Mr. Domash in
9   that regard, pursuant to that power of attorney?
10  A   Yes, I did.
11  Q   What did you do for him?
12  A   We used it with Tim Hughes who helped Larry
13  deal with an issue about a dispute over a payment that
14  was allegedly due to some attorneys that Larry was
15  working with.
16  Q   When was that?
17  A   I don't recall, sir. I'd have to go back
18  and look at the date of that. And we also used it
19  with I believe Val Diviacchi. And that was to help
20  Larry on another legal matter also.
21  Q   Anything else?
22  A   Off the top of my head, I don't believe so.