# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Peter M. Mace <br>     Plaintiff, <br><br>     vs. <br><br> Larry A. Domash <br>     Defendant | Case No. 1: 06-02244 (HHK) <br> Judge Henry H. Kennedy, Jr. <br> Next Event: Discovery Completion Date 5 February 2007 |

**To:**     Defendant Larry A. Domash
          c/o Adam Augustine Carter, Esq.
          Attorney for Defendant

**From:**    Plaintiff Peter M. Mace
          c/o Michael J. Trevelline, Esq.
          Attorney for Plaintiff

## Plaintiff's Response to
## Defendant's First Set of Interrogatories

Now comes the **Plaintiff** to answer the interrogatories of the **Defendant** in the number and order propounded.

## General Objections

    A. **Plaintiff** objects to each Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client, work product or other privileges; such information will not be produced. The inadvertent revelation of any such privileged information shall not be deemed a waiver of any applicable privilege or doctrine with respect to that information or the subject matter thereof.

    B. **Plaintiff** objects to each Interrogatory to the extent it seeks information that is readily available to the requesting party from that party's own records. Recitation of such information would, therefore, be unduly burdensome.

    C. **Plaintiff** objects to each Interrogatory to the extent that it is unreasonably vague, overly-broad, repetitious or unduly burdensome.

    D. **Plaintiff** objects to each Interrogatory to the extent it seeks information not in its possession, custody or control or that of its agents or representatives.

    E. **Plaintiff** reserves the right to object to the relevancy, materiality or admissibility of any information provided in this Answer, at trial, or any other evidentiary proceeding.

    F. **Plaintiff** reserves the right to supplement its responses upon discovery of additional, responsive information.

## Answers

    1. Describe in detail each and every expenditure you made

*Answers to Interrogatories—Page 1*

for which you are claiming that Defendant owes you reimbursement by (1) identifying the amount, purpose and date of the expenditure, (2) identifying to whom the expenditure was made and (3) identifying all documents concerning such expenditures.

**Answer:** IFA was incorporated in May of 1989 as seen on the articles of incorporation found at the documents bates-stamped Mace 75 and following. IFA was to be an insurance company. I was the officer who did most of the day-to-day work in getting IFA up and running. From 1989 to October 2004, I devoted most of my working hours to IFA. IFA had very little start-up money and no funds to compensate me for my work. In addition, I had been helping Mr. Domash starting in September 1998, by serving as a type of coordinator or administrator of some of his legal problems as well as providing him with emotional support.

In April 1999, I had exhausted my personal finances and told Mr. Domash that IFA may well have to be shut down and that I would have to seek full-time employment. I called Mr. Domash to tell him this. Mr. Domash seemed disappointed, especially since he had often told me of his desire to establish his own investment company to be called Domash & Associates. He had hoped that D&A would have IFA for its main account and so was quite interested in IFA's success. In response to my plight, he told me that he already owed Dr. George Graham $50,000 for psychological counseling and for coordinating his legal problems.

He also said that I should continue on with IFA for he would reimburse me not only for all the expenses I would continued to incur in assisting him but also he would reimburse me for my own personal living expenses as well as for any expenses I incurred on behalf of IFA. In other words, he promised to reimburse me for all expenses—both my living expenses and IFA expenses—incurred from that point (April 1999) forward. Although I lived and had been living rather frugally, my personal living expenses included support I was providing to my cousin Judy Pentoney. Mr. Domash said that he understood my situation and would be glad to reimburse me for everything if only I would continue on trying to get IFA established. The main obstacle to IFA starting operations was obtaining financing. Mr. Domash said he understood this and was optimistic that financing would soon come through. I explained that since the only means I had of obtaining money to help him, to support myself, and to keep IFA running was to incur credit card debt. He said he understood that the finance charges would be great, but not to worry since he would cover it all.

Relying on his assessment and promises, I continued on

*Answers to Interrogatories—Page 2*

helping Mr. Domash as before, continued supporting myself and sending money to my cousin, and continued to finance IFA—all with credit card debt. I did this until November 2002 when he said he would not honor his promise.

The three categories of expenditures, then, are (1) those made on behalf of Mr. Domash, (2) those made to support me (as well as money sent to my cousin), and (3) those made on behalf of IFA. Since these expenditures were made through credit cards, with a few being made through bank accounts, the credit card and bank records contain all the information sought. Please refer to the documents bates-stamped Mace 185-1535. I am in the process of working with an accountant or bookkeeper to prepare a more detailed accounting and will provide it to you when completed. I believe it would be physically impossible for such to be prepared on such short notice. I will certainly keep you abreast of progress.

2. Identify all individuals employed by ("IFA") or Domash & Associates ("D & A"), including officers, directors and board members, identifying their positions and dates of employment/board service at IFA or D & A.

**Answer:** IFA never had any employees as such. I worked in the hopes of being a stockholder and officer if the company should succeed. Please see the bates-stamped documents Mace 85 to 86 for information on the six initial members of the board of directors. The company never prepared any further written minutes, other than some board of director notes, which I believe are in the possession of Robert Gaegler and Gene Sierzant. All board members dropped out except for me, Gene Sierzant, and John Miller. (I will soon provide the contact information on Robert Gagler and John Miller, since they are not in my initial disclosures.) IFA never had any other officers or board members or employees. I have no information concerning D&A. I believe D&A was never more than a concept of Mr. Domash, although it is possible he took more steps to establishing it than I am aware of. He made it clear to me that its establishment was a major life goal. Please see Mace 58.

3. State the basis for your contention in paragraph 2 of the Complaint that Defendant is experienced in insurance company investing and equity portfolio management by (1) identifying all facts or information supporting your contention, (2) identifying all documents supporting or concerning your contention, and (3) identifying all persons possession knowledge of facts or information supporting the contention, and summarizing the facts or information each such person possesses.

**Answer:** Mr. Domash's resumes are found at the documents bates-stamped Mace 47-53. Mr. Domash was a principal, chief investment officer and director of Institutional Fixed Income for Gofen & Glossberg, Inc. from April 1986 to August 1990. During that time he was in charge of the account of Jackson National Life Insurance Company, the 18th largest life insurance company in the United States. Please see Mace 72-73. Mr. Domash spoke to me and others many times about his expertise in insurance company investing and portfolio management as reflected in the above resumes. In addition to the testimony of Mr. Domash himself, who I intend to call as a witness, virtually all the witnesses on my witness list also familiar with Mr. Domash's career. Additional witnesses would be employees and ex-employees of Fleet Securities, Susquehanna Partners, the successor to Cleary Gull Reiland and McDevitt, and Fidelity Management & Research Company.

4. Describe in detail the communication between the parties in April 1999 referenced in paragraphs 8 and 9 of the Complaint by (1) identifying the precise date and the location of the communication, (2) identifying everything that was said during the communication and (3) identifying any other person that was present during the communication.

**Answer:** We spoke on the phone. I was at my home at Apt. 209, 4701 Connecticut Avenue, N.W., Washington, DC 20008. I had called him from my home telephone, telephone number (202) 966-2761. I called him at his home telephone (610) 642-6048. His home address at the time was 450 Moreno Road, Wynnewood, PA 19096. I believe the call was made during daylight hours. No one else was present at that conversation although several people have knowledge of later circumstances as well as later statements made by Mr. Domash confirming the promises he made during the conversation.

As far as I can recall the substance of the conversation consisted of the following: In April 1999, I had exhausted my personal finances and told Mr. Domash that IFA may well have to be shut down and that I would have to seek full-time employment. Mr. Domash seemed disappointed, especially since he had often told me of his desire to establish his own investment company to be called Domash & Associates. He had hoped that D&A would have IFA for its main account and so was quite interested in IFA's success. In response to my plight, he told me that he already owed Dr. George Graham $50,000 for psychological counseling and for coordinating his legal problems.

*Answers to Interrogatories—Page 4*

He also said that I should continue on with IFA for he would reimburse me not only for all the expenses I would continued to incur in assisting him but also he would reimburse me for my own personal living expenses as well as for any expenses I incurred on behalf of IFA. Although I lived and had been living rather frugally, my personal living expenses included support I was providing to my cousin Judy Pentoney. Mr. Domash said that he understood my situation and would be glad to reimburse me for everything if only I would continue on trying to get IFA established. The main obstacle to IFA starting operations was obtaining financing. Mr. Domash said he understood this and was optimistic that financing would soon come through. I explained that since the only means I had of obtaining money to help him, to support myself, and to keep IFA running was to incur credit card debt. He said he understood that the finance charges would be great, but not to worry since he would cover it all.

During the phone call, we also discussed his children's well-being, his former wife and her lawyers' shenanigans and his conviction that a better day lay just ahead. I recall the conversation as one of the brightest, most hopeful discussions I ever had with Mr. Domash.

5. State the basis for your contention in paragraph 19 of the Complaint that Defendant's alleged representations in April 1999 that it was his intention to reimburse Plaintiff for his expenditures were made untruthfully and with knowledge of that untruth by (1) identifying all facts or information supporting your contention, (2) identifying all documents supporting or concerning your contention, and (3) identifying all persons possession knowledge of facts or information supporting the contention, and summarizing the facts or information each such person possesses.

**Answer:** I believe that in discovery of Mr. Domash it will come to light that Mr. Domash had the financial wherewithal in April 1999 to reimburse me as promised. I believe that such discovery will further show that he had the financial wherewithal to reimburse me through the November 2002 breach. Since he always had the financial wherewithal at all times, he must have never intended to keep his promise. I need to conduct further discovery of Mr. Domash's finances in order to answer fully this interrogatory and will supplement this answer after I have done so. The only facts, documents, and witnesses I know of now (before conducting discovery) are his above-described promises, his financial records, and his fellow workers, supervisors, financial advisors who know of his wherewithal to pay me.

*6.* State the basis for your contention in paragraph 23 of the Complaint that you conferred a benefit on the Defendant by (1) identifying all facts or information supporting your contention, (2) identifying all documents supporting or concerning your contention, and (3) identifying all persons possession knowledge of facts or information supporting the contention, and summarizing the facts or information each such person possesses.

**Answer:** The assistance I supplied to Mr. Domash consisted of the following: (1) I provided him with extensive emotional support by speaking with him on the telephone during all times of the day or night from September 1998 to November 2002. I would estimate that he called me approximately two times per day on average during this time in order to receive emotional support. (2) On his behalf I communicated to his domestic relation lawyers including: Mr. Paul Perocchi, Ms. Chouteau Merrill, Mr. Edward Barshak, Mr. Val Diviacchi, Mr. Joseph Walsh, and Mr. Paul Kelly. (3) On his behalf I arranged litigation support for his domestic relation litigation including: locating, hiring and managing Bet Tek to provide analysis of tape recordings, as well I actually paid part of the Bet Tek bill myself. (4) I paid part of Mr. Diviacchi's bill. (5) I contacted several psychologists and psychiatrists regarding his legal situation. (6) I acted as a "switchboard" facilitating communication between all parties regarding his domestic relations litigation. (7) I kept Dr. Graham informed and engaged in the process of supporting Mr. Domash during his domestic relations litigation, something of immense importance. (8) I developed a friendship with Mr. Steve Killion of Bet Tek that assisted Mr. Domash by way of receiving advice from Mr. Killion and passing it on to Mr. Domash. (9) I worked with Mr. Steve Shar, Mr. Domash's trust lawyer, to resolve particularly bitter family disputes that erupted between Mr. Domash and his two brothers. (10) I worked with Mr. Tim Hughes, Esq., who represented Mr. Domash in a dispute over fees owed to Mr. Perocchi's law firm. (11) I traveled to Boston and New York for meetings with lawyers. (12) I accompanied Mr. Domash to many court proceedings in Boston concerning child custody matters. (13) I worked many, many hours and did my best to get IFA off of the ground so that Mr. Domash could form D&A.

The financial records found at bates-stamped Mace 185-1535 contain the record of expenditures I made on his behalf or expenses I incurred in helping him. As explained above, with the help of a bookkeeper or accountant I will provide a further breakdown of these. Other documents reflecting help I provided to Mr. Domash include Mace 32, showing that I had authority to act on his behalf; Mace 59-71, showing I was privy to his family law

*Answers to Interrogatories—Page 6*

litigation and so assisted him; Mace 110-120, showing I assisted him with one of his family law litigators; Mace 180-184, showing I obtained litigation support for him and actually paid part of the bill on his behalf out of my own funds.

The witnesses with knowledge of the assistance I provided to Mr. Domash are George A. Graham, Jr., Ph.D.; Darryl R. Wright; Steve Killion; Bruce E. Koenig; Gene E. Sierzant; Tex Hunt; Judy Arellano; Bernice Pentoney; Chris Dowell, Ph.D., Paul Perrochi, Chouteau Merrill; Edward Barshak; Joseph Walsh; Val Diviacchi; Paul Kelly; Tim Hughes; and Ron Mysleviec.

7. Describe in detail the involvement and relationship that Graham Capital International had with IFA and/or D & A, identifying all documents concerning this relationship and all persons possessing knowledge of facts or information regarding this relationship.

**Answer:** Schematics of the relationship is found at the documents bates-stamped Mace 108, 006, 011 and 1638. The original idea was Gene Sierzant's. The formation of Graham Capital was a means to integrate and provide unified leadership to the various divisions of the company as they emerged over ten to fifteen years. Graham Capital International never was formed. We, meaning Greorge Graham, Larry Domash, Gene Sierzant and myself, decided that IFA could be owned by a holding company called Graham Capital International. This was discussed during the late summer of 2000. Darryl Wright and Tex Hunt helped significantly to shape the discussion that lead to pursuing this option. D&A was never contemplated to have an ownership relationship with IFA or Graham Capital, rather D&A would be a vendor to IFA providing financial services.

8. Describe in detail each communication you had with Defendant concerning IFA, D & A, or any other issue referenced in the Complaint by (1) identifying the content, date and location of each such communication, (2) identifying whether any other person was present during these communications, and (3) identifying all documents concerning these communications.

**Answer:** The communications I had with Mr. Domash were overwhelmingly telephonic. This is so since that is how he preferred to communicate. We never used email. He did mail us large files sometimes, numbering several hundred pages per shipment. Often we would receive this mail unexpectedly with no explanation as to its significance or context. Parenthetically, sometimes he told us to expect certain documents via mail and

*Answers to Interrogatories—Page 7*

they never arrived. His printed material—many feet of it and almost all of it dealing with child custody legal issues—was held at the IFA office. In time, when it became dated and was no longer useful, I threw it away. What was left was moved to a basement storage garage at my home where much of it was destroyed by water damage. Dr. Graham is mailing files to me that I shared with him when we were working together to help Mr. Domash, but which I no longer have.

As to his taped messages or oral statements, they were heard by George Graham, Darryl Wright, Steve Killion, Gene Sierzant and myself. Please see the documents bates-stamped Mace 017-021.

Mr. Domash met once with Mr. John Martin in Washington on December 4, 2000. He had two meetings with Mr. John Stein, both in New York. The first I believe was held in February 2001, the second, five months later. The document bates-stamped Mace 1639-40 is related to the February 2001 meeting. None of these meetings were particularly helpful to Mr. Domash regarding D&A.

We copied Mr. Domash by mail with our offering memorandum and executive summary. Actually this was done several times because he kept claiming to have misplaced or lost the material. The Bet Tek bills were mailed to him several times too.

9. Describe in detail each time you communicated the name Larry Domash or Domash & Associates in connection with the marketing/sales of IFA, whether orally or in writing, by (1) identifying the content, date and location of each such communication, (2) identifying all persons to whom you communicated the name Larry Domash or Domash & Associates, (3) identifying the purpose of communicating the name Larry Domash or Domash & Associates and (4) identifying all documents concerning your communicating the name Larry Domash or Domash & Associates in this regard.

**Answer:** Mr. Domash is identified indirectly in the citation beginning Gofen and Glossberg on page 70 (Mace 1641) of the offering memorandum (Mace 1641-52) and is identified directly on the executive summary (Mace 1644). Mr. Domash was provided a copy of this offering memorandum and executive summary. The list starting at Mace 1645 lists "potential sources of capital" and "banking institutions" and "senior institutional insurance analysts." All of these were contacted and Mr. Domash's identity would have appeared in the offering memorandum since the Gofen and

*Answers to Interrogatories—Page 8*

Glossberg reference was essentially a reference to Mr. Domash, who was then employed by Gofen and Glossberg. The following insurance companies were also contacted: Firemans Fund, TransAmerica, Lincoln National, Pacific Life, Midland National, Allianz. As well we did discuss raising capital with the consulting firms of Firemark and Conning & Co. I am not aware of a single instance in which the name Larry Domash enhanced our prospects, and in only two instances, that of Scott Ketner and Walter Kass, did it ever come up. The document bates-stamped Mace 109 shows his name was mentioned to David Prokupek, Leon Wright and George Cochran, but ultimately his name had an impact far different than that of being helpful.

A document entitled "Overview of Financial Skills" (Mace 1653-55) was written for John Martin concerning D&A. Mr. Domash promised to draft a similar document for John Stein, but never did. The story of IFA's attempt to obtain financing from Bank of America can be seen in the documents bates-stamped Mace 008-009 and 022-031. Crises Management International, Sonny Lee, Asset Allocation & Management, Tom Bystryk, Dan Harshberger, Randy Zeller, Peter Marshall, Jack Grimes and Bob Chicoski had the offering memorandum and executive summary.

The documents bates-stamped Mace 033 and 049 also answer this interrogatory.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _14 December 2006_.

_____Peter M. Mace_____
Peter M. Mace

As to objections,

Respectfully submitted,

Dated: _14 Dec 06_   Signed: _____
                             Michael J. Trevelline, DC Bar # 437454
                    Address: 1823 Jefferson Place, NW
                             Washington, DC 20036-2504
                    Telephone: (202) 737-1139/Fax: (202) 775-1118
                    Email: mjt@mjtlegal.com

*Answers to Interrogatories—Page 9*

Attorney for **Plaintiff Peter M. Mace**

**Certificate of Service**

I hereby certify that a copy of the foregoing was sent via first class mail, postage prepaid, this __14__ day of __December__, 20_06_, to:

Mr. Douglas Brooks
Kelly, Libby & Hoopes, P.C.
175 Federal Street
Boston, MA 02110

_____
Michael J. Trevelline