# EXHIBIT B

1  financing team.  A man named Prokapek (phonetic) who
2  was at one time a partner of Larry's, a man named
3  Leon Wright.  Larry had conversations with all these
4  people during in that time frame.
5       Q  Pursuant to this agreement, you say that
6  Mr. Domash agreed to reimburse you for all of your
7  expenditures?
8       A  He agreed to reimburse me for reasonable
9  expenditures, for my living expenses to continue to
10 help him to promote IFA and to cover my cousin's
11 expenses.
12      Q  What did you discuss in terms of what was
13 reasonable?
14      A  I asked Larry about that in the course of
15 several conversations and he never -- he was always
16 very cavalier about the whole thing, you know, Larry
17 trusted me to use prudence in what was going on.  I
18 lived a very frugal life, I still do, I always have.
19      Q  How do you know Mr. Domash trusted you?
20      A  Because Mr. Domash said he did,
21 repeatedly, and I never gave Mr. Domash any reason
22 not to.

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 68

1    A   Yes.

2    Q   How many court hearings did you actually
3  go to?

4    A   I would guess and say anywhere from 7 to
5  12.

6    Q   You went from 7 to 12?

7    A   No.  We could go back and try to figure
8  out when they were -- every one that he asked me to
9  go to.  The last one I went to was one that Mr. Kelly
10 attended, and I think that was 2001.

11   Q   What was the first one that you attended?

12   A   Good question.  I don't know.  Sometime
13 in -- I'm going to guess and say sometime in 1999.

14   Q   Before or after the contract was formed?

15   A   Before.

16   Q   Okay.  Under the contract, did Mr. Domash
17 have a responsibility to pay you for your help to him
18 other than to reimburse your credit card debt?

19   A   Well, that was where the money was coming,
20 from Mr. Brooks.

21   Q   Was there any understanding, for instance,
22 that if you came to court, he just had to give you

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 69

1   $200?

2        A   No.

3        Q   And nothing like that?

4        A   Nothing like that.

5        Q   Under the contract, were Mr. Domash's
6   reimbursement payments to you contingent on your
7   performance under the contract?

8        A   It was never expressed that way, but he
9   knew that I gave him my word that I would do all that
10  I could to help him and help further our joint aims.

11       Q   How did he know that?

12       A   Because he had known me for many, many
13  years, and he knew I was serious about wanting to
14  achieve this and he knew that I wouldn't abandon it.

15       Q   How do you know that?

16       A   He told me that.

17       Q   When?

18       A   Many times over the course of many years
19  in our relationship, certainly from -- certainly from
20  1998 on.

21       Q   When was the last time he told you that?

22       A   In those words, probably sometime in the

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

Page 212

1   opposed to Attorney Walsh or Mr. Domash directly?
2       A   Good question.  Perhaps it was because
3   they knew that I was trying to help Larry.  They
4   had -- if I'm not mistaken, I think there's a letter
5   somewhere from Joe Walsh asking me to do this which
6   they may have a copy of.  Perhaps it was because
7   Mr. Walsh wanted, again, a firebreak.  Our job was to
8   help Larry if we could and so that's what we did.  We
9   got that and that was done and the contents were
10  returned to Mr. Walsh.
11      Q   Mr. Walsh on occasions such as this asked
12  you to help out?
13      A   Uh-huh.
14      Q   Is that right?
15      A   Uh-huh.
16      Q   As far as you know, did he have an
17  understanding that you were being paid for your
18  services?
19      A   Being paid for my services, I mean -- I
20  wasn't an employee of Larry's.  I was Larry's -- he
21  would describe it as kind of coordinator, switchboard
22  between all these different parties.  I wasn't paid

1    for it.  My goal was to try to get IFA up and
2    running.
3         Q    Do you know if Mr. Walsh knew that?
4         A    Knew what?
5         Q    Knew that you were doing that as part of
6    hopes that you would get IFA up and running?
7         A    I don't recall -- I know we talked about
8    it but I don't remember really what was said.  The
9    meetings with Mr. Walsh were very, very serious
10   meetings concerning Larry and Larry's position in
11   terms of the children and the divorce.  It was
12   important I think that -- you know, that we focus on
13   those kinds of things.
14        Q    Turning your attention to the second page
15   of Exhibit Mace 21.
16        A    Yes, sir.
17        Q    You see where it indicates that on
18   November 22nd, 2001, a retainer of $12,000 was
19   applied?
20        A    The only thing that I know --
21        Q    Let start with the question.  Do you see
22   where it says that?

DEPOSITION OF PETER M. MACE - VOLUME II
CONDUCTED ON THURSDAY, FEBRUARY 22, 2007

Page 271

1   I felt -- this was something that he asked me to have.
2   It was never something that I asked him to give me.
3       Q    Was there an understanding between the two
4   of you that you would be paid for your role in taking
5   over his power of attorney for Mr. Domash?
6       A    No.  Not at all.  I never would have
7   accepted money for something like that.
8       Q    Mr. Mace, you've been in the business world
9   ever since you graduated from law school, is that
10  correct?
11      A    Business world ever since I graduated law
12  school.  Well, for a few years I was doing other kinds
13  of work before I got involved in the insurance
14  business.
15      Q    Okay.  Well, do you consider yourself fairly
16  experienced in the insurance business?
17      A    I do consider myself fairly experienced.  I
18  consider myself knowledgeable about some aspects of it
19  and experienced in the agency side of the business and
20  in being knowledgeable about the human sales aspect of
21  the business.  The business is highly fragmented.
22      Q    So what areas specifically are you