UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER M. MACE | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Case No. 1:05CV02244 |
| | ) (HHK/DAR) |
| | ) Dispositive Motions Due 7/18/08 |
| LARRY A. DOMASH | ) |
| | ) |
| | ) |
| Defendant | ) |
| | ) |

### DEFENDANT LARRY DOMASH'S MOTION FOR SUMMARY JUDGMENT

Defendant Larry Domash hereby moves the Court, pursuant to Fed. R. Civ. P. 56, to enter summary judgment in his favor on all three counts of the Complaint. As grounds for this Motion, Domash states as follows:

1.    The purported terms of the oral contract are far too indefinite to constitute a binding and enforceable agreement under well-settled District of Columbia law.

2.    All three counts of the Complaint are barred by the applicable statutes of limitations.

3.    Separate and apart from the statute of limitations, the unjust enrichment claim also fails for various reasons.

4.    The Complaint is barred by the Statute of Frauds.

In further support of this Motion, Domash relies upon and incorporates the accompanying memorandum of points and authorities and all of the supporting materials and exhibits thereto.

WHEREFORE, Defendant Larry Domash respectfully requests that this

Honorable Court enter summary judgment in his favor on all counts in the Complaint.

Respectfully submitted,


/s/ Adam Augustine Carter_____
Adam Augustine Carter
DC Bar # 437381
888 Seventeenth Street, N.W., Suite 900
Washington, D.C.  20006-3307
Tel: 202-261-2803
Fax: 202-261-2835
acarter@employmentlawgroup.net


/s/ Douglas S. Brooks_____
Douglas S. Brooks
*Pro Hac Vice*
LibbyHoopes, P.C.
175 Federal Street
Boston, MA 02110
Tel: 617-338-9300
Fax: 617-338-9911
dbrooks@libbyhoopes.com


Dated:  July 18, 2008

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing was

delivered via the Court's electronic filing system to the following counsel for Plaintiff

Peter M. Mace, this 18th day of July, 2008

Michael J. Trevelline, Esq.
1823 Jefferson Place, NW
Washington, D.C. 20036-2504
mjt@mjtlegal.com

/s/ Douglas S. Brooks_____
Douglas S. Brooks

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER M. MACE | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Case No. 1:05CV02244 |
| | ) (HHK/DAR) |
| | ) Dispositive Motions Due 7/18/08 |
| LARRY A. DOMASH | ) |
| | ) |
| | ) |
| Defendant | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT LARRY DOMASH'S MOTION FOR SUMMARY JUDGMENT**

**I.    SUMMARY OF ARGUMENT**

Defendant Larry Domash is entitled to summary judgment on all counts (breach of contract, fraud and unjust enrichment) of Plaintiff Peter Mace's Complaint, which is premised entirely on an alleged oral agreement between the parties in which Domash allegedly agreed to reimburse Mace for various credit card expenditures. Several separate and independent grounds exist which require that summary judgment enter in Domash's favor.

First, the purported terms of the oral contract are far too indefinite to constitute a binding and enforceable agreement under well-settled District of Columbia law. Just by way of brief example, the alleged oral agreement did not specify: (i) the terms of payment or any type of payment schedule; (ii) the length of the agreement; (iii) even a general estimate or upper ceiling of the amount ultimately to be reimbursed; (iv) the interest rate;

or (v) the manner of Mace's performance.  Moreover, at least in large part, the consideration to Domash under the alleged contract was itself based on another alleged oral understanding, <u>from nine years earlier</u>, which completely lacked <u>any</u> specific terms. In short, the undisputed evidence demonstrates that there was not "mutual assent between the parties as to <u>all</u> material terms of the deal" (a requirement under District of Columbia law), and thus there can be no enforceable agreement.

<u>Second</u>, all three counts of the Complaint are clearly barred by the applicable statutes of limitations.  The undisputed facts demonstrate that, among other things, outside of the limitations period the following occurred: (i) Mace, in discussing Domash's failure to reimburse him as promised, referred to Domash as "<u>deceitful</u>," "weak," "a weasel," "a coward," and that he had "let [his] life become a lie," and further wrote, in connection with his mounting credit card debt: "Damn Larry [Domash] and his selfishness and deceit" (fraud claim); (ii) Mace demanded immediate payment from Domash while referring to Domash's obligation to reimburse him under the oral contract as "<u>overdue</u>" (breach of contract claim); and (iii) Mace made his last payment and performed his last act which even arguably conferred any benefit on Domash (unjust enrichment claim).

<u>Third</u>, separate and apart from the statute of limitations, the unjust enrichment claim also fails, because to the extent it is based on Mace's "reimbursement of expenditures" theory (i) it is simply an alternative version of Mace's breach contract claim and thus, under District of Columbia law, cannot exist if the contract claim founders (as it does for the reasons set forth above); and (ii) Mace has failed to put forth any evidence that Domash actually benefited from any of the expenditures at issue.

Moreover, to the extent that Mace's unjust enrichment claim is based on an alternative "value of services" theory, it fails because (i) the evidence demonstrates that Mace was not expecting payment (separate and apart from expenditure reimbursement) for any of the services he allegedly rendered on Domash's behalf; and (ii) Mace never pled this theory; he never included it in any of his <u>three</u> Rule 26 disclosures, nor did he raise it at all until several months <u>after</u> the close of discovery.

<u>Fourth</u>, Mace's case is barred by the Statute of Frauds, because the alleged oral arrangement obligated Domash to pay to Mace the debt that he independently owed to various credit card companies. As such, it constituted an agreement to assume the debt of another, and D.C. Code, § 28-3502 thus requires that it be in writing to bind the parties.

## II.    <u>FACTUAL BACKGROUND</u>[1]

In April or May 1999, Mace claims to have exhausted his personal resources trying to establish his own insurance company, Investors Fidelity of America ("IFA"). *See* Plaintiff's Rule 26(a)(1) Disclosures at 4, (attached as Exhibit A hereto); Plaintiff's Responses to Defendant's First Set of Interrogatories at 2 (attached as Exhibit B hereto). According to Mace, he and Domash entered into an oral contract in or around that time, whereby the parties allegedly agreed that if Mace continued working to establish IFA, and "continued serving as a type of coordinator or administrator of some of Domash's legal problems," Domash would agree to reimburse Mace for the following expenses: (1) Mace's reasonable living expenses; (2) reasonable financial support that Mace provided

---

[1] Domash denies that the parties ever even discussed the alleged agreement that forms the crux of this case. However, as set forth below, the undisputed facts, taken together with Mace's own testimony (even assuming it is all true), demonstrate that Domash is entitled to summary judgment as a matter of law.

his cousin; (3) reasonable expenditures made on behalf of IFA; and (4) reasonable expenditures that Mace made directly on behalf of Domash.  *Id.*[2]

## A.    The Lack of Contractual Specificity

Through his testimony, Mace acknowledges that the alleged oral contract lacked specificity.  In answering questions about the particulars (or lack thereof) of the alleged contract during his deposition, Mace explained: "This was [a] conversation between two men who Larry had described to me as a friend and a brother, you know.  There was nothing like that."  *See* LcvR 56.1 Statement of Material Facts as to Which There is no Genuine Issue ("SMF") ¶ 1.

Mace concedes that there was no <u>payment schedule</u> of any kind under the alleged reimbursement contract.  *Id.* ¶ 2.  The parties did not reach agreement on a specific date by which Domash had to make any payment to Mace.  *Id.* ¶ 3.  Instead of any type of date certain, according to Mace, Domash's obligation to repay Mace would begin when the "dust settled" on Domash's child custody and divorce matters and "the economic fall out to [Domash's] life where [Domash] would right himself emotionally and be able to do the kind of work that was significant, that he felt he was capable of doing."  Ex. C at 44:9-19; 86:5-14.  Further, Mace explains that the obligation would become due when "[Domash] had gone through all of that and had been able to assume the kind of dynamic economic role that he wanted for himself."  *Id.* 87:2-5.  At the time they entered into the alleged oral contract, the parties did not know when (even approximately) this would occur such

---

[2] Although not directly relevant to this Motion, Mace's own testimony casts serious doubt on the veracity of Mace's basic premise underlying this lawsuit (*i.e.*, that he had been working hard to establish his own international insurance company).  For example, although Mace claims that he had been doing so for approximately <u>21 years</u> as of the time of his deposition in February 2007, he admitted that IFA had only one working computer during that time, and it only lasted a few years.  *See* Deposition Transcript of Peter Mace ("Mace Tr.") at 14:7-12; 20:19-21; 21:19-22:4 (a copy of the relevant excerpts are attached hereto as Exhibit C).

that payment would become due.  SMF ¶ 4.  When asked for his best estimate, Mace

testified, "if you want a time line, I don't know, two years, two and a half years, three

years."  *Id.* ¶ 5.   Moreover, Mace concedes that there was no specific triggering event

which, if it occurred, would have required Domash to reimburse him.  *Id.* ¶ 6.  Nor did

the parties reach any agreement with respect to how often payments were due.  *Id.* ¶ 7.

The <u>length</u> of the alleged contract was never agreed upon.  It contained no

termination date.  *Id.* ¶ 9.  Moreover, the parties did not reach an agreement on how either

side could terminate it.  *Id.* ¶ 10.  They did not discuss, for example, whether any interim

payment of the full amount outstanding by Domash would have terminated the

arrangement or whether Mace could have continued to make unfettered expenditures

after such a payment was made.  *Id.* ¶ 12.  When questioned about this, Mace replied, "I

think we would have had to have seen what the relationship was like at that time."  *Id.*

The <u>amount</u> of the alleged contract was never agreed upon.  *Id.* ¶ 13.  As Mace

put it, "there was never an upper ceiling" as to the amount he could spend and then

expect reimbursement.  *Id.*  The parties never reached agreement on a monthly spending

limit.  *Id.* ¶ 14.  Nor did they ever reach agreement on any other limits to Mace's

spending authority under the alleged contract.  *Id.* ¶ 15.

According to Mace, Domash was responsible for the <u>interest</u> that accrued on the

credit cards in connection with Mace's expenditures.  Mace Tr. at 57:15-19, Ex. C.   As

Mace put it, that issue "had been briefly touched on in the conversations that [the parties]

had."  *Id.*  Mace admits, however, that the alleged contract itself had no terms regarding

interest, apart from the interest that accrued directly on Mace's credit cards.  SMF ¶ 16.

This effectively meant that the parties did <u>not</u> agree on a contractual interest rate, because

the credit cards that Mace used all contained different and varying interest rates, (*id.* ¶ 17), and the parties never even discussed – much less agreed to – other terms that would thus necessarily affect the rate of interest, such as: (i) limits on the interest rates of the credit cards that Mace was permitted to use (*id.* ¶ 18); (ii) Mace's minimum monthly payment obligations to the credit card companies (*id.* ¶ 19); (iii) the number of different credit cards that Mace was permitted to use (*id.* ¶ 20); and (iv) how partial payments would be applied to the various credit cards – of differing interest rates – in use under the alleged agreement. *Id.* ¶ 21. Moreover, during the life of the alleged contract, the only funds Mace used to make partial payments on the various credit cards came from cash advances from other credit cards. *Id.* ¶ 22. At least some (and perhaps all) of the credit cards charged higher interest for cash advances than they did for direct purchases. *Id.* ¶ 23. In addition, due to late payments, Mace incurred late fees on some of the cards. Pursuant to the alleged contract, the parties never discussed the possibility of Mace using cash advances from certain credit cards to pay off his credit card debt on other cards or incurring late fees. *Id.* ¶ 24.

Mace's performance obligations under the contract were also entirely undefined. For example, although Mace concedes his expenditures had to be "reasonable" in order to seek reimbursement, the parties did not specifically agree on what would constitute a reimbursable expenditure. *Id.* ¶¶ 25-26. The parties did not reach any agreement as to the permissible nature of Mace's expenditures. *Id.* ¶ 27. The parties never discussed whether Domash could exercise veto power with respect to any of Mace's expenditures. *Id.* ¶ 28. Mace never provided Domash with any documentation of his expenditures over the life of the alleged contract (some three and one-half years). *Id.* ¶ 30. Expenditures

aside, the parties never reached any agreement as to what Mace specifically had to do in connection with his other obligations under the alleged oral understanding. *Id.* ¶ 31. For example, the alleged contract did not specify whether IFA or Domash's personal and legal problems took priority. *Id.* ¶ 32. Nor did the alleged contract specifically require that Mace perform his (non-expenditure) obligations in order for Defendant's payment obligations to ripen. *Id.* ¶ 33.

Finally, according to Mace, at least part of the <u>consideration</u> to Domash was an alleged separate oral promise from 1990 that if IFA became operational, he would have the opportunity to manage its money (the "1990 Promise"). Mace Tr. at 73:3-16, Ex. C. No specific terms were ever discussed in connection with the alleged 1990 Promise. SMF ¶ 34. For example, the parties never discussed compensation pursuant to the alleged 1990 Promise. *Id.* ¶ 35. Nor did the parties ever discuss the length of time Domash would be under contract to manage IFA's money pursuant to the alleged 1990 Promise. *Id.* ¶ 36. In addition, by November 2001, Mace was concerned that Domash might not be able to work for IFA in the future (the purported consideration under the alleged contract). *Id.* ¶ 37.[3] Nonetheless, Mace continued making expenditures for which he now seeks reimbursement in this lawsuit. *Id.* ¶ 39.

## B.    Events that Occurred Outside of the Three-Year Statute of Limitations

The limitations cut-off date for this action is November 18, 2002. Prior to September 2000, Mace told Dr. George Graham, an individual known to both parties, that he was quite anxious to have what he felt was a payment due him from Domash. *Id.* ¶ 42.

---

[3] In addition, Mace wrote a letter to Domash, dated October 30, 2002 (twelve years after the alleged 1990 Promise), in which he demonstrates that there was no firm agreement for Domash to manage IFA's money. For example, in that letter, Mace wrote: "I'd expect you to run IFA's money" and "If you're up to it I'd want you to take the post." *See* SMF ¶ 38; Exhibit ("Ex") E.

In March 2001, Mace told an individual named Steven Killion that Domash's outstanding financial obligation to Mr. Killion's company "was only the latest in Mr. Domash's pattern of unmet responsibilities to financially reimburse [Mace] for [Mace's] efforts to support and assist him." *Id.* ¶ 43; Ex. G. In or about June 2001, Killion told Mace that he did not believe Domash was being truthful regarding his (Domash's) financial affairs. *Id.* ¶ 44.

According to Mace, from 1999 to 2002, Domash told him that he could not repay him immediately, because "he needed to maintain as much financial liquidity as he could." *See* Plaintiff's First Supplemental Responses to Defendant's First Set of Interrogatories, attached hereto as Exhibit H. Despite these alleged assertions, in December 2001 or January 2002, Mace came to believe that Domash <u>was</u> in a financial position to reimburse him. SMF ¶ 45. During that timeframe, Domash purchased a speedboat. *Id.* ¶ 46. According to Mace, Domash initially lied to Mace about the source of funds that he used to buy a speedboat. Mace Tr. at 103:20-104:9, Ex. C. Originally, he told Mace that he was taking out a bank loan to finance the boat purchase. *Id.* Domash then allegedly told Mace that he bought the boat with cash. *Id.* Mace viewed the purchase of the speedboat, which he learned about in or about January 2002, as being "inconsistent" with Domash's statement about the necessity of conserving financial liquidity. SMF ¶ 47.

On January 17, 2002, Mace wrote a letter to an individual named Bruce Koenig, which referred to Domash's financial obligations: "If you're frustrated after thirteen months and partial payment imagine how we feel after years and years and no payment." *Id.* ¶ 48; Ex. I.

Referring to what he perceived to be Domash's misrepresentations about his ability to reimburse him, on January 23, 2002 – 10 months <u>before</u> the limitations cut-off date – Mace wrote to Graham the following: "That Larry [Domash] may have been 'somewhat less than forthcoming' is an understatement.  THIS CRAP IS GOING TO STOP.  Do <u>nothing</u> until we speak.  He has put everything at risk." *Id.* ¶ 49; Ex. J (emphasis in original).  Mace explains these statements as follows: "I think what I was concerned about was Larry not being straightforward with us.  I mean, you know, you can't say that you don't have it [money to reimburse] when you're going off and buying a speedboat." *Id.*

In January 2002, although Domash had allegedly given Mace the impression that he was seriously strapped for cash, Mace believed this was inconsistent with other things he learned about Domash's finances.  *Id.* ¶ 50.  Specifically, by January 2002, Mace had formed an understanding that Domash had a corporation with $1.13 million in it.  *Id.* ¶ 51.

Mace did not speak to Domash in connection with providing him legal and emotional support under the alleged contract after May or June 2002.  *Id.* ¶ 52.  Moreover, Mace cannot identify any acts that he took after June 2002, which conferred a benefit on Domash.  *Id.* ¶ 53.  Domash did not actually receive any benefit, after June 2002 (if at all), from any actions taken by Mace.  *Id.*

Mace claims Domash made multiple promises to reimburse him after the alleged April/May 1999 agreement.  Mace Tr. at 61:21-62:6, Ex. C.  According to Mace, however, the last time Domash ever promised to reimburse him was in May or June 2002.  SMF ¶ 54.

On June 24, 2002 – five months after his above letter to Graham but five months before the limitations cut-off date, Mace wrote and sent Domash a letter. *Id.* ¶ 55; Ex. K. In that letter, Mace agreed with a previous assessment that Domash was "weak," a "coward" and a "weasel." *Id.* He further stated that:

> [a]nyone who's spent a considerable period of time with you would add that you don't do what you say you're going to do, or what you've agreed to do, that you're deceitful, frequently confused and have a serious problem with selfishness. For someone who's public mantra is 'always tell the truth', always do the right thing', always turn the other cheek', in private you're the essence of hypocrisy and denial. In some deep, essential way, Larry, you have let your life become a lie. *Id.*

In the June 24, 2002 letter, Mace also wrote:

> And remember this – whether you heed my warning or not – you have a number of outstanding responsibilities to the people that have gotten you this far and whether you take my advice or not you are not going to get a pass from any of us. You have to face your responsibilities, Larry, and live up to your obligations. If you don't you are never going to get well. Let me say that again for emphasis. You have to, you are going to, one way or the other, face your responsibilities and live up to your obligations. You're very good at conveniently forgetting that when you think it suits your purpose. Let me assure you we have no intention of letting you forget. *Id.* ¶ 56; Ex. K.

Mace concedes that one of Domash's "outstanding responsibilities" for which he wrote that Domash was not going to get a pass, as of June 24, 2002, was Domash's obligation to reimburse him. *Id.* ¶ 58. On July 5, 2002, Mace resent Domash a copy of the above-referenced June 24, 2002 letter. *Id.* ¶ 59; Ex. L. Mace marked the copy, in red ink, "2nd notice, 7/5/02." *Id.*

On July 10, 2002, Mace wrote <u>another</u> letter to Domash, in which he stated, "To say that you don't owe BEK TEK and yours truly money is absurd as suggesting you don't owe George money." *Id.* ¶ 60; Ex. M. At the time Mace wrote this letter, he had concerns that Domash had not reimbursed him. SMF. ¶ 61.

10

On October 27, 2002, Mace wrote yet <u>another</u> letter to Domash which he sent to Domash on October 30, 2002. *Id.* ¶ 62; Ex. E & N.[4]  In that letter, Mace stated:

> Regardless of how that works out, however thats (sic) resolved, <u>you have an obligation to me that is overdue</u>.  Prior to the Walsh trial, as you knew and acknowledged you owed me $75,000.  After the trial on the drive from Boston to New York you spoke repeatedly of repaying me.  Larry, its been two years, indeed almost exactly two years.  I've done what you asked me to do, what I said I would do and now you have to meet your committment (sic).  You made the promise to repay me, live up to it.  Write me a check for $100,000 in the next two weeks.  Just to build the relationship with Mr. Stein—who played a key role in getting us to this point – cost $25,000 since my visit to Providence 13 months ago.  You need to keep your word, you can not afford its loss.  As health permits, over the next several weeks I'll figure out what remains, notify you and expect you to close out the balance in monthly payments over the following five months. *Id.*  (Emphasis added).

On November 9, 2002, a date outside of the limitations period, Mace wrote a note to Graham. *Id.* ¶ 63; Ex. O.  He stated, "Damn Larry [Domash] and his selfishness and deceit." *Id.*  This note was affixed to a letter Mace wrote, on the same date, to the Credit Services Unit of First USA Bank, N.A. *Id.*  Mace's correspondence to the credit card company responded to the company's letter to him, dated October 31, 2002, alerting him that it was closing his account due to lack of adequate payment. *Id.*  Mace testified that part of Domash's deceitful conduct referenced in his November 9, 2002 note to Graham included his failure to reimburse Mace as of that date. *Id.* ¶ 64.

Despite Mace's demand, Domash did not make the $100,000 payment – or any payment whatsoever – within the two weeks following the October 30, 2002 letter. *Id.* ¶ 65.  On November 24, 2002, Domash wrote a letter to Mace, denying that he owed Mace any money. *Id.* ¶ 66.

---

[4] The October 27, 2002 draft is attached hereto as Exhibit N.  The October 30, 2002 letter is attached hereto as Exhibit E.

### C.     Lack of Benefits Domash Received from Mace's Actions

Domash never benefited from any expenditures that Mace made in connection with IFA.  *Id.* ¶ 67.  Domash never benefited from any expenditures that Mace made on behalf of Mace's cousin.  *Id.* ¶ 68.  Domash never benefited from any expenditures that Mace made on behalf of himself.  *Id.* ¶ 69.[5]

## III.    <u>PERTINENT PROCEDURAL BACKGROUND</u>

Mace filed this Complaint on November 18, 2005, asserting claims for breach of contract, fraud and unjust enrichment.  The theory of damages underlying all three counts of the Complaint was the same (*i.e.,* Domash's failure to reimburse Mace for his alleged expenditures).  On September 5, 2006, Domash moved for involuntary dismissal for lack of prosecution, based on Mace's failure to prosecute the case and abide by the Court's order to meet and confer in advance of the Initial Scheduling Conference.  (Docket No. 7).  On October 14, 2006, the Court denied that Motion.

On October 30, 2006, Domash moved for summary judgment based on the fact that Mace had failed to respond to his requests for admissions, and thus they were deemed admitted.  (Docket No. 12).  On June 6, 2007, the Court denied that Motion, giving Mace yet another bite at the apple.  (Docket No. 21).

The discovery period closed on March 22, 2007.  Five days <u>after</u> the close of discovery, Mace moved to extend it, for purposes, *inter alia*, of providing his "accountant's report," which was purportedly going to provide specifics regarding all of the expenditures for which Mace sought reimbursement under the alleged contract.

---

[5] Mace has not adequately identified the alleged expenditures that he claims to have made directly on Domash's behalf such that Domash can determine whether he received any benefit from such alleged expenditures (or whether such expenditures were actually made).  In any event, as set forth below, according to Mace's own accountant's report, these expenditures reflect a relatively nominal amount ($8,727.05).  *See* Ex. P & Q.

(Docket No. 17). Prior to that time, Mace had been unable to provide any information regarding the amount or specific nature of these expenditures.[6] On April 10, 2007, the Court granted Mace's motion and extended the discovery period until April 21, 2007. Mace did not provide the promised accountant's report by that date.

On September 7, 2007, four and one-half months after the close of discovery, Mace served his Second Supplemental Responses to Defendant's First Set of Interrogatories, which finally attached the long-awaited "report" of his accountant. (A copy of the Second Supplemental Responses is attached hereto as Ex. P; a copy of the accountant's report is attached hereto as Ex. Q).[7] That supplemental interrogatory answer relied on the report from the accountant, which was completely at odds with all of Mace's previous discovery responses and submissions regarding damages. Based on his accountant's report, Mace's supplemental interrogatory answer listed the following alleged reimbursable expenditures: $8,727.05 in expenses attributable to payments Mace allegedly made on behalf of Domash; $10,975.00 in expenses attributable to payments Mace allegedly made on behalf of his cousin; $26,755.02 in expenses attributable to payments Mace allegedly made for his own personal expenses; and $0.00 in expenses attributable to payments Mace made on behalf of IFA. *See* Exhibit Q at 2. The accountant also listed $61,752.39 of credit card expenditures that he could not identify as being covered by the alleged contract. *Id.*

---

[6] For example, at his deposition, in response to a question about providing a breakdown of his alleged expenditures under the contract, Mace answered, "That breakdown is being prepared right now by an accountant which you obviously will get a copy of. *See* Ex. C at 93:18-94:8.

[7] Mace's accountant's "report" is not admissible evidence in this case. First, Mace has never listed his accountant as a witness in this case – much less designated him as an expert. Second, Mace has not established that the report satisfies the criteria of Fed. R. Evid. 703 so as to be admissible. Third, the report was produced months after discovery closed, and thus Mace should not be permitted to affirmatively rely on it.

On October 31, 2007, Domash moved to dismiss this case for lack of subject matter jurisdiction.  (Docket No. 36).  Domash argued that the above figures demonstrated that the amount in controversy did not exceed $75,000.  Mace's Opposition was based primarily on (i) an argument that, although he could not identify any of the unallocated $61,752.39 of credit card expenditures, that entire amount was nevertheless covered by the alleged contract; and (ii) a first-time argument that Mace should be able to recover for the value of the services he allegedly provided to Domash under an unjust enrichment theory, which was completely different than the unjust enrichment theory he pled and had set forth in his three Rule 26 disclosures.  *See* Docket No. 38.  On May 8, 2008, the Court denied that motion.  (Docket No. 41).  In doing so, the Court stated:  "It may well be that Mace will not be able to prove that the $61,752.39 in charges were made pursuant to the alleged contract.  But a plaintiff's inability to recover must not be conflated with a court's jurisdiction over a matter."  Memorandum and Order at 6.

## IV.    ARGUMENT

### A.    Summary Judgment Standard

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *U.S. ex rel Purcell v. MWI Corp.*, 520 F.Supp.2d 158, 166 (D.D.C. 2007) (granting summary judgment against plaintiff on statute of limitations grounds).  "In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true."  *Id.*  "A nonmoving party, however, must establish more than the mere

existence of a scintilla of evidence" in support of its position." *Id.* The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit only if he "support[s] his allegations ... with facts in the record," or provides "direct testimonial evidence." *Id.* (citations omitted). "Indeed, for the court to accept anything less would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Id.* (citations omitted).

### B.    The Alleged Oral Contract Fails for Lack of Specificity

Plaintiff's own testimony about the terms of the alleged oral agreement demonstrates that it is unenforceable as a matter of law. "For an enforceable contract to exist under D.C. law, there must be agreement as to <u>all</u> material terms and an intention of the parties to be bound." *Virtual Defense and Dev. Int'l, Inc. v. Republic of Moldova*, 133 F.Supp.2d 9, 17 (D.D.C. 2001) (granting defendant summary judgment because alleged oral agreement did not demonstrate "meeting of the minds as to any number of elements") (emphasis added). "The contract 'must be sufficiently definite as to its material terms (which include, *e.g.,* subject matter, price, payment terms, quantity, quality, and duration) that the promises and performances to be rendered by each party are reasonably certain.'" *Id.* (citing *Rosenthal v. Nat'l Produce Co., Inc.*, 573 A.2d 365, 370 (D.C. 1990)). Stated differently: "For the parties to be bound by their oral agreement, the agreement must show an intent to be bound, must contain <u>all</u> material terms, <u>and must not be vague or indefinite</u>." *In re U.S. Office Products Co. Securities Litig.*, 251 F.Supp.2d 77, 97 (D.D.C. 2003) (emphasis added). <u>Plaintiff</u> bears the burden of establishing that a binding contract was made and of proving the terms of the contract.

*Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995) (granting defendant summary judgment as to the issue of enforceability of alleged oral contract because plaintiff failed to demonstrate that parties agreed to <u>all</u> material terms).  Mace has failed to meet this burden here.

The evidence establishes that the parties agreed on virtually <u>no</u> material terms of the alleged oral agreement – much less <u>all</u> such terms as required.  Indeed, as Mace described in discussing the lack of definite terms, the putative contract was not an enforceable agreement as much as "[a] conversation between two men who Larry had described to me as a friend and a brother, you know.  There was nothing like that."  SMF ¶ 6.  In short, the parties never agreed on the material terms necessary to render an agreement enforceable under D.C. law, such as a payment schedule, the duration, the amount of expenditures to be covered, the interest rate, or Mace's role and manner of performance.  Moreover, at least in large part, the (oral) consideration that purportedly flowed to Domash was as ill-defined and hopelessly vague as the alleged oral agreement itself.

First, the parties never agreed upon – or even discussed – a <u>payment schedule</u>, one of the material terms often cited by D.C. courts as being required to demonstrate the existence of an enforceable contract.  SMF ¶ 2.  *See, e.g., Republic of Modolva, supra* at 17.  Specifically, the parties did not reach any agreement on a specific date by which Domash had to make any payment to Mace.  SMF ¶ 3.  Instead, according to Mace, Domash's obligation to repay him would begin when the "dust settled" on Domash's child custody and divorce matters and "the economic fallout to [Domash's] life where [Domash] would right himself emotionally and be able to do the kind of work that was

16

significant, that he felt he was capable of doing." Mace Tr. at 44:9-19; 86:5-14, Ex. C.

Further, Mace explains that Domash's obligation to reimburse him would become due

when "[Domash] had gone through all of that and had been able to assume the kind of

dynamic economic role that he wanted for himself." *Id.* at 87:2-5. This type of

incomprehensible vagueness dooms Mace's contract claim, because "[r]easonable

definiteness in the essential terms of a purported contract . . . must be a precondition for

its enforceability, for otherwise the court has no adequate means of identifying the

obligations which it should enforce." *Rosenthal*, 573 A.2d at 370. *See also In re U.S.*

*Office Products Co.*, 251 F.Supp.2d at 97 (holding enforceable contract cannot have

vague or indefinite terms).

       This is especially true here, because Mace concedes that at the time the parties

entered into the alleged oral contract, they did not know <u>when</u> the above would occur

such that Domash's obligation to reimburse Mace would be triggered. SMF ¶ 4. Indeed,

Mace was unable even to provide a reasonable approximation. When asked for his best

estimate, Mace testified, "if you want a time line, I don't know, two years, two and a half

years, three years." *Id.* ¶ 5. This is a far cry from the certainty of payment terms that

must exist for an agreement to be deemed enforceable. *See, e.g., Rosenthal, supra.*

Moreover, the parties did not reach agreement on any specific triggering event that

required Domash to make any payment to Mace. *Id.* ¶ 6. Similarly, the parties did not

reach any agreement with respect to how often payments were due. *Id.* ¶ 7.

       Second, the alleged contract also fails because there was no meeting of the minds

in terms of its <u>duration</u>. *See Republic of Moldova*, 133 F.Supp.2d at 17 (observing that

duration is one of the material terms that must be "sufficiently definite" for a contract to

be enforceable).  The parties never discussed the length of the alleged contract, or even a reasonable estimate.  SMF ¶ 5.  Indeed, as set forth above, Mace cannot even provide an estimate of when Domash's <u>first</u> payment was due – much less the length of the entire arrangement.  *Id.*  The parties never agreed on a termination date, nor did they reach agreement on how the alleged contract could be terminated.  *Id.* ¶¶ 9-10.  They did not discuss, for example, whether any interim payment of the full amount outstanding by Domash would have terminated the alleged contract or whether Mace could have continued unabated in making further expenditures.  *Id.* ¶ 12.  When questioned about this, Mace replied, "I think we would have had to have seen what the relationship was like at that time." *Id.*

Third, in *Stansel v. American Security Bank*, 547 A.2d 990, 993 (D.C. 1988), the court held that "the exact amount of the loans" is a term upon which the parties must agree in order for a putative contract, like the one at issue here, to be enforceable under D.C. law.  Here, not only was an <u>exact</u> amount never discussed, but Mace concedes the parties did not even reach agreement on an <u>estimated</u> amount.  SMF ¶ 13.  Indeed, the parties never discussed Mace's spending <u>limits</u> under the alleged oral agreement.  *Id.* ¶¶ 14-15.  Incredibly, as Mace put it, "there was never an upper ceiling." *Id.* ¶ 13.  In other words, according to Mace, Domash's obligation to reimburse him in full would have existed even if Mace had expended over $100,000,000.  This type of vague agreement is unenforceable as a matter of law.  *See, e.g., id.; In re U.S. Office Products Co.*, 251 F.Supp.2d at 97.

Fourth, courts applying D.C. law have also held that the parties must reach agreement on the <u>interest rates</u> underlying any enforceable agreement of this kind.  *See*

*Stansel,* 547 A.2d at 993.  Here, that was not done – at least with any sort of meaning or the specificity required to render an agreement enforceable.  According to Mace, Domash was responsible for the interest that accrued on the credit cards in connection with Plaintiff's expenditures.  Mace Tr. at 57:15-19, Ex. C.  As Mace puts it, that issue "had been briefly touched on in the conversations that [the parties] had."  *Id.*  However, the alleged contract itself had no terms regarding interest, apart from whatever interest accrued on Mace's credit cards.  *Id.* ¶ 16.  This is critical here, because the various credit cards that Mace used were all subject to different and varying interest rates.  *Id.* ¶ 17.  Accordingly, a number of factors would have an effect on the interest rates under the alleged contract.  Such factors include: (1) limits on the interest rates of the credit cards that Mace was permitted to use; (2) Mace's minimum payment obligations to the credit card companies so as to minimize the interest that accrued; (3) the number of different credit cards that Mace was permitted to use; and (4) how partial payments of the amount outstanding would be applied to the various credit cards with different interest rates.  Nonetheless, the parties never even <u>discussed</u> any of these crucial matters.  *Id.* ¶¶ 18-21.

   Moreover, during the life of the alleged contract, the only funds Mace used to make partial payments on the various credit cards came from cash advances from other credit cards.  *Id.* ¶ 22.  At least some (and perhaps all) of the credit cards charged higher interest rates on cash advances than they did for direct purchases.  *Id.* ¶ 23.  In addition, due to late payments, Mace incurred late fees on some of the cards.  Nonetheless, pursuant to the alleged contract, the parties never even discussed the possibility of Mace using cash advances from certain credit cards to pay off his credit card debt on other cards or incurring late fees.  *Id.* ¶ 24.  As such, the parties never reached a meeting of the

minds on the interest rates that <u>actually</u> attached to Mace's expenditures under the alleged

contract, and thus the alleged contract is unenforceable as a matter of law.  *Stansel*, 547

A.2d at 993.

Fifth, the evidence also unequivocally demonstrates that the manner of Mace's

performance and his "role in the deal," were never agreed upon with the necessary level

of precision.  *See Republic of Moldova*, 133 F.Supp.2d at 18-19 (holding "the manner of

performance" and "the plaintiff's role in the deal" are necessary elements to which

plaintiff must demonstrate there was a meeting of the minds).  For example, here,

although Mace concedes that all of his expenditures had to be "reasonable," the parties

did not specifically agree on what constituted a reimbursable expenditure.  SMF ¶¶ 25-

26.  They did not reach any agreement as to the permissible nature of Mace's

expenditures.  *Id.* ¶ 27.  The parties never discussed whether Domash could exercise veto

power with respect to any of Mace's expenditures or whether Mace simply had unfettered

discretion in this regard.  *Id.* ¶ 28.  This is especially important here, because the alleged

contract did not contain any requirement that Mace submit anything in writing to Domash

regarding his expenditures, and, in fact, Mace <u>never</u> did so.  *Id.* ¶¶ 29-30.[8]  The parties

never reached any agreement about what Mace specifically had to do in connection with

his non-expenditure obligations.  *Id.* ¶ 31.  The contract did not specifically require that

Mace perform any of his obligations in order for Domash's payment obligations to ripen.

*Id.* ¶ 33.

---

[8] In fact, Mace never kept any kind of contemporaneous records of his expenditures.  SMF ¶ 72.
Accordingly, he is now unable to identify them, and thus he cannot meet his burden of proving that the
expenditures for which he seeks reimbursement were reasonable (a requirement, according to Mace, under
the alleged oral contract).

Sixth, the <u>consideration</u> for Domash to enter the alleged oral agreement – at least in large part – was as ill-defined as the alleged agreement itself.  Mace contends that Domash agreed to reimburse him for his expenditures because of Domash's alleged desire to manage money for IFA if it ever became operational.  *Id.* ¶ 42.  According to Mace, this separate understanding was reflected in yet another oral agreement – this one from 1990, <u>nine years earlier</u> – that if IFA became operational, Domash would in fact have the opportunity to manage its money (the "1990 Promise").  Mace Tr. at 73:3-16, Ex. C.  Mace concedes, however, that no specific terms were ever discussed in connection with the 1990 Promise.  SMF ¶ 34.  For example, the parties never discussed Domash's compensation pursuant to the 1990 Promise.  *Id.* ¶ 35.  Nor did they ever discuss the length of time Domash would manage IFA's money.  *Id.* ¶ 36.  Moreover, by November 2001, purportedly still during the life of the alleged oral contract, Mace was not even certain that Domash would run IFA's money if that company ever became operational.  *Id.* ¶ 37.  At that point in time, Mace was concerned that Domash might not be able to work for IFA in the future because, according to Mace, Domash "was consuming a lot of alcohol."  *Id.*  Mace nonetheless continued spending money for which he now seeks reimbursement from Domash.  *Id.* ¶ 39.  The consideration thus also fails as a matter of law.

In sum, the terms of the alleged oral contract are simply too vague and indefinite to render it enforceable.  It cannot seriously be disputed that the parties never agreed on <u>all</u> material terms as required (indeed, they agreed on virtually none), and thus Mace's breach of contract claim fails as a matter of law.  *E.g., Republic of Moldova*, 133 F.Supp.2d at 17.

## C.    All of Mace's Claims are Barred by the Statute of Limitations

All of Mace's claims are subject to a three-year statute of limitations.  *See* D.C. Code, § 12-301(8) (fraud) & § 12-301(7) (breach of contract and unjust enrichment).

Here, the accrual of any one of Mace's claims started the limitations clock on the others as well.  "When one cause of action accrues, the limitations period begins to run for all possible dependent or intertwined causes of action, and if one claim is barred by the statute of limitations, then dependent or intertwined claims are also barred." *Tolbert v. Nat'l Harmony Memorial Park*, 520 F.Supp.2d 209, 212 (D.D.C. 2007) (applying D.C. law and holding fraud and emotional distress claims were intertwined with breach of contract claim, and thus, even though plaintiff may not have known that injury constituted fraud and may not have appreciated the emotional distress until months after contract accrual date, those claims were nonetheless barred).

All three of Mace's claims are indisputably intertwined and dependent upon each other.  Indeed, they all seek redress for the exact same alleged wrongdoing (*i.e.,* Domash's failure to reimburse Mace for his expenditures).  *See* Complaint.  As such, if one claim is barred by the statute of limitations, the other ones necessarily fail as well.

In addition, as set forth below, the undisputed evidence demonstrates that <u>each</u> of Mace's three claims <u>independently</u> accrued more than three years before he filed suit. Accordingly, Mace's action is barred in its entirety.

1.    **Mace's Fraud Claim Accrued More than Three Years Before Filing Suit.**

a.    **The Applicable Standard**

Mace filed this lawsuit on November 18, 2005.  Accordingly, if his claim accrued before <u>November 18, 2002</u>, it is barred by the statute of limitations.  The undisputed facts conclusively demonstrate that the fraud claim accrued well before this date.

"For statute of limitations purposes, a claim usually accrues at the time an injury occurs."  *Diamond v. Davis*, 680 A.2d 364, 389 (D.C. 1996).  Where the relationship between the fact of injury and the alleged wrongful conduct is obscure, however, the "discovery rule" applies to determine when the limitations period began.  *Id.*  Under the discovery rule, "[a] cause of action accrues when the potential plaintiff has 'knowledge of <u>some</u> injury, its cause, and related wrongdoing.'"  *Tolbert*, 520 F.Supp.2d at 212 (quoting *Knight v. Furlow*, 553 A.2d 1232, 1236 (D.C. 1989)) (emphasis in original).  The discovery rule applies in cases alleging fraud.  *See In re Delaney*, 819 A.2d 968, 981-82 (D.C. 2003) (holding that mere "suspicions" about potential wrongdoing "placed upon [plaintiff] the obligation to move promptly and with reasonable diligence to inquire further into the matter").  "Knowledge of facts, and not knowledge of the legal significance of those facts, controls the time of accrual."  *Tolbert*, *supra* (quoting *Johnson v. Long Beach Mortg. Loan Trust 2001-4*, 451 F.Supp.2d 16, 42 (D.D.C. 2006)).  "The fact that [the plaintiff] did not then comprehend the full extent of <u>all</u> possible *sequelae* does not matter, for the law of limitations requires only that she have inquiry notice of the existence of a <u>cause of action</u>. . . .").  *Id.* (quoting *Baker v. A.H. Robins Co.*, 613 F. Supp. 994, 996 (D.D.C. 1985)) (emphases, brackets and ellipses in original).

The discovery rule creates a duty of inquiry. *Diamond*, 680 A.2d at 389. "[A]n injured person will be deemed to have legal notice of the claim, and the statute of limitations will begin to run, not only when that person actually learns about the claim but also as of any earlier time the injured person can be said to have 'inquiry notice' of the claim and fails to discover available details." *Id.* "To be as clear as possible: the concept of inquiry notice under the discovery rule . . . means that a potential plaintiff may be legally accountable for investigating a possible claim <u>before</u> learning some evidence of wrongdoing." *Id.* (emphasis in original).

Here, the "inquiry notice" standard is not even necessarily implicated, because the undisputed facts demonstrate that Mace had <u>actual</u> knowledge of his fraud claim well outside of the limitations period. At bottom, Mace's fraud claim is based on the contention that, despite Domash's alleged representations to the contrary, he never intended to reimburse Mace for his alleged contractual expenditures. The <u>specific theory</u> of this claim, as reflected by Mace's discovery responses and testimony in this matter, has shifted considerably throughout this litigation, but regardless of the theory upon which he relies, his fraud claim is clearly time-barred.

**b.    Mace's (Ever-Changing) Theories Allegedly Underlying his Fraud Claim**

On December 14, 2006, Mace served his Responses to Domash's First Set of Interrogatories. *See* Ex. B. In response to interrogatory number 5, seeking a full and complete description of the basis of his fraud claim, Mace answered as follows:

> I believe that in discovery of Mr. Domash it will come to light that Mr. Domash had the <u>financial wherewithal</u> in April 1999 to reimburse me as promised. I believe that such discovery will further show that he had the <u>financial wherewithal</u> to reimburse me through the November 2002 breach. Since he always the <u>financial wherewithal</u> at all times, he must

24

have never intended to keep his promise.  (Emphases added).  *See* Ex. B at 5.

On February 21, 2007, Mace testified at his deposition about the basis of his fraud claim:

> Q:  But you understood under the contract that if [Domash] had the financial wherewithal to reimburse you, that he was obligated to do so, correct?

*See* Ex. C at 104:17-19.

After this question was asked, Mace's attorney objected on the grounds that it misstated the testimony.  *Id.* at 104:20-21.  Nonetheless, over objection, Mace confirmed it, by responding:  "That is my understanding . . . ."  *Id.* at 106:8.

Shortly thereafter, a lunch break was taken.  *Id.* at 106:14-16.  Perhaps in recognition of the fact that certain documents unequivocally demonstrated that Mace knew specifics about Domash's "financial wherewithal" outside of the limitations period, after the lunch break, Mace, without any question pending, sought to modify the record. Specifically, he testified that "wherewithal has nothing to do with [the fraud claim]…." *Id.* at 107:14-15.

Several weeks later, on April 10, 2007, Mace served his "First Supplemental Responses to Defendant's First Set of Interrogatories," which apparently sought to clarify the basis of his fraud claim in light of his contradictory deposition testimony.  *See* Ex. H. Contrary to his first interrogatory answer and his initial deposition testimony, Mace described his (revised) fraud claim as follows:

> [Domash] told me the litigation caused him a great deal of financial uncertainty, both since he was spending much money on attorney's fees and expenses and since he would incur substantial property division, alimony and child support obligations.  Because of this financial uncertainty, Mr. Domash said in effect that he needed to maintain as much financial liquidity as he could, although he did maintain at all times that he did have the financial wherewithal to uphold his financial obligation to

> me. . . . From 1999 to 2002, he repeatedly told me that he would pay me
> but that these domestic relation litigation concerns prevented him from
> doing so at the moment. He also repeatedly told me that he was doing his
> best to maintain his financial liquidity.

Ex. H at 1-2. In short, presumably in a (futile) attempt to stave off a statute of limitations

defense, Mace changed his sworn testimony about his fraud claim from being based on

Domash's "financial wherewithal" in general, to his need to "maintain as much financial

liquidity as he could." Even under this latter theory, however, Mace's claim is time-

barred.

### 3.    Application of the Relevant Facts to the Limitations Analysis

Several separate and independent grounds exist for finding that Mace's fraud

claim is barred by the statute of limitations. First, Mace's supplemental interrogatory

answer itself demonstrates that he was aware of the alleged fraud before November 18,

2002. After the description of the basis of his fraud claim set forth above, Mace states:

"These repeated statements were false and fraudulent since [Domash] never intended to

pay me, since he did not conserve his financial liquidity as he said he needed to do and

would do, and since he was not uncertain about he financial results of the domestic

relation litigation. Instead of conserving financial liquidity, he purchased a motor boat

and may have made other expenditures inconsistent with his fraudulent promises to me

and false concerns he expressed to me." Ex. H at 2 (emphasis added).

These statements demonstrate that the fraud claim is time-barred, because Mace

concedes that he was aware – nearly one year before the limitations cut-off date – both

that Domash purchased the motorboat and that the purchase was inconsistent with

Domash's alleged position that he needed to maintain financial liquidity. As Mace was

aware in real-time, Domash purchased the boat in or around January 2002. SMF ¶¶ 45-

46. According to Mace, Domash initially lied to him about the source of funds that he used to buy the boat. Mace Tr. at 103:20-104:9, Ex. C. Originally, Domash allegedly told Mace that he was taking out a bank loan to finance the boat purchase. Domash then told Mace that, in truth, he bought the boat with cash. *Id.* Critically, as set forth above, Mace viewed the purchase of the speedboat as being "inconsistent" with Domash's statement about the necessity of conserving financial liquidity. *Id.* ¶ 47; Ex. H at 2. This alone is fatal to his fraud claim, because that claim is premised on this very inconsistency. *See Richards v. Duke Univ.*, 480 F.Supp.2d 222, 236 (D.D.C. 2007) (dismissing fraud claim because plaintiff had knowledge of alleged fraud outside statute of limitations period). Accordingly, once Mace became aware of it, his cause of action accrued. *E.g., id.; In re Estate of Delaney*, 819 A.2d at 982.

Indeed, Mace's own words regarding Domash's boat purchase – <u>at the time</u> – conclusively demonstrate that his fraud claim is time-barred. On January 23, 2002, nine months before the limitations cut-off date, Mace, in referring to what he perceived to be Domash's misrepresentations about his inability to reimburse him, wrote the following to Graham: "That Larry [Domash] may have been 'somewhat less than forthcoming' is an understatement. THIS CRAP IS GOING TO STOP. Do <u>nothing</u> until we speak. He has put everything at risk." SMF ¶ 49. (Emphasis in original). Mace admits that this letter referred to what he perceived as Domash's deceit in connection with his financial state: "I think what I was concerned about was Larry not being straightforward with us. I mean, you know, you can't say that you don't have it [money to reimburse] when you're going off and buying a speedboat." *Id.* As such, the undisputed evidence demonstrates

that Mace was on <u>actual</u> notice, as of January 2002, that Domash's alleged statements about needing to maintain financial liquidity – and in fact doing so – were false.

Second, at the time Mace discovered that Domash's alleged statements about financial liquidity were untrue, he was already on at least inquiry notice that Domash was allegedly being untruthful <u>generally</u> about his financial affairs.  In or about June 2001, nearly one and one-half years before the limitations cut-off date, Mace admits that a third party named Steve Killion told him that he did not believe Domash was being truthful regarding his (Domash's) financial affairs.  SMF ¶ 44.  Moreover, Mace concedes that in January 2002, although Domash had given him the impression that he was seriously strapped for cash, Mace believed this was inconsistent with other things he learned about Domash's finances.  *Id.* ¶ 50.  Specifically, by January 2002, Mace had formed an understanding that Domash had a corporation with $1.13 million in it.  *Id.* ¶ 51.  At minimum, this put Mace on the required inquiry notice sufficient for his claim to accrue.  *See In re Delaney*, 819 A.2d at 982 (holding mere "suspicions" about potential wrongdoing create inquiry notice).

Third, and most importantly, a series of written correspondence that Mace authored unequivocally demonstrates that his fraud claim accrued before November 18, 2002.  Like Mace's testimony regarding Domash's boat purchase, this correspondence shows that Mace had <u>actual</u> knowledge of Domash's alleged fraudulent conduct outside of the limitations period.  On June 24, 2002, Mace wrote Domash a letter in which he agreed with an assessment that Domash was "weak," a "coward" and a "weasel."  SMF ¶ 55; Ex. K.  He further stated that:

> "[a]nyone who's spent a considerable period of time with you would add that <u>you don't do what you say you're going to do, or what you've agreed to do, that</u>

> you're deceitful, frequently confused and have a serious problem with selfishness. For someone who's public mantra is 'always tell the truth', always do the right thing', always turn the other cheek', in private you're the essence of hypocrisy and denial.  In some deep, essential way, Larry, you have let your life become a lie."  *Id.* (Emphases added).

It is hard to imagine language that more clearly establishes the knowledge necessary for the limitations clock to start ticking on a fraud claim.

Mace, however, was not done.  On November 9, 2002, five months later but still outside of the limitations period, Mace wrote a note to Graham.  *Id.* ¶ 63; Ex. O.  He stated, "Damn Larry [Domash] and his selfishness and deceit."  *Id.* (emphasis added). This note was affixed to a letter Mace wrote, on the same date, to the Credit Services Unit of First USA Bank, N.A.  *Id.*  Mace's letter to the credit card company responded to the company's letter to him, dated October 31, 2002, alerting him that they were closing his account due to lack of payment.  *Id.*  Critically – and, in fact, dispositively – Mace testified that part of Domash's deceitful conduct, as of November 9, 2002, included his failure to reimburse Mace.  *Id.* ¶ 64.  This knowledge, which Mace concedes he possessed prior to the limitations cut-off date, forms the very basis of his current fraud claim in this lawsuit.  As such, his fraud claim accrued before November 18, 2002, and it is therefore time-barred.  *See, e.g., Richards*, 480 F.Supp.2d at 236.

### 2.    Mace's Breach of Contract Claim is Time-Barred.

As set forth above, because Mace's breach of contract claim is based on the same underlying facts as his fraud claim (*i.e.*, Domash's failure to reimburse Mace), one cannot accrue later than the other.  *See Tolbert*, 520 F.Supp.2d at 212.  Accordingly, for the reasons set forth above in the discussion on the fraud claim, the breach of contract claim is also untimely.  In addition, all of the documents and testimony which demonstrate that Mace thought Domash's failure to reimburse him – prior to the limitations cut-off date –

29

constituted fraud, also <u>necessarily</u> demonstrate that he was likewise aware of his claim for breach of contract at that time.  This is the case, because Domash's failure to reimburse Mace could not have been fraudulent if his purported obligation to do so under the alleged contract had not yet ripened.

Separate and apart from the above, the undisputed facts also demonstrate that the breach of contract claim is barred by the statute of limitations for reasons wholly independent from the fraud claim.

A cause of action for breach of contract accrues at the time of the breach. *Bembery v. District of Columbia*, 758 A.2d 518, 520 (2000) (holding statute of limitations on breach of contract claim begins running when defendant received bills for rent, not when defendant later rejected them).  "A contract is breached if a party fails to perform when performance is <u>due</u>."  *Winston-Murray v. Wells Fargo Home Mortg.*, --- A.2d ----, 2008 WL 2755068 (D.C. July 17, 2008) (citing 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 943 (interim ed. 2002)) (emphasis added).

Although Mace testified that Domash's obligation to repay him was not subject to a date certain (one of the reasons the purported agreement cannot be deemed enforceable as a matter of law, *see supra*), it is clear that <u>Mace</u> believed Domash breached the alleged oral contract prior to the limitations cut-off date, as during that time-frame, Mace made demand for payment which he specifically stated was "<u>overdue.</u>"

The undisputed facts demonstrate that Mace felt Domash owed him reimbursement well before November 2002.  For example, prior to September 2000, Mace told Dr. Graham that he was quite anxious to have what he felt was a payment due him from Domash.  SMF ¶ 42.  In March 2001, Mace told Steven Killion that Domash's

outstanding financial obligation to Mr. Killion's company "was only the latest in Mr. Domash's pattern of unmet responsibilities to financially reimburse [Mace] for [Mace's] efforts to support and assist him." *Id.* ¶ 43; Ex. G.

More directly, in the June 24, 2002 letter discussed above, in which Mace called Domash "deceitful," Mace also wrote:

> And remember this – whether you heed my warning or not – you have a number of outstanding responsibilities to the people that have gotten you this far and whether you take my advice or not you are not going to get a pass from any of us. You have to face your responsibilities, Larry, and live up to your obligations. If you don't you are never going to get well. Let me say that again for emphasis. You have to, you are going to, one way or the other, face your responsibilities and live up to your obligations. You're very good at conveniently forgetting that when you think it suits your purpose. Let me assure you we have no intention of letting you forget.

*Id.* ¶ 56; Ex. K. Mace admits that one of Domash's "outstanding responsibilities" for which he wrote that Domash was not going to get a pass, as of June 24, 2002, was his obligation to reimburse Mace. SMF ¶ 58.

On July 5, 2002, Mace re-sent Domash a copy of the June 24, 2002 letter. *Id.* ¶ 59; Ex. L. Further demonstrating <u>his own</u> belief that Domash owed him reimbursement under the alleged contract, Mace marked the copy, in red ink, "2nd notice, 7/5/02." *Id.*

On July 10, 2002, five days later, Mace wrote another letter to Domash, in which he stated, "To say that you don't owe BEK TEK and yours truly money is absurd as suggesting you don't owe George [Graham] money." SMF ¶ 60; Ex. M. Mace concedes that at the time he wrote this letter, he had concerns that Domash had not yet reimbursed him. SMF ¶ 61. Obviously, such concern could only arise if, according to Mace, Domash in fact had such an obligation <u>at that time</u> under the alleged contract.

On October 27, 2002, Mace wrote yet another letter to Domash, which he sent to Domash on October 30, 2002.  SMF ¶ 62; Ex. E & N.  That letter erases any lingering doubt that Mace's breach of contract claim accrued before November 18, 2002. Specifically, Mace wrote:

> Regardless of how that works out, however thats (sic) resolved, you have an <u>obligation to me that is overdue</u>.  Prior to the Walsh trial, as you knew and acknowledged you owed me $75,000.  After the trial on the drive from Boston to New York you spoke repeatedly of repaying me.  Larry, its been two years, indeed almost exactly two years.  I've done what you asked me to do, what I said I would do and now you have to meet your committment (sic).  You made the promise to repay me, live up to it. Write me a check for $100,000 in the next two weeks.  Just to build the relationship with Mr. Stein—who played a key role in getting us to this point – cost $25,000 since my visit to Providence 13 months ago.  You need to keep your word, you can not afford its loss.  As health permits, over the next several weeks I'll figure out what remains, notify you and expect you to close out the balance in monthly payments over the following five months.  *Id.*  (Emphasis added).

There can be no doubt that these letters demonstrate that Mace had the requisite amount of knowledge for his claim to have accrued.  *See Cormier v. District of Columbia Water & Sewer Auth.*, 946 A.2d 340, 350 (D.C. 2008) (holding plaintiff's accusatory letters to defendant triggered accrual, despite plaintiff's claim that they fell short of required notice, because "the language of [plaintiff's] letters speak[s] for [it]self").  Accordingly, Mace's breach of contract claim is time-barred.[9]

### 3.    Mace's Claim for Unjust Enrichment is Barred by the Statute of Limitations.

As set forth above, under the facts of this case, Mace's unjust enrichment claim accrued on the same day as his fraud and breach of contract claims because the claims are

---

[9] Mace claims that Domash made several oral promises to reimburse him for his expenditures after the alleged initial oral promise in or around April 1999.  These alleged promises do nothing to save Mace's time-barred claim, because Mace concedes that Domash's last alleged such promise was made in June 2002, some five months outside of the limitations period.  SMF ¶ 54.

all intertwined.  *See Tolbert*, 520 F.Supp.2d at 212.  Accordingly, it is time-barred.  Even

so, taken alone, the unjust enrichment claim is independently barred by the statute of

limitations.

There are two arguable bases for Mace's unjust enrichment claim.  First, that

Domash was unjustly enriched by virtue of the fact that he did not reimburse Mace as

promised.  This is Mace's unjust enrichment claim as pled.  *See* Complaint.  Second, that

Domash was unjustly enriched by virtue of the fact that Mace allegedly rendered services

to him without corresponding payment.  This is Mace's unjust enrichment claim as

described for the first time several months after the close of discovery.  *See* Opposition to

Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket No. 38).  For purposes

of the limitations analysis, the Court need not decide if the latter theory was timely

raised, because both theories are barred by the statute of limitations.

As for Mace's first unjust enrichment theory, in cases such as the present, where a

plaintiff is looking to recover for refund of monies paid under an unjust enrichment

theory, the statute of limitations accrues at the time of payment.  *See Woodruff v.*

*McConkey*, 524 A.2d 722, 726 (D.C. 1987).  As the *Woodruff* court explained:

"Woodruff's action is for a refund of monies paid; the injury occurs when that money is

actually paid.  Accordingly, the statute of limitations runs separately for each payment,

and Woodruff is entitled to bring an action to recover only those monies that have been

paid after September 27, 1982."  *Id.*  As such, at least as far as the unjust enrichment

claim is concerned, all expenditures Mace made prior to November 18, 2002 are time-

barred.[10]

---

[10] To the extent Mace argues that the expenditures he made on or after November 18, 2002 but before he
received Domash's letter explicitly denying the existence of the contract (about a week later) are timely,

Mace's second theory of unjust enrichment, based on the purported value of the services he provided, is also barred by the statute of limitations. The statute of limitations for this type of claim begins to run when the <u>last service is rendered</u> and payment is not made. *McQueen v. Woodstream Corp.*, 244 F.R.D. 26, 36 (D.D.C. 2007). "To determine when unjust enrichment occurs, it is 'inappropriate to look at [the plaintiff's] expectations of payment, rather than at the services he provided [to the defendant].'" *Id.* (holding discovery rule does not apply to unjust enrichment actions) (quoting *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1224 (D.C. 2005)) (brackets in original). Here, Mace concedes that he last spoke to Domash in connection with providing him any legal or emotional support in May or June 2002. SMF ¶ 62. Moreover, Mace admits that he cannot identify any acts that he took after June 2002 (some five months prior to the limitations cut-off date) that conferred a benefit on Domash. *Id.* ¶ 53.[11]

Accordingly, regardless of Mace's specific theory of recovery, his unjust enrichment claim is untimely.

---

such an argument fails. Given Mace's testimony that all expenditures had to be <u>reasonable</u> in order to be reimbursable (SMF ¶ 25), as well as his correspondence demonstrating that he thought Domash's failure to reimburse him up to that date constituted fraud, any such further expenditures would have to be considered unreasonable as a matter of law. A contrary decision would reflect a finding that Mace acted reasonably in making expenditures for which he anticipated reimbursement from Domash, at a time that he believed Domash was committing fraud by not reimbursing him for his previous expenditures. Obviously, such an argument defies logic.

[11] In his deposition, Mace claims that Domash <u>may</u> have benefited after June 2002 from certain actions which Mace took before June 2002. *See* Ex. C at 189-192. However, under *McQueen*, *supra*, the applicable test is when Mace rendered his last service, not when Domash subsequently obtained the benefit, and thus the claim is time-barred. In any event, in his attached affidavit, Domash states unequivocally that he did not benefit from any such actions undertaken by Mace, and Mace's deposition testimony makes clear that he is unable to dispute this. SMF ¶ 53.

**D.    In Addition to Being Time-Barred, the Unjust Enrichment Claim Fails as a Matter of Law.**

**1.    The "Expenditure-Reimbursement" Theory of Unjust Enrichment is not Viable Under the Facts of this Case.**

**a.    Mace's Unjust Enrichment Claim, as Pled, is Simply a Re-Characterization of his Faulty Breach of Contract Claim.**

The Complaint makes clear that Mace's unjust enrichment claim seeks damages based on the exact same theory behind his breach of contract claim (*i.e.,* Domash's failure to reimburse Mace for the expenditures Mace felt were covered by the alleged contract). As illustrated in a recent decision of the District of Columbia Court of Appeals, under these circumstances, an unjust enrichment claim cannot stand if the underlying breach of contract claim founders. *See Fort Lincoln Civil Assoc., Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1076 (D.C. 2008) (holding unjust enrichment claim based on same erroneous theory as contract claim – *i.e.,* that plaintiffs were beneficiaries of a trust – fails because contract claim failed).

The same holds true here. Mace's breach of contract claim fails because his own testimony makes clear that there was no meeting of the minds on multiple essential elements. Accordingly, insofar as Mace's unjust enrichment claim seeks expenditure reimbursement from Domash based solely on the purported oral understanding between the parties – as opposed to the value of any services he allegedly rendered to Domash – the claim must fail for the reasons articulated in *Fort Lincoln*.

**b.    Mace's "Expenditure-Reimbursement" Unjust Enrichment Claim Also Fails Because he has not Put Forth any Evidence Demonstrating that Domash Benefited from his Alleged Services.**

It is axiomatic that one must provide valuable services that benefit another in order to maintain a viable unjust enrichment claim.  *See, e.g., Ellipso, Inc. v. Mann*, 460 F.Supp.2d 99, 104 (D.D.C. 2006).  It goes without saying – and Mace has not alleged to the contrary – that his expenditures for his own living expenses and those of his cousin did not benefit Domash.  SMF ¶¶ 68-69; Ex. D.  Moreover, Mace concedes that Domash did not benefit from any of the expenditures made on behalf of IFA.  SMF ¶ 67. Accordingly, the only category of expenditures that even arguably could constitute part of an unjust enrichment claim are those made directly on behalf of Domash (a total of $8,727.05 according to Mace's inadmissible accountant's report).  *See* Ex. Q.  However, as to this last category, Mace never identified the nature or purpose of any such expenditure in response to Domash's discovery requests directing him to do so.  SMF ¶ 70.  *See also* Ex. B at 3.   As such, he has failed to meet his burden for summary judgment purposes of showing that <u>any</u> actual expenditures conferred a benefit on Domash.

**2.    Mace's "Value of Services" Theory of Unjust Enrichment is not Viable Under the Facts of this Case.**

**a.    Mace Cannot Recover Because he was not Expecting Payment for his Services (Aside from Reimbursement for his Alleged Expenditures).**

"Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another."  *Ellipso, Inc.*, 460 F.Supp.2d at 104 (quoting *4934, Inc. v. District of Columbia Dep't of Employment Servs.,* 605 A.2d 50, 55 (D.C. 1992)).  There are five elements of such an action: (i) valuable services rendered by the

plaintiff; (ii) for the person from whom recover is sought; (iii) which services were accepted and enjoyed by that person; (iv) <u>under circumstances which reasonably notified the person that the plaintiff, in performing such services, expected to be paid</u>; and (v) it would be unjust for the recipient of a benefit to retain that benefit. *See id.*

Here, Mace never asserted the existence of any "non-reimbursement" theory of unjust enrichment until well after the close of discovery and after he had provided <u>three</u> separate Rule 26 disclosures, each of which set forth his theory of damages in this action. *See* Ex. A, R & S. Accordingly, the factual record related to Mace's expectation of payment (or lack thereof) – and his reasonable notification to Domash of same – is not as robust as it would have been had Domash been made aware of this purported claim in a timely fashion and thus taken discovery related to it. Nonetheless, the record that does exist in this regard makes clear that Mace was <u>not</u> expecting payment (other than expenditure reimbursement) and thus cannot maintain an unjust enrichment claim based on a theory of the value of his services.

For example, as support for the notion that Mace has a right to receive compensation in this regard pursuant to his unjust enrichment claim, Mace's opposition to Domash's motion to dismiss for lack of subject matter jurisdiction, (Docket No. 38), relied heavily on the fact that Domash granted Mace a power of attorney during the timeframe of the parties' alleged agreement. *See* Opposition at 6-7. Yet, during his deposition, Mace unequivocally testified that he did <u>not</u> expect payment for such services:

> Q:    Was there an understanding between the two of you that you would be
>        paid for your role in taking over power of attorney for Mr. Domash?
>
> A:    <u>No. Not at all. I never would have accepted money for something like
>        that.</u>

Ex. C at 271.

Additionally, Mace's deposition testimony generally indicates that he was not

expecting money from Domash other than to reimburse him for his expenditures:

> Q:     Under the contract, did Mr. Domash have a responsibility to pay you for your help to him other than to reimburse your credit card debt?

> A:     Well, that was where the money was coming, Mr. Brooks.

> Q:     Was there any understanding, for instance, that if you came to court [on Domash's behalf], he just had to give you $200?

> A:     No.

> Q:     And nothing like that?

> Q:     Nothing like that.

*Id.* at 68-69.

Moreover, in response to a question as to whether Domash's divorce attorney

believed that Mace was being paid for the assistance he allegedly provided Domash,

Mace's testimony reveals that he was not expecting payment for such services, but

instead, consistent with his expenditure-reimbursement theory of unjust enrichment, was

doing so because he believed it would assist his goal of launching IFA, his putative

insurance company:

> Q:     As far as you know, did [Domash's divorce attorney] have an understanding that you were being paid for your services?

> A:     Being paid for my services, I mean – I wasn't an employee of Larry's. I was Larry's – he would describe it as kind of coordinator, switchboard between all these different parties. I wasn't paid for it. My goal was to try to get IFA up and running.

*Id.* at 212-213.

**b.    Mace Should not be Able to Proceed on an Unjust Enrichment Theory Based on the Alleged Value of his Services Because it was not Properly Raised Either in his Pleadings or Various Discovery Submissions.**

In his opposition to Domash's motion to dismiss for lack of subject matter jurisdiction, which was filed seven months after the close of discovery, Mace asserted alternative – and never-before raised – valuations of his unjust enrichment claim, based on the alleged value of the services that he allegedly provided to Domash.  *See* Opposition at 11-12.  In doing so, Mace not only ignored that he had never raised the theories behind these valuations in connection with this lawsuit, but also that such theories are facially inconsistent with his actual unjust enrichment claim.[12]

Mace's Complaint and his subsequent discovery material make clear that his unjust enrichment claim is based <u>only</u> on the out-of-pocket expenditures he made, and not on the value of his services, as he claimed for the first time months after discovery closed.  Specifically, Count III of the Complaint, titled "Unjust Enrichment – Quantum Meruit," alleges: "<u>In making expenditures</u> after April, 1999 in support of the development of IFA and D & A and the management of Defendant's personal legal problems, Plaintiff conferred a benefit upon Defendant."  Complaint ¶ 23 (emphasis added).  "In conferring that benefit, <u>Plaintiff was promised reimbursement by Defendant for the expenditures concerned</u>.  Defendant understood that Plaintiff expected <u>reimbursement for the expenditures</u>."  Complaint ¶ 25 (emphasis added).  "If Defendant were allowed to retain the benefit of <u>Plaintiff's expenditures</u> without reimbursing

---

[12] Notably, Magistrate Judge Robinson has already denied Mace's similar attempts to add new damages claims and theories after the discovery deadline.  Specifically, after oral argument on September 27, 2007, Judge Robinson granted Domash's motion to strike Mace's second supplemental Rule 26 disclosures (also filed after the discovery period ended), in which he asserted, for the first time, damages for emotional distress and time spent managing his alleged debt as part of his pre-existing fraud and contract claims.  A copy of the transcript of this hearing is attached hereto as Ex T.  Plaintiff's "value of services" theory of unjust enrichment relies on this exact same (already rejected) tactic.

therefor, Defendant would be unjustly enriched."  Complaint ¶ 26 (emphasis added).  The Complaint contains no allegations which would even conceivably support an unjust enrichment claim based on the value of alleged services provided by Mace (other than whatever value the alleged expenditures carried).

Separate and apart from his Complaint, as referenced above, Mace's <u>three</u> Rule 26 damages disclosures are consistent with the position he had taken throughout this litigation (until he filed the opposition to the motion to dismiss well after the close of discovery), that his unjust enrichment claim was based only on the alleged expenditures he made pursuant to his alleged agreement with Domash.  In these three disclosures, Mace never set forth a damages claim or calculation based on the alleged value of his services to Domash, *see* Ex. A, R & S, and thus relying on such a theory now violates Rule 26.  As previously recognized by the Magistrate Judge (*see* n.12, *supra*), to permit Mace to go forward on this theory now would be extremely prejudicial to Domash.

### E.    Mace's Claim is Barred by the Statute of Frauds

The Statute of Frauds provides that: "An action may not be brought . . . to charge the defendant upon a special promise to answer for the debt, default, or miscarriage of another person, . . . unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing . . .."  D.C. Code, § 28-3502.  Here, Mace seeks to hold Domash liable for an alleged oral promise to answer for Mace's debt to various credit card companies.  As it is undisputed that there was no writing memorializing the alleged promise, the Statute of Frauds bars Mace's claim.

To the extent that Mace argues that the "leading object" exception to the Statute of Frauds applies, such an argument fails.  Under that exception, "[e]ven where there is a

promise to answer the debt of another, it may be enforceable notwithstanding the Statute of Frauds if the 'leading object' of the promisor was to obtain a <u>direct, personal benefit</u>." *Hudson v. Ashley*, 411 A.2d 963, 967 (D.C. 1980) (emphasis added).  Here, as set forth above in the discussion regarding his unjust enrichment claim, Mace cannot establish that Domash received any direct or personal benefit from – at the very least – the vast majority of his expenditures.  SMF ¶¶ 67-69.  This is fatal to all three of Mace's claims (not just his breach of contract claim) because they all seek recovery for Domash's refusal to reimburse Mace for his expenditures.  *See New Economy Capital, LLC v. New Markets Capital Group*, 881 A.2d 1087, 1098 (D.C. 2005) (granting summary judgment in favor of defendants on breach of contract, promissory estoppel <u>and</u> quantum meruit claims based on inapplicability of leading object exception under the statute of frauds).[13]

---

[13] The *New Economy Capital* court did permit a quantum meruit claim based on consulting services allegedly performed by plaintiffs to go forward.  *See id.*  This claim appears to be analogous to Mace's untimely "value of services" unjust enrichment claim.  As set forth above, that claim fails for several separate and independent reasons.

## V.    **CONCLUSION**

For all of the foregoing reasons, Defendant Larry Domash is entitled to summary judgment on all three counts of Plaintiff Peter Mace's Complaint.

Respectfully submitted,


/s/ Adam Augustine Carter_____
Adam Augustine Carter
DC Bar # 437381
888 Seventeenth Street, N.W., Suite 900
Washington, D.C.  20006-3307
Tel: 202-261-2803
Fax: 202-261-2835
acarter@employmentlawgroup.net


/s/ Douglas S. Brooks_____
Douglas S. Brooks
*Pro Hac Vice*
LibbyHoopes, P.C.
175 Federal Street
Boston, MA 02110
Tel: 617-338-9300
Fax: 617-338-9911
dbrooks@libbyhoopes.com



Dated:  July 18, 2008

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing was

delivered via the Court's electronic filing system to the following counsel for Plaintiff

Peter M. Mace, this 18th day of July, 2008


Michael J. Trevelline, Esq.
1823 Jefferson Place, NW
Washington, D.C. 20036-2504
mjt@mjtlegal.com


                                        /s/ Douglas S. Brooks_____
                                        Douglas S. Brooks

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER M. MACE | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Case No. 1:05CV02244 |
| | ) (HHK/DAR) |
| | ) Dispositive Motions Due 7/18/08 |
| LARRY A. DOMASH | ) |
| | ) |
| | ) |
| Defendant | ) |
| | ) |

## LcvR 56.1 STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

1.    Plaintiff Peter Mace describes the lack of specific provisions in the alleged contract as follows:  "This was [a] conversation between two men who Larry had described to me as a friend and a brother, you know.  There was nothing like that." Deposition Transcript of Peter Mace ("Mace Tr.") at 55:11-14 (copies of the relevant excerpts of Mace's deposition transcript are attached as Exhibit C to the Memorandum of Points and Authorities in Support of Defendant Larry Domash's Motion for Summary Judgment ("Memorandum")).

2.    The parties did not reach any agreement on any kind of payment schedule. *Id.* at 54:16-18.

3.    The parties did not reach any agreement on a specific date by which Domash had to make any payment.  *Id.* at 89:16-17.

4.      At the time they entered into the alleged oral contract, the parties did not know when Domash's obligation to reimburse Mace would occur.  *Id.* at 45:17-21.

5.      When asked for an estimate on how long it would take the above to occur as of the time the parties entered into the alleged oral contract, Mace testified, "if you want a time line, I don't know, two years, two and a half years, three years."  *Id.* at 88:8-9.

6.      The parties did not reach an agreement on a specific triggering event that required Domash to make payment to Mace.  *Id.* at 90:7-13.

7.      The parties did not reach any agreement with respect to how often payments were due under the alleged contract.  *Id.* at 55:6-8.

8.      The parties did not reach any agreement on an outstanding dollar amount, which would trigger Mace's right to demand payment.  *Id.* at 56:2-5.

9.      The alleged contract contained no termination date.  *Id.* at 61:20-21.

10.     The parties did not reach an agreement on how either side could terminate the alleged contract.  *Id.* at 64-6-9.

11.     The parties did not reach an agreement as to a notice provision required to terminate the alleged contract.  *Id.* at 65-14-17.

12.     The parties did not discuss whether any interim payment of the full amount outstanding by Domash would have terminated the alleged contract or whether Mace could have continued to make expenditures.  *Id.* at 65:5-9.  When questioned about this, Mace replied, "I think we would have had to have seen what the relationship was like at that time."  *Id.* at 65:10-11.

13.     The parties never reached agreement on the amount of reimbursable expenditures Mace was allowed to incur under the alleged contract.  *Id.* at 61:3-7.  As Mace put it, "there was never an upper ceiling."

14.     The parties never reached agreement on a monthly spending limit under the alleged contract.  *Id.* at 61:11-13.

15.     The parties never reached agreement on any other limits to Mace's spending authority under the alleged contract.  *Id.* at 61:14-17.

16.     The alleged contract had no terms regarding interest, apart from the interest that accrued on Mace's credit cards.  *Id.* at 57:1-14.

17.     The credit cards that Mace used throughout the life of the alleged contract contained different and varying interest rates.  *Id.* 340:9-13.

18.     The parties never discussed limits on the interest rates of the credit cards that Mace was permitted to use.  *Id.* at 70:2-11.

19.     The parties never discussed Mace's minimum payment obligations to the credit card companies pursuant to his alleged contract with Domash.  *Id.* at 59:6-11.

20.     The parties never discussed the number of different credit cards that Mace was permitted to use.  *Id.* at 70:12-18.

21.     The parties never reached any agreement as to how partial payments would be applied to the various credit cards in use under the alleged contract.  *Id.* at 300:3-9.

22.     During the life of the alleged contract, the only funds Mace used to make partial payments on the various credit cards came from cash advances from other credit cards.  *Id.* at 343:1-16.

23.    At least some (and perhaps all) of the credit cards charged higher interest for cash advances than they did for direct purchases. *Id.* at 344:8-12.

24.    The parties never discussed the possibility of Mace using cash advances from certain credit cards to pay off his credit card debt on other cards or his incurring late fees on the cards. *See* Affidavit of Larry A. Domash ("Domash Aff.") ¶ 9, attached as Exhibit D to the Memorandum.

25.    The alleged contract did not require Domash to reimburse Mace for unreasonable expenditures. Mace Tr. at 48:5-13.

26.    The parties did not agree on what constituted a reimbursable expenditure under the alleged contract. *Id.* at 49:18-22.

27.    The parties did not reach any agreement as to the permissible nature of Plaintiff's expenditures under the alleged contract. *Id.* at 49:18-22.

28.    The parties never discussed whether Domash could exercise veto power with respect to any of Mace's expenditures. *Id.* at 60:15-18.

29.    The alleged contract did not contain any requirement that Mace submit anything in writing to Domash regarding his expenditures. *Id.* at 56:17-22.

30.    Mace never submitted anything in writing to Domash regarding his expenditures. Domash Aff. ¶ 2.

31.    The parties never reached any agreement as to what Mace had to do specifically in connection with his obligations under the alleged contract. Mace Tr. at 67:1-3.

32.    The alleged contract did not specify whether IFA or Domash's personal and legal problems took priority. *Id.* at 67:11-16

33.     The alleged contract did not specifically require that Mace perform his obligations in order for Domash's payment obligations to ripen.  *Id.* at 69:5-10.

34.     No specific terms were ever discussed in connection with the alleged 1990 Promise (defined in the Memorandum).  *Id.* at 75:10-16.

35.     The parties never discussed compensation pursuant to the alleged 1990 Promise.  *Id.* at 75:17-18.

36.     The parties never discussed the length of time Domash would manage IFA's money pursuant to the alleged 1990 Promise.  *Id.* at 76:1-4.

37.     By November 2001, Mace was concerned that Domash might not be able to work for IFA in the future because, according to Mace, Domash "was consuming a lot of alcohol."  *Id.* at 111:21-112:8.

38.     Mace wrote a letter to Domash, dated October 30, 2002, in which he wrote, *inter alia*,: "I'd expect you to run IFA's money" and "If you're up to it I'd want you to take the post."  *See* Exhibit E to the Memorandum.

39.     Mace continued making expenditures for which he now seeks reimbursement in this lawsuit after November 2001.  Domash Aff. ¶ 8.

40.     The parties never reached any agreement as to how the reimbursement payments would be treated from a tax perspective.  Mace Tr. at 299:12-15.

41.     The parties never reached any agreement as to how the interest from the credit cards would be treated from a tax perspective.  *Id.* at 299:16-20.

42.     Prior to September 2000, Mace told Dr. Graham that he was quite anxious to have what he felt was a payment due him from Domash.  Deposition of George Graham at 15 (relevant excerpt attached as Exhibit F to the Memorandum).

43.     In March 2001, Mace told an individual named Steven Killion that Domash's outstanding financial obligation to Mr. Killion's company "was only the latest in Mr. Domash's pattern of unmet responsibilities to financially reimburse [Plaintiff] for [Plaintiff's] efforts to support and assist him." *See* September 1, 2006 letter from Killion to Mace, attached as Exhibit G to the Memorandum.

44.     In or about June 2001, Killion told Mace that he did not believe Domash was being truthful regarding his (Domash's) financial affairs.  Mace Tr. at 262:17-263:4.

45.     In December 2001 or January 2002, Mace came to feel that Domash was in a financial position to reimburse Mace.  *Id.* at 103:7-20.

46.     During that timeframe, Domash purchased a speedboat.  *Id.* at 103:20-104:9.

47.     Mace viewed the purchase of the speedboat, which he learned about in or about January 2002, as being "inconsistent" with his statement about the necessity of conserving financial liquidity.  *See* Exhibit H to the Memorandum at 2.

48.     On January 17, 2002, Plaintiff wrote a letter to an individual named Bruce Koenig, where he wrote, referring to Defendant's financial obligations, that:  "If you're frustrated after thirteen months and partial payment imagine how we feel after years and years and no payment."  Mace Tr. at 114:9-20; 118:13-18 (a copy of the letter is attached as Exhibit I to the Memorandum).

49.     Referring to what he perceived to be Domash's misrepresentations about his ability to reimburse Mace, on January 23, 2002, Mace wrote the following to Dr. George Graham, "That Larry [Domash] may have been 'somewhat less than forthcoming] is an understatement.  THIS CRAP IS GOING TO STOP.  Do nothing until

we speak.  He has put everything at risk."  *Id.* at 121:6-122:14 (a copy of this letter is attached as Exhibit J to the Memorandum).  Mace was referring to what he perceived as Domash's deceit:  "I think what I was concerned about was Larry not being straightforward with us.  I mean, you know, you can't say that you don't have it [money to reimburse] when you're going off and buying a speedboat."  Mace Tr. at 123:21-124:5.

50.     In January 2002, although Mace claims that Domash had given him the impression that he was seriously strapped for cash, Mace believed this was inconsistent with other things he learned about Domash's finances.  *Id*. at 266:2-8.

51.     Specifically, by January 2002, Mace had formed an understanding that Domash had a corporation with $1.13 million in it.  *Id.* at 265:14-17.

52.     Mace did not speak to Domash in connection with providing him legal and emotional support under the alleged contract after May or June 2002.  *Id.* at 188:10-12.

53.     Mace cannot identify any acts that he took, after June 2002, which conferred a benefit of any kind on Domash.  *Id.* at 191:11-21.  Domash did not actually receive any benefit, after June 2002, from any actions taken by Mace.  Domash Aff ¶ 4.

54.     Domash never promised to reimburse Mace after May or June 2002.  *Id.* at 195:2-8.

55.     On June 24, 2002, Mace wrote and sent Domash a letter.  In that letter, Mace agreed with an assessment that Domash was "weak," a "coward" and a "weasel."  Mace Tr. at 134:16-135:22 (a copy of the June 24, 2002 letter is attached as Exhibit K to the Memorandum).  Mace further stated that:

> "[a]nyone who's spent a considerable period of time with you would add that you don't do what you say you're going to do, or what you've agreed to do, that you're deceitful, frequently confused and have a serious problem with selfishness. For someone who's public mantra is 'always tell the truth', always do the right

thing', always turn the other cheek', in private you're the essence of hypocrisy and denial.  In some deep, essential way, Larry, you have let your life become a lie."  Exhibit K to the Memorandum.

56.    In the June 24, 2002 letter, Mace also wrote:

"And remember this – whether you heed my warning or not – you have a number of outstanding responsibilities to the people that have gotten you this far and whether you take my advice or not you are not going to get a pass from any of us.  You have to face your responsibilities, Larry, and live up to your obligations.  If you don't you are never going to get well.  Let me say that again for emphasis.  You have to, you are going to, one way or the other, face your responsibilities and live up to your obligations.  You're very good at conveniently forgetting that when you think it suits your purpose.  Let me assure you we have no intention of letting you forget."  *Id.*

57.    Mace further testified that he believed Domash was deceitful as of June 24, 2002.  Mace Tr. at 136:1-16.

58.    According to Mace, one of Domash's "outstanding responsibilities" for which he wrote Domash was not going to get a pass, in Mace's June 24, 2002 letter, was Domash's alleged obligation to reimburse Mace.  *Id.*. at 138:7-16; 139:14-19.

59.    On July 5, 2002, Plaintiff resent Defendant a copy of the above-referenced June 24, 2002 letter.  Plaintiff marked the copy, in red ink, "2nd notice, 7/5/02."  *Id.* at 141:4-14; 142:14-18; *see also* Exhibit L to the Memorandum.

60.    On July 10, 2002, Mace wrote another letter to Domash, in which he stated, "To say that you don't owe BEK TEK and yours truly money is absurd as suggesting you don't owe George money."  *Id.* at 148:3-11; 15-18 (a copy of the July 10, 2002 letter is attached to the Memorandum as Exhibit M).

61.    At the time Mace wrote this letter, he had concerns that Domash had not reimbursed him.  Mace Tr. at 155:10-18.

62.    On October 27, 2002, Mace wrote yet another letter to Domash, which he mailed to Domash on October 30, 2002, after sending a draft version to Graham's

assistant, Wendy Tonn on October 27, 2002.  *Id.* at 165:13-15 (a copy of the October 27,

2002 draft is attached to the Memorandum as Exhibit N; a copy of the October 30, 2002

letter is attached to the Memorandum as Exhibit E).  In that letter, Mace stated:

> Regardless of how that works out, however thats (sic) resolved, you have an
> obligation to me that is overdue.  Prior to the Walsh trial, as you knew and
> acknowledged you owed me $75,000.  After the trial on the drive from Boston to
> New York you spoke repeatedly of repaying me.  Larry, its been two years,
> indeed almost exactly two years.  I've done what you asked me to do, what I said
> I would do and now you have to meet your committment (sic).  You made the
> promise to repay me, live up to it.  Write me a check for $100,000 in the next two
> weeks.  Just to build the relationship with Mr. Stein—who played a key role in
> getting us to this point – cost $25,000 since my visit to Providence 13 months
> ago.  You need to keep your word, you can not afford its loss.  As health permits,
> over the next several weeks I'll figure out what remains, notify you and expect
> you to close out the balance in monthly payments over the following five months.
> *See* Exhibit E to the Memorandum.

63.     On November 9, 2002, Mace wrote a note to third party George Graham.

He stated, "Damn Larry and his selfishness and deceit."  This note was affixed to a letter

Mace wrote, on the same date, to the Credit Services Unit of First USA Bank, N.A.

Mace's letter to the credit card company responded to the company's letter to him, dated

October 31, 2002, alerting him that they were closing his account.  Mace Tr. 180-184 (a

copy of this correspondence is attached as Exhibit O to the Memorandum).

64.     Mace testified that part of Domash's deceitful conduct he was referring

to, as of November 9, 2002, included his failure to reimburse Mace as of that date.  Mace

Tr. at 184:9-22.

65.     Domash did not make the $100,000 payment – or any payment whatsoever

– within the two weeks following the October 30, 2002 letter.

66.     On November 24, 2002, Domash wrote Mace, denying that he owed Mace

any money.

67.     Domash never received any benefit from any expenditures that Mace made in connection with IFA.  Mace Tr. at 186:14-19.

68.     Domash never received any benefit from any expenditures that Mace made on behalf of Mace's cousin.  Domash Aff. ¶ 5.

69.     Domash never received any benefit from any expenditures that Mace made on behalf of himself.  Domash Aff ¶ 6.

70.     Mace is unable to identify any specific credit card expenditures that he made under the alleged contract.  *See, e.g.,* Mace's Response No. 1 to Domash's First Set of Interrogatories (a copy is attached as Exhibit B to the Memorandum).

71.     Mace is unable to allocate any specific credit card expenditures he made under the alleged contract to one of the four categories of the contract.  *See* Mace Tr. at 93:22-94:8; Exhibit B, Response No. 1.

72.     Other than whatever was reflected in his various credit card statements, Mace did not keep any records regarding his expenditures under the contract.

73.     Mace was not expecting payment from Domash in connection with his services other than reimbursement for his reasonable expenditures under the contract. *See generally* Mace Tr. 68:16-69:4; 212:16-213:2; 271:3-7.

74.     For example, Mace did not accept – and would not have accepted – money for taking over power of attorney for Domash.  *Id.* at 271:3-7.

75.     The parties had no understanding that Domash would pay Mace directly for Maces purported help to Domash, other than the alleged promise to reimburse Mace's reasonable expenditures under the alleged contract.  *Id.* at 68:16-69:4.

Respectfully submitted,


/s/ Adam Augustine Carter _____
Adam Augustine Carter
DC Bar # 437381
888 Seventeenth Street, N.W., Suite 900
Washington, D.C.  20006-3307
Tel: 202-261-2803
Fax: 202-261-2835
acarter@employmentlawgroup.net


/s/ Douglas S. Brooks _____
Douglas S. Brooks
*Pro Hac Vice*
LibbyHoopes, P.C.
175 Federal Street
Boston, MA 02110
Tel: 617-338-9300
Fax: 617-338-9911
dbrooks@libbyhoopes.com


Dated:  July 18, 2008

11

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing was

delivered via the Court's electronic filing system to the following counsel for Plaintiff

Peter M. Mace, this 18th day of July, 2008


Michael J. Trevelline, Esq.
1823 Jefferson Place, NW
Washington, D.C. 20036-2504
mjt@mjtlegal.com


/s/ Douglas S. Brooks_____
Douglas S. Brooks