# EXHIBIT C

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

1 (Pages 1 to 4)

---

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - x
PETER M. MACE,          :
        Plaintiff,     :
    vs.          : Case No. 1:05CV02244 (HHK)
LARRY A. DOMASH,        :
        Defendant.    :
- - - - - - - - - - x

Deposition of PETER M. MACE
Washington, D.C.
Wednesday, February 21, 2007
9:44 a.m.

Job No.: 1-97081
Pages: 1 - 254
Reported by: Sarah M. Bickel

---

**2**

Deposition of PETER M. MACE, held at the offices of:

Employment Law Group
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006
(202) 331-2883

Pursuant to agreement, before Sarah M. Bickel, Court Reporter and Notary Public in and for the District of Columbia.

---

**3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
MICHAEL J. TREVELLINE, ESQ.
Law Offices of Michael J. Trevelline
1823 Jefferson Place, N.W.
Washington, D.C. 20036
(202) 737-1139

ON BEHALF OF THE DEFENDANT:
DOUGLAS S. BROOKS, ESQ.
Kelly, Libby & Hoopes
175 Federal Street
8th Floor
Boston, Massachusetts 02110
(617) 338-9300

ALSO PRESENT:  Larry A. Domash

---

**4**

C O N T E N T S

EXAMINATION OF PETER M. MACE          PAGE
  By Mr. Brooks          6

E X H I B I T S
(Retained by Counsel)

MACE DEPOSITION EXHIBIT          PAGE
No. 1          30
No. 2          76
No. 3          80
No. 4          83
No. 5          90
No. 6          94
No. 7          100
No. 8          109
No. 9          114
No. 10          121
No. 11          127
No. 12          132
No. 13          134

---

**13**

1    Q  What is your current address?
2    A  It's apartment 209, 4701 Connecticut
3  Avenue, Northwest Washington, D.C. 2008.
4    Q  How long have you lived there?
5    A  Since 1980.
6    Q  Who do you live there with?
7    A  My wife.
8    Q  And how long have you been married?
9    A  Since 1980.
10    Q  What's your wife's name?
11    A  Vicky.
12    Q  Do you have any kids?
13    A  No, we had an ectopic pregnancy. She
14  almost died twice. We never adopted.
15    Q  I'm sorry to hear that.
16    MR. TREVELLINE:  Let me stop. I need to
17  take a break and get some water.
18    (Off the record.)
19    BY MR. BROOKS:
20    Q  Mr. Mace, the name of the insurance
21  company that you tried to get going was Investors
22  Fidelity of America?

**14**

1    A  Yes.
2    Q  Do you often refer to it as IFA for short?
3    A  Yes.
4    Q  Can we agree that if we say IFA, we're
5  talking about Investors Fidelity of America?
6    A  Yes.
7    Q  What year did you -- what year did IFA
8  begin as a concept for you?
9    A  I believe 1986.
10    Q  At that time, what were you trying to do
11  for IFA?
12    A  We were trying to give it life.
13    Q  When you say "we," who is we?
14    A  A number of people who were involved in
15  putting the company together.
16    Q  Who are the names of those people?
17    A  Gene Sierzant, Gary LeClair, myself, Yorke
18  Roberts was a part of it, he's now deceased.
19    Q  What year was IFA incorporated?
20    A  I believe 1986.
21    Q  What was the purpose of IFA?
22    A  It was to create the premier life and

**15**

1  annuity company in the United States.
2    Q  How would you describe your experience in
3  the field at that time?
4    A  I had experience selling insurance. And I
5  had experience in acting as a brokerage manager,
6  dealing with hundreds of different insurance agents.
7    Q  This was your first attempt to start your
8  own company?
9    A  Yes.
10    Q  Other than IFA, have you ever tried to
11  start any other insurance companies?
12    A  Yes.
13    Q  Can you describe that.
14    A  Yorke Roberts asked me to help him form
15  his own company and I mentioned the bank earlier.
16    Q  After you incorporated IFA in 1986, were
17  there any points in time that you tried to start
18  another insurance company?
19    A  No.
20    Q  Okay. So from 1986, it's been all IFA?
21    A  Yes.
22    Q  In 1986, did IFA own or lease any

**16**

1  computers?
2    A  At the time did it own or lease any
3  computers? No.
4    Q  At the time IFA was incorporated, did it
5  have any assets?
6    A  Minimal assets.
7    Q  What were those minimal assets?
8    A  Whatever we needed to meet, whatever the
9  statutory minimum was. It was a concept.
10    Q  Did it ever become more than a concept?
11    A  No.
12    Q  So from 1986 or whenever it was
13  incorporated to the present, it's always been a
14  concept?
15    A  Uh-huh.
16    Q  Was IFA shut down at some point?
17    A  Yes.
18    Q  When?
19    A  I believe October of 2004.
20    Q  Why was it shut down?
21    A  Because I was no longer able to work on
22  it.

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

5 (Pages 17 to 20)

17

1    Q  Why were you no longer to able work on it?
2    A  Because of my financial situation.
3    Q  Can you be more specific?
4    A  I needed to find a salaried job.
5    Q  Did you in fact find a salaried job?
6    A  Yes, I did.
7    Q  Where?
8    A  With the uniformed division of the United
9  States Diplomatic Security Service.
10    Q  That was in October 2004?
11    A  That would have been January of 2005.
12    Q  What did you do for them?
13    A  We protect -- we protect Department of
14  State facilities and personnel five days of the year,
15  we protect the President of the United States.
16    Q  Are you still employed there?
17    A  No.
18    Q  How long did you do that for?
19    A  A year and a half.
20    Q  So from about January 2005 to summer of
21  '06, approximately?
22    A  Yes.

18

1    Q  What was your specific role?
2    A  I was a uniformed officer and carried a
3  weapon. My job was to protect those facilities and
4  those individuals.
5    Q  Before taking that job in January 2005,
6  did you have any experience in the security business?
7    A  No, I did not.
8    Q  What did you do for work when you left
9  that employment in the summer of 2006?
10    A  I became a -- what's referred to as an
11  elite team security officer with the Department of
12  Defense's Pentagon Force Protection Agency, which is
13  an auxiliary of the Pentagon Police.
14    Q  Are you still so employed?
15    A  Yes.
16    Q  What are your specific roles and
17  responsibilities in that job?
18    A  To protect the individuals and
19  facilities -- physical facilities of the Pentagon,
20  both the main building and the annexes.
21    Q  What is your salary?
22    A  About 52 to 55,000 a year.

19

1    Q  The job that you took in 2005, was that
2  the first time that you earned any income since IFA
3  was incorporated?
4    A  Yes.
5    Q  Where was IFA located?
6    A  It was located in Virginia.
7    Q  Where specifically in Virginia?
8    A  Falls Church, Virginia.
9    Q  What address?
10    A  31 -- I think it was 3121 Stoney Brae
11  Drive, Falls Church, Virginia.
12    Q  Was that where it was located for the
13  entire period from 1986 until 2004?
14    A  There was a time when we had another
15  office at 7777 Leesburg Pike.
16    Q  When was that?
17    A  Very early on. Maybe '86 to '88.
18    Q  And after that, it went to the other
19  address?
20    A  Yes.
21    Q  Okay. Was that a residence as well?
22    A  Yes, it's the home of Gene Sierzant.

20

1    Q  Was IFA located in a specific part of the
2  house, in a basement, in an attic or how did that
3  work?
4    A  Yes, it was in a basement.
5    Q  How big was the basement?
6    A  Very large.
7    Q  Any estimate of square footage?
8    A  Maybe half the size of a normal home,
9  maybe a thousand square feet to a hundred square
10  feet. That's a guess.
11    Q  And as best you can describe, what did the
12  physical setup look like of the office?
13    A  We had desks on one side of the office.
14  The office was separated by a large formal stairway.
15  On the other side of the stairway, we had
16  desks -- excuse me, we had -- forgive me, I'm wrong.
17  We had a large meeting table. And adjacent to that,
18  eventually we put a computer in.
19    Q  When did you put the computer in?
20    A  I'd say 1990.
21    Q  Was that the only computer you ever had in
22  there?

**Page 21**

1    A No, there was another computer there, but
2    it wasn't an IFA computer. It was a private computer
3    that Gene had.
4        Q Did you ever use it for IFA business?
5        A No.
6        Q What kind of computer was the IFA computer
7    that was purchased in 1990?
8        A What kind of computer? I believe it was
9    an IBM computer.
10       Q Do you remember the model?
11       A AT.
12       Q Where's that computer today?
13       A I'm sure it's no longer in existence.
14       Q Was it in existence when IFA was shut down
15   in October 2004?
16       A No.
17       Q When did that computer cease to exist?
18       A A few years after it was acquired.
19       Q That's the only computer that IFA ever
20   had?
21       A Gene put -- Gene Sierzant put another
22   computer there, but it was used very, very rarely for

**Page 22**

1    IFA purposes.
2        Q Where's that computer?
3        A I think that particular computer has been
4    destroyed also. It was quite some time ago.
5        Q When did Gene Sierzant put that computer
6    in IFA's office?
7        A I'm guessing roughly contemporaneous with
8    the destruction or the breakdown of the IBM computer.
9        Q Mr. Mace, other than you, who has IFA
10   records and documents?
11       A Dr. George Graham had a number of IFA
12   documents and records. There is no archivals.
13       Q Does Mr. Sierzant have any archive that
14   you're aware of?
15       A No. Gene does not.
16       Q So as far as you know, the only two people
17   that have IFA records are you and Dr. Graham?
18       A That's true.
19       Q Did IFA ever have a document retention
20   policy?
21       A No, again it was a concept.
22       Q To your knowledge, were any IFA documents

**Page 23**

1    or records lost or destroyed?
2        A Yes, Gene threw out a number of documents.
3        Q When did that happen?
4        A When did that happen? In the 1990s. I
5    also threw out IFA documents in 1990s.
6        Q Can you be a little more specific?
7    Approximately, what year did Gene throw out the
8    documents?
9        A Let's say from 2000 to 2004. Not 1990 --
10       Q Gene threw out documents in 2000 to 2004?
11       A Right.
12       Q What documents did he throw out?
13       A He disposed of some tax records. He
14   disposed of marketing material. He threw out a large
15   amount of material that was sourced from Mr. Domash.
16   I --
17       Q Let me just interrupt you there. You mean
18   material that Mr. Domash had sent?
19       A Yes.
20       Q What kind of material?
21       A Material that talked about his situation,
22   his child custody matters, legal matters, things like

**Page 24**

1    that.
2        Q I'm sorry. What else?
3        A And I also threw out a lot of that same
4    material. Various material.
5        Q Did you throw out any IFA material?
6        A Yes.
7        Q What IFA material did you throw out?
8        A Some duplicates of marketing material.
9    Part of your question was, was any of it destroyed.
10   Some of it was stored in my garage and some of it was
11   damaged in the water leak --
12       Q When did the water leak happen?
13       A About 2002, 2003.
14       Q What material was damaged?
15       A Various business documents, various
16   marketing materials, materials related to Larry.
17       Q What kind? Again, Larry's divorce case
18   materials?
19       A Yes. We had a wide variety of material
20   from Larry.
21       Q Have you now described all the material
22   that was lost or destroyed that related to IFA?

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

11 (Pages 41 to 44)



**41**

1   in paying this.

2       Q  Anything else said during that discussion?

3       A  I'd have to go back and look at the

4   record, but that's what comes to mind immediately.

5       Q  Okay.  Sitting here today, do you recall

6   anything else said in that discussion other than what

7   you put in the interrogatories and what you've

8   testified about here today?

9       A  No, I believe that there may be something

10  else in the materials in the file, but I don't have a

11  photographic memory, Larry does.  And I'll stand with

12  that.

13      Q  You claimed that you had exhausted your

14  personal resources at that time?

15      A  Yes.

16      Q  How much money had you already expended on

17  IFA?

18      A  Well, in terms of my time, several

19  hundreds of thousands of dollars I had in inheritance

20  that we had used that Larry knows about.

21      Q  So you had spent several hundred thousand

22  dollars?

**42**

1       A  In terms of my time and my living

2   expenses.  So -- I'm sorry.  Go ahead.

3       Q  I'm just looking for how much money had

4   you spent on IFA from the time it was incorporated

5   until April 1999?

6       A  Thousands and thousands of dollars.

7       Q  Can you be more specific?

8       A  Well, we had money spent for travel, money

9   spent for meetings.

10      Q  Do you have records demonstrating the

11  amount of money that you spent on IFA prior to April

12  1999?

13      A  No.

14      Q  Had anyone else expended any money on IFA

15  prior to 1999?

16      A  The founders had each put in $12,500 of

17  cash.

18      Q  When was that done?

19      A  Over a several year period from the

20  founding of the company.

21      Q  Aside from that you were the only one who

22  expended money on behalf of IFA?

**43**

1       A  And what's the time frame that you're

2   talking about, sir?

3       Q  The time frame I'm talking about is from

4   the time of incorporation until April 1999, when you

5   allegedly entered into a contract with Mr. Domash?

6       A  Well, the actuarial teams did many, many,

7   actuarial reports and those are very expensive to do.

8   And they were simply going to, you know, hold off on

9   building on that until we got the company

10  established.

11      Q  So they've never been paid?

12      A  That's correct.

13      Q  What steps did you take to verify

14  Mr. Domash's financial wherewithal after entering

15  into the agreement with him?

16      A  Well, I depended on a long standing

17  relationship with Larry.  Larry's good name and good

18  word.  And I knew that he had accounts from both his

19  mother and his father.  I had no reason ever to doubt

20  that aspect of this because he in countless

21  statements and promises had said to us that we would

22  be repaid.

**44**

1       Q  Well, I'm talking about in April 1999.  At

2   that point, he hadn't made any promotions to repay

3   you, had he?

4       A  Other than to say in April of '99 that I

5   should go forward with this and he would repay me,

6   yes.

7       Q  At that time, did you take any steps to

8   verify his financial wherewithal?

9       A  No, I had no reason to think that he could

10  not meet it.  He said that he could.  He said that he

11  could with ease, and he was simply waiting for the

12  dust to settle on his child custody and divorce

13  matters and he thought that IFA would be a success, a

14  very large success.

15      Q  Was it understood then that he wouldn't

16  repay you until, as you put it, the dust settled on

17  his divorce proceedings?

18      A  I think that we -- I think that that's a

19  fair thing to agree to.  We were trying to give him

20  as much latitude as good reason and compassion

21  could.  He had great weights on his shoulder and he

22  was trying to deal with very serious issues.  And

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

12 (Pages 45 to 48)

---

**45**

1    while he was constantly complaining about the cost of
2    pursuing his legal claims, we came to believe that he
3    had significant assets even while all that was going
4    on.
5        Q But yet it was understood that he wouldn't
6    begin paying you back until after the dust settled?
7        A I never asked him to do anything other
8    than that. Our goal was to get IFA established, so
9    that Domash & Associates could be established.
10       Q At the time you entered into the contract,
11   did you have an understanding of when the dust would
12   settle on his divorce proceedings?
13       A He was deeply involved in child custody
14   and divorce matters. As I said, we later came to
15   believe he had considerable assets that anywhere
16   along the way he could have paid us.
17       Q What I'm getting at is in April 1999, did
18   you have a sense of when the dust was going to settle
19   on his divorce proceedings?
20       A We all hoped quite soon, but we didn't
21   know -- he didn't know.
22       Q What was the earliest that the dust could

---

**46**

1    settle?
2        A I can't speculate on that.
3        Q Prior to April 1999, what role did
4    Mr. Domash play in connection with IFA?
5        A May I go -- I certainly will answer your
6    question. May I go back and add something?
7        Q Go ahead.
8        A Thank you. The child custody
9    materials -- issues came to a head in the last few
10   days of October, first few days of November, I
11   believe in the year 2000, but there were many other
12   issues that spun off from that. I'm sorry, your
13   question again?
14       Q My question was, prior to April 1999, what
15   role did Mr. Domash play in connection with IFA?
16       A Well, he had been involved in promoting
17   the company and he had been involved in meetings to
18   see what steps he could take to help. In the last
19   week of August of 1990, he had all the IFA people
20   come to Fidelity in Boston, because he had said that
21   he had secured the initial funding that we needed to
22   start the company. That was certainly a joyous

---

**47**

1    moment for everyone.
2        Q Did he do anything from between August of
3    1990 and April 1999 on behalf of IFA?
4        A Let me finish if I could. And we were
5    told that the company would receive funding from
6    Fidelity at that point. Now, from August 1990 until
7    when, 1999?
8        Q Until April 1999.
9        A He met with several people who we were
10   working with to -- with the aim in mind of achieving
11   our ends of getting the company up and running. And
12   those people knew that it was our pledge to Larry
13   that he would run the money that IFA was able to
14   generate.
15       Q Who were these people?
16       A Who were these people? Ted Cohen and his
17   partners at Gramercy Partners, Gramercy Associates.
18   Walter Kass, who was a young investment professional,
19   who was someone we were working with. Scott Kettner
20   from Oppenheimer, another person that we were workin
21   with. There were a number of people whose names are
22   delineated as part of -- referred to as the IFA

---

**48**

1    financing team. A man named Prokapek (phonetic) who
2    was at one time a partner of Larry's, a man named
3    Leon Wright. Larry had conversations with all these
4    people during in that time frame.
5        Q Pursuant to this agreement, you say that
6    Mr. Domash agreed to reimburse you for all of your
7    expenditures?
8        A He agreed to reimburse me for reasonable
9    expenditures, for my living expenses to continue to
10   help him to promote IFA and to cover my cousin's
11   expenses.
12       Q What did you discuss in terms of what was
13   reasonable?
14       A I asked Larry about that in the course of
15   several conversations and he never -- he was always
16   very cavalier about the whole thing, you know, Larry
17   trusted me to use prudence in what was going on. I
18   lived a very frugal life, I still do, I always have.
19       Q How do you know Mr. Domash trusted you?
20       A Because Mr. Domash said he did,
21   repeatedly, and I never gave Mr. Domash any reason
22   not to.

---

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

13 (Pages 49 to 52)

**49**

1  Q  How many conversations did you have about
2  the reasonableness of the contract?
3  A  It wasn't something that had a lot of
4  conversation that were involved in it. Several -- I
5  can remember that there was a meeting that Larry
6  attended, George Graham attended, Gene Sierzant
7  attended, I attended in Milwaukee. And I believe in
8  the late summer or fall of 2000, in which I asked
9  Larry if he wanted some kind of -- I asked him again
10 if he wanted some kind of accounting line with
11 something I can report back to him with --
12 Q  When was this conversation?
13 A  This would have been the summer of 2000 or
14 the fall of 2000 in Milwaukee. And he said it was of
15 no consequence. In other words, keep doing what
16 you're doing, get us to where we need to go. Help me
17 get to where I need to go.
18 Q  So pursuant to the contract, there was no
19 specific agreement about what you could expend money
20 on and hope to get reimbursed by Mr. Domash?
21 A  No, I raised it a couple of times with him
22 and he saw no need to delineate anything. I offered

**50**

1  to put it in writing. He said he had no contract
2  like or agreement like that with George Graham and he
3  was very relaxed about the whole matter.
4  Q  Were the parties to this agreement, you
5  and Mr. Domash individually?
6  A  Yes, the parties were myself and
7  Mr. Domash.
8  Q  Was IFA a party to this agreement?
9  A  Well, IFA is not suing, I am.
10 Q  Respectfully, that wasn't my question.
11 Was IFA a party to the agreement?
12 A  I was acting as IFAs president in the
13 agreement.
14 Q  Did you make the agreement on behalf of
15 IFA?
16 A  Certainly, to see that IFA was given life
17 and created, yes. To see that I was able to
18 participate in that and to help Larry in what he was
19 pleading with me to do, yes.
20 Q  Was Domash & Associates a party to this
21 agreement?
22 A  No, because in order for Domash &

**51**

1  Associates to be created, Larry said that first you
2  had to create investors that are only American. Now,
3  it's possible that Larry at some subsequent time
4  could have created Domash & Associates through his
5  own contacts and experience.
6  Q  Was Graham Capital International a party
7  to this agreement?
8  A  George Graham and Graham Capital
9  International was not a party to the agreement when
10 it was -- the agreement was made, George Graham
11 and -- well, Graham Capital International had not yet
12 fully gelled. That came together, if I remember
13 correctly, in the summer of 2000.
14 Q  Did Dr. George Graham know about your
15 agreement with Mr. Domash at the time you made it?
16 A  Yes. Well, he knew about it -- he
17 certainly knew -- did he know about it in April of
18 1999? He certainly knew about it shortly thereafter,
19 yeah.
20 Q  When's the latest he would have known
21 about it?
22 A  I don't know.

**52**

1  Q  Would he have known about it by June of
2  1999?
3  A  He would have known about it -- he would
4  have known about it soon, but when, I can't tell you.
5  I don't know.
6  Q  But would he have known about it within
7  four months?
8  A  Could have, yes. If not sooner.
9  Q  Okay. So you think he knew about it by
10 August 1999 at the latest?
11 A  At the very latest.
12 Q  Were there any --
13 A  In fact, he talked to Larry about it.
14 Q  When was that?
15 A  I'd have to go back and look at the
16 record.
17 Q  How do you know he talked to Larry about
18 it?
19 A  Because he told me he talked to Larry
20 about it.
21 Q  Dr. Graham told you that?
22 A  Yes.

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

14 (Pages 53 to 56)

---

**Page 53**

1    Q When did he talk to Larry about it?

2    A Perhaps the summer or the spring of 2000.

3    Q But he knew about it well before then?

4    A Yes.

5    Q Were there any other parties to this

6    contract?

7    A No.

8    Q Did the parties --

9    MR. TREVELLINE: Objection, it's not

10    clear. It's vague what you mean by other parties.

11    BY MR. BROOKS:

12    Q Did the parties to the contract change

13    over time?

14    A No.

15    Q Had you ever entered into a reimbursement

16    contract like this before?

17    A Never.

18    Q Have you since?

19    A No.

20    Q As of April 1999, had you entered into any

21    contracts on behalf of IFA?

22    A We had an agreement between ourselves and

---

**Page 54**

1    our actuaries that they would be reimbursed.

2    Q Was that a written agreement?

3    A No.

4    Q Who were your actuaries?

5    A John Miller, Miller Newburg, Kansas City.

6    Q As of April 1999, did IFA have any written

7    contracts whatsoever?

8    A I don't believe so.

9    Q Other than what you've already testified

10    to, when you formed this contract with Mr. Domash,

11    were there any other specific contractual terms that

12    you discussed?

13    A No, I think what's in the file and what

14    I've said to you as I remember it at this moment

15    complete.

16    Q Under the contract, what was the payment

17    schedule?

18    A There was no payment schedule. Larry had

19    been a very wealthy man. Larry, we believe was and

20    is a very wealthy man and he said repeatedly, he

21    would have no problem meeting those obligations. If

22    IFA had been successful, it would have been an

---

**Page 55**

1    astronomical amount of money that would have been

2    coming to him.

3    Q So there was no date that the first

4    payment was due?

5    A No.

6    Q Was there any agreement with respect to

7    how often payments were due?

8    A No, there was not.

9    Q What kind of penalties did the contract

10    call for if Mr. Domash was late with a payment?

11    A Absolutely none. This was conversation

12    between two men who Larry had described to me as a

13    friend and a brother, you know. There was nothing

14    like that.

15    MR. TREVELLINE: I need to take a break

16    and get more water.

17    (Off the record.)

18    THE WITNESS: I'd like to clarify

19    something because I don't want you misled. As I said

20    earlier, IFA is not suing Mr. Domash, I am suing

21    Mr. Domash, the issue at hand is the arrangement

22    between Mr. Domash and myself.

---

**Page 56**

1    BY MR. BROOKS:

2    Q Thank you. Under the contract between you

3    and Mr. Domash, is there an outstanding dollar amount

4    at which you were able to demand full payment?

5    A That was never discussed.

6    Q How often did the contract require you to

7    submit information regarding your expenditures to

8    Mr. Domash?

9    A When the contract was entered into, I

10    asked Larry if he wanted this memorialized, if he

11    wanted this written down, and he said at that time

12    there was no need to do that. That this was between

13    us. In the subsequent occasions that that issue

14    arose or when I asked him if he wanted an accounting,

15    most notably at that meeting in Milwaukee, he just

16    dismissed it.

17    Q So is it fair to say that the contract did

18    not require you to submit information regarding your

19    purchases to Mr. Domash?

20    A Yes.

21    Q That's fair to say?

22    A That is accurate.

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

15 (Pages 57 to 60)

---

**57**

1    Q What was the rate of interest under the
2  contract?
3    A I wasn't charging, I mean, are you talking
4  about the credit cards?
5    Q I'm talking about your contract with
6  Mr. Domash.
7    A I wasn't charging Larry interest.
8    Q Was Mr. Domash stuck with whatever
9  interest the credit cards incurred?
10    A Well, he certainly -- he knew in the
11  conversation that we had, that these were credit
12  cards and that they had interest attached to it.
13  That had been briefly touched on in the conversation
14  that we had.
15    Q So under the contract, Mr. Domash was
16  ultimately responsible to pay the interest on the
17  credit cards?
18    A He was responsible for that, yes, it was
19  reasonable expenses.
20    Q What did the contract -- what were the
21  terms of the contract with respect to how often you
22  had to pay the credit cards?

---

**58**

1    A I was to use the credit cards to further
2  our joint interest in every 30-day cycle. The
3  monthly billing that you got.
4    Q But seeing how Mr. Domash was responsible
5  for the interest, under this contract, you had no
6  obligations to make payments to the credit card
7  companies?
8    A I made payments to the credit card
9  companies.
10    Q I understand you made payments, but what
11  did the contract say about that? What were your
12  obligations under the contract?
13    A I was to use the credit cards to further
14  our interest, as I've noted prior and the young
15  lady's work and what's in the documents.
16    Q What were your obligations to pay off the
17  credit card debt?
18    A I've told you what my obligations are. I
19  was to make the payments on the credit cards, to use
20  them to further our interests and that Larry was then
21  going to come in behind me and make a payment to me
22  and I would then turn that money over in its entirety

---

**59**

1  to the credit card company. He was going to
2  reimburse me.
3    Q But you didn't make full payment to the
4  credit card companies every month?
5    A No, I did not.
6    Q My question is, under your contract with
7  Mr. Domash, what were your minimal obligations of
8  payments to the credit card companies?
9    A He never spoke to me about that.
10    Q So that was never discussed?
11    A That's correct.
12    Q Under the contract, what say did
13  Mr. Domash have with respect to your expenditures?
14    A That I keep the expenditures -- that I
15  keep the expenditures within the framework of our
16  agreement.
17    Q What was the frame work of your agreement
18  with respect to expenditures?
19    A That the expenditures would cover my
20  reasonable living expenses, that of my cousin in
21  California, that we would use money to further
22  increase the chance of creating IFA. And that I

---

**60**

1  would be available to him to help him in matters he
2  thought were important to his personal and legal
3  situation.
4    Q Were your reasonable living expenses
5  further defined under the contract?
6    A They were reasonable expenses, that was
7  the extent.
8    Q So then they weren't further defined?
9    A I would say that they were reasonable and
10  that's how they were defined.
11    Q Okay. How were your cousin's reasonable
12  living expenses defined?
13    A I was trusted with making those
14  determinations.
15    Q Did Mr. Domash -- under the contract, did
16  Mr. Domash have any veto power with respect to
17  expenditures that you made?
18    A Veto power was never discussed.
19    Q Under the contract, if you went out and
20  bought a jet plane, would he have to reimburse you?
21    A That wouldn't be reasonable.
22    Q So if you bought a jet plane, that would

---

Case 1:05-cv-02244-HHK   Document 44-4   Filed 07/18/2008   Page 11 of 43
DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

16 (Pages 61 to 64)

**61**

1  have been outside the parameters of this contract?
2      **A Yes.**
3      Q What was the limit in terms of dollars
4  that you were allowed to spend under this contract?
5      **A It was discussed that I had in excess of**
6  **$200,000 available in credit cards. There was never**
7  **an upper ceiling.**
8      Q When you say "it was discussed." you mean
9  you told Mr. Domash I have $200,000 in credit?
10     **A It was actually more than that, but yes.**
11     Q Was there a monthly limit under the
12  contract that you could spend?
13     **A A monthly limit was never discussed.**
14     Q Any other limits discussed?
15     **A I recall no break in that regard. These**
16  **were to be reasonable expenses. And again, he**
17  **trusted my judgment to get the job done.**
18     Q He told you that?
19     **A Oh, many times.**
20     Q Did the contract have a termination date?
21     **A The contract carried no termination date**
22  **with it, but it was understood that when his personal**

**62**

1  **business relationships stabilized, he would reimburse**
2  **us.**
3      Q How was that understood?
4      **A He had discussed that with me.**
5      Q When?
6      **A In April of '99 and in subsequent dates.**
7      Q What are those subsequent dates?
8      **A There -- in the record there are letters**
9  **from George Graham, Darryl Wright, Steve Killion and**
10  **their -- he had said repeatedly on a number of**
11  **instances and those -- those letters carry the dates**
12  **that you're referring to, both in telephone messages**
13  **he had left and in statements he made to me and to**
14  **other people, that payment would be made. I -- just**
15  **specifically to answer your question again, I**
16  **remember in the summer or in the fall of 2000 him**
17  **saying in a meeting that he would make those**
18  **payments.**
19     Q Other than the dates that you've testified
20  in about -- that you've testified about and that are
21  referenced in the material you provided by way of
22  letters from Mr. Wright, Mr. Killion and Dr. Graham,

**63**

1  are there any other times that you remember
2  Mr. Domash promising that he would pay you when his
3  personal life or divorce proceedings stabilized?
4      **A There were messages that he left on our**
5  **telephone answering machine assuring us that**
6  **payment -- payments would be due.**
7      Q When did he leave those messages?
8      **A Throughout the course of the relationship.**
9      Q But first of all, when you say "our
10  telephone answering machine," you mean IFA's?
11     **A Yes.**
12     Q When was the first time he left such a
13  message?
14     **A It's just an estimate. I'd say within 60**
15  **days of the agreement being reached.**
16     Q How many other messages would you say he
17  left?
18     **A Many.**
19     Q How many?
20     **A From April of '99 to let's say June of**
21  **2002 he must have touched on this issue at least 10**
22  **or 12 times.**

**64**

1      Q Other than those 10 or 12 times and what
2  you've already testified about, any memory of him
3  touching upon the subject?
4      **A Other than the meetings where he mentioned**
5  **it which is in your file (indicating).**
6      Q Getting back to the contract, I understand
7  that it didn't have a termination date. How were you
8  permitted to terminate the contract?
9      **A I had no specific instructions from Larry**
10  **about that. I mean, you know, he was to succeed in**
11  **finding money for us or we were to succeed in finding**
12  **money for us, or his situation stabilized in a few**
13  **years or a few months, that would have triggered.**
14     Q So you never discussed with Mr. Domash
15  what steps needed to be taken to terminate the
16  contract?
17     **A Well, it was understood in the answer I**
18  **gave you just a moment ago that that would have been**
19  **the way it would have been terminated.**
20     Q I'm sorry. I'm confused. How would it
21  have been terminated?
22     **A If -- it would have been terminated if**

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

17 (Pages 65 to 68)

---

**65**

1 Larry had stabilized the situation and written me a
2 check or if we had gotten the company up and running,
3 he would have gotten, you know, money from our
4 efforts and he could have paid me back through that.
5    Q So let's say hypothetically here, when his
6 situation got stabilized, he owed you $50,000, if he
7 had paid you that $50,000, the contract would have
8 ended and you wouldn't have been able to keep
9 spending with hopes for reimbursement?
10    A I think we would have had to have seen
11 what the relationship was like at that time.
12    Q So that wasn't discussed?
13    A That -- that was not discussed.
14    Q Did you ever discuss with Mr. Domash a
15 notice provision for terminating the contract?
16    A No notice provision for terminating the
17 contract was ever discussed.
18    Q Other than what you've already testified
19 about, were there any other performance obligations
20 that you had under the contract?
21    A To be faithful in assisting him and
22 furthering the possibility of our success with IFA.

---

**66**

1    Q What were your obligations with respect to
2 further the success of IFA?
3    A To continue the work that we were doing to
4 try to see that IFA was funded.
5    Q How much capital were you trying to raise
6 for IFA?
7    A Six and a half million dollars.
8    Q Is part of your agreement with
9 Mr. Domash -- did you discuss what vehicles were
10 agreed upon for raising that capital?
11    A Would you be more specific when you say
12 "vehicles"?
13    Q How were you going to raise the capital?
14 Was that discussed -- is part -- was that part of the
15 agreement with Mr. Domash?
16    A We were looking for money from individuals
17 or institutions that shared the values that I have
18 based it for and saw the potential as a money-making
19 proposition that I'd think would generate, and he
20 knew that.
21    Q Was that part of the agreement that you
22 had to proceed in a certain way?

---

**67**

1    A I don't know how else we would have
2 proceeded. Was it part of the agreements? No, it
3 was not.
4    Q In the other part of your obligation was
5 to help Mr. Domash in connection with his personal
6 legal problems?
7    A His personal problems and his legal
8 problems.
9    Q Two separate things?
10    A They were intertwined.
11    Q How was it decided under the contract what
12 took priority, IFA or Mr. Domash's personal and legal
13 problems?
14    A That -- that was never defined under the
15 contract nor it had been in the -- nor had it been
16 prior to that.
17    Q How did you decide which court hearings
18 involving Mr. Domash to attend?
19    A Mr. Domash always asked me to come. I
20 didn't decide.
21    Q Did you go to every court hearing that he
22 asked you to attend?

---

**68**

1    A Yes.
2    Q How many court hearings did you actually
3 go to?
4    A I would guess and say anywhere from 7 to
5 12.
6    Q You went from 7 to 12?
7    A No. We could go back and try to figure
8 out when they were -- every one that he asked me to
9 go to. The last one I went to was one that Mr. Kelly
10 attended, and I think that was 2001.
11    Q What was the first one that you attended?
12    A Good question. I don't know. Sometime
13 in -- I'm going to guess and say sometime in 1999.
14    Q Before or after the contract was formed?
15    A Before.
16    Q Okay. Under the contract, did Mr. Domash
17 have a responsibility to pay you for your help to him
18 other than to reimburse your credit card debt?
19    A Well, that was where the money was coming
20 from Mr. Brooks.
21    Q Was there any understanding, for instance,
22 that if you came to court, he just had to give you

---

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

18 (Pages 69 to 72)

69

1  $200?
2      A No.
3      Q And nothing like that?
4      A Nothing like that.
5      Q Under the contract, were Mr. Domash's
6  reimbursement payments to you contingent on your
7  performance under the contract?
8      A It was never expressed that way, but he
9  knew that I gave him my word that I would do all that
10  I could to help him and help further our joint aims.
11      Q How did he know that?
12      A Because he had known me for many, many
13  years, and he knew I was serious about wanting to
14  achieve this and he knew that I wouldn't abandon it.
15      Q How do you know that?
16      A He told me that.
17      Q When?
18      A Many times over the course of many years
19  in our relationship, certainly from -- certainly from
20  1998 on.
21      Q When was the last time he told you that?
22      A In those words, probably sometime in the

70

1  summer of 2002 or the late spring of 2002.
2      Q Going back to the credit cards. Under the
3  contract, were there any limits on the interest rate
4  on credit cards under which you could make
5  expenditures?
6      A There were no limits on -- on that.
7      Q So interest rates on credit cards were not
8  discussed?
9      A Other than he knew that that was an
10  expensive part of this which we talked about, but he
11  never said there was a limit on it.
12      Q Did the contract have any terms with
13  respect to the number of credit cards you could use?
14      A There was no limit as to the number of
15  credit cards that I could use.
16      Q Was that ever discussed?
17      A That subject was never touched upon in
18  terms of raw number.
19      Q Did you ever obtain any rewards points on
20  these credit cards?
21      A I'm going to say yes to that.
22      Q Who was entitled to the reward points

71

1  under the contract?
2      A I would have been.
3      Q Was that discussed?
4      A No, that was not discussed. And given the
5  nature of what we were trying to do to keep the cost
6  reasonable, I mean, I wasn't taking flights to
7  vacation spas. I took no vacations during this time
8  period. I bought nothing with --
9      Q So you assumed you were entitled to the
10  reward points but that wasn't discussed or agreed
11  upon as part of the contract?
12      A I didn't assume that. Actually, I -- that
13  never really crossed my mind.
14      Q All right. Did you discuss this contract
15  with an attorney before entering into it?
16      A No, I did not. Larry had a -- he said he
17  had a similar agreement with Dr. Graham and that he
18  owed Dr. Graham $50,000 which he said that he was not
19  worried about repaying and that Dr. Graham was not
20  worried about. No, I -- I didn't speak to an
21  attorney about it.
22      Q Did you confirm that at the time with Dr.

72

1  Graham?
2      A Not at the time. I depended on Larry's
3  word.
4      Q He said he owed $50,000 to Dr. Graham?
5      A He -- that was the exact amount that he
6  said he owed Dr. Graham, $50,000.
7      Q But you didn't confirm that with
8  Dr. Graham separately?
9      A That is correct.
10      Q Did you have any concern about entering
11  into a reimbursement contract with somebody who
12  already owed another individual $50,000?
13      A I did not because I had always known Larry
14  to be good -- at that point good to his word and
15  Larry had great worldly resources upon -- which to
16  draw upon and he had a sound financial background
17  which he maintained was very, very marketable. And
18  he thought that there would be great things in the
19  future for him in that environment. I had no reason
20  not to believe that.
21      MR. TREVELLINE: Excuse me. I need to
22  take a break.

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

19 (Pages 73 to 76)

---

**73**

1        (Off the record.)

2        BY MR. BROOKS:

3        Q   Was part of Mr. Domash's consideration for

4    entering into this contract that he had been

5    agreement with IFA to manage its money?

6        A   A promise had been made to Larry that he

7    would in fact have that opportunity.

8        Q   When was that promise made?

9        A   In August of 1990.

10       Q   Was it ever reduced to writing?

11       A   It appeared on a schematic that we used

12    and it was a promise that was made many times to the

13    point of it being completely understood that the sun

14    is going to rise in the morning and Larry's going to

15    have the opportunity if we succeed in getting the

16    company up to run its money.

17       Q   Was it that he was just going to have the

18    opportunity or was it a guarantee that he would run

19    the money?

20       A   Well, if, God forbid, he had had a stroke

21    or some physical issue or emotional issue had

22    intervened, then as long as he was able to run the

---

**74**

1    money, he would have had that opportunity.

2        Q   Who was his agreement with besides you?

3        A   All of the IFA people.

4        Q   At that time, who were they?

5        A   The people that we've mentioned before.

6    In fact, at that time it was the entire IFA board.

7    It was everyone who was involved in the project.

8        Q   So all of the officers and directors as

9    of --

10       A   Everyone.

11       Q   Was Mr. Domash the only one who was going

12    to be managing IFA's money?

13       A   Mr. Domash was going to create Domash &

14    Associates. He would have had employees who would

15    have helped him do that I'm sure. I know that -- I'm

16    sorry to interrupt.

17       Q   What were the terms Mr. Domash's agreement

18    to manage IFA's money?

19       A   The terms were that we were fortunate in

20    having someone who was interested in having his own

21    shop and had the background that he had had working

22    with people at Gofen and Glossberg, Bob Gaegler,

---

**75**

1    people who were otherwise involved in his youth and

2    that -- would you repeat that question, please.

3        MR. BROOKS:  Can you read that back,

4    please.

5        (The reporter read the requested portion

6    of the record.)

7        THE WITNESS:  He was going to have his own

8    separate company and act as a vendor to IFA.

9        BY MR. BROOKS:

10       Q   Were any specific terms discussed?

11       A   There may be terms that were mentioned in

12    some of the documents, but beyond our pledge to

13    benefit from his experience and his -- and what would

14    have been the arrangement that would have benefitted

15    him from having this great engine of commerce

16    throwing out money.

17       Q   Was compensation discussed?

18       A   No.

19       Q   Was the term of Mr. Domash's agreement to

20    serve as a vendor for IFA discussed?

21       A   Larry spoke about wanting to have a

22    relationship that extended through his natural life.

---

**76**

1        Q   But the contract itself didn't have a term

2    of years?

3        A   It was a -- it was an understanding that

4    we had and it did not have a term of years. We were

5    hopeful that this would be something that would

6    continue throughout our lives and that this would be

7    helpful to all the parties involved.

8        (Mace Exhibit No. 2 was marked for

9    identification and retained by counsel.)

10       BY MR. BROOKS:

11       Q   Sir, I'm showing you what's been marked as

12    Exhibit Mace 2 or Mace Exhibit 2 and it has also a

13    Bates number of LD 0028. Do you recognize this

14    document?

15       A   Thank you.

16       Yes, I do recognize this document.

17       Q   What is that document?

18       A   This is a letter from me concerning Larry

19    to a Mr. Doug Foreman at the Bank of America.

20       Q   Is it dated October 20, 2000?

21       A   It is indeed.

22       Q   Is this a true and accurate copy of that

---

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

22 (Pages 85 to 88)

85

1    A  I was just communicating what the subject
2    was.  I was not holding myself out to be -- I mean
3    I -- to -- to be an employee of Domash & Associates.
4        Q  But you agree that's not the subject line
5    where it was written on, in other words, it's the
6    company name not the subject line, do you see that?
7        A  That's right.  And that -- I'm still --
8    I'm -- I'm not holding myself out to be a Domash &
9    Associates.  There was that I knew of -- what year
10   was this, 2001.  There -- there was no Domash &
11   Associates at that time.  There was no Graham
12   Foundation.  I mean, even the name Graham Foundation
13   didn't -- I am not aware of there having been a
14   Graham Foundation.  There may have been some working
15   title that was used and I wish I could tell you what
16   the subject matter was about, but I don't know.
17       Q  So there's no -- you're not aware of any
18   entity known as the Graham Foundation or the IFA
19   Foundation?
20       A  No, or the Domash & Associates, IFA,
21   Graham Foundation, no.
22       Q  Mr. Mace, earlier you testified that you

86

1    understood that Mr. Domash would reimburse you in
2    your words, "once the dust settled on his divorce
3    proceedings"; is that correct?
4        A  Yes.
5        Q  Can you tell me what you mean by that
6    phrase "and the dust settled"?
7        A  I think that that's an accurate, but broad
8    statement.  It encompasses not only -- it encompasses
9    not only the divorce proceedings and the child
10   custody proceedings, but the economic fall out to
11   Larry's life where Larry would write himself
12   emotionally and be able to do the kind of work that
13   was significant, that he felt that he was capable of
14   doing.
15       Q  At the time you entered into the contract
16   in April 1999, did you know when that would be?
17       A  We had every hope that this arduous
18   journey he was traveling through would be concluded
19   within a year or two.  We knew that the custody
20   issues were going to run for some time.
21       Q  Well, I guess my question is when was his
22   reimbursement due?  Was it after the custody issues

87

1    or was it just after the arduous journey?
2        A  It was more than that.  It was when he had
3    gone through all of that and had been able to assume
4    the kind of dynamic economic role that he wanted for
5    himself.
6        Q  So his reimbursement to you was not due
7    until that time?
8        A  He certainly could have made it anytime
9    that he wished, and as I said earlier, when we came
10   to believe that he had considerable assets that he
11   was saying weren't available for that, it was
12   wondered, you know, why he had taken so much time to
13   step forward.
14       Q  Again, what I'm wondering or what I'm
15   asking is under the contract, when did his obligation
16   to reimburse you come due?
17       A  He was convinced -- he was convinced that
18   he would have no problem in meeting his obligation
19   when he was able to step away from the divorce
20   custody issues and focus his attention on his
21   business practice.
22       Q  Okay.  But I'm not -- respectfully, I'm

88

1    not asking what his thoughts were.  I'm asking under
2    the contract, when did his obligation to reimburse
3    you come due?
4        A  And I'm not trying to be rude in the
5    least, but I mean that quite sincerely.  That was our
6    understanding, that he was hopeful that the worst of
7    this would be behind him.  If you're saying that --
8    if you want a time line, I don't know, two years, two
9    and a half years, three years.
10       Q  That's sort of a broad period of time.
11       A  Yes, it is, but we had -- in April '99, we
12   had no idea -- we had every hope, all of us did, that
13   he would be able to overcome the maelstrom that he
14   was going through and the divorce proceedings and the
15   custody hearings, regain his equilibrium, and move
16   forward in the business world.
17       Q  Assume for a moment that none of that
18   happened, did he no longer have an obligation to
19   reimburse you?
20       A  If I assumed for a moment that that no
21   longer happened, he would have had an obligation to
22   reimburse me and he would have had the wherewithal to

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

23 (Pages 89 to 92)

89

1  reimburse me. I knew from what he had told me, even
2  before April of '99, that he had two trust accounts.
3  And as I said earlier, he was very cavalier about
4  reimbursing either myself or Dr. Graham and the
5  $50,000 that he said he owed Dr. Graham. There was
6  never a moment's hesitation in his expression of
7  this.
8      Q  I understand that. And again,
9  respectfully, I'm not sure you're answering my
10 question so let me try to rephrase it.
11     Was there -- when you entered the contract
12 in April '99, was there a specific date by which
13 Mr. Domash had to reimburse you?
14     A  Because of Mr. Domash's belief that we
15 would be successful and that he would eventually come
16 out of the tailspin he was in. There was no specific
17 date. We all believed that he would come out of it
18 and we all believed that he had the ability to meet
19 his obligations.
20     Q  Was there a specific triggering event, if
21 there wasn't a date, that would have caused
22 Mr. Domash to have to reimburse you under the

90

1  contract?
2      MR. TREVELLINE: Objection, asked and
3  answered.
4      Go ahead and answer it.
5      THE WITNESS: Go ahead and answer it?
6      MR. TREVELLINE: Yes.
7      THE WITNESS: Was there a specific
8  triggering event? No, there was not a specific
9  triggering event. We could have been
10 successful if -- I don't mean to cut you off -- I
11 mean, we could have been successful in acquiring
12 funding. He could have been successful in the people
13 he was talking to in acquiring funding.
14     (Mace Exhibit No. 5 was marked for
15 identification and retained by counsel.)
16     BY MR. BROOKS:
17     Q  I'm showing you, sir, what's been marked
18 as Exhibit Mace 5 and it's Bates-numbered Mace 000004
19 through 000010. I ask you if you recognize this
20 document.
21     A  Yes, Mr. Brooks, I do recognize this.
22     Q  And what is it?

91

1      A  It's a letter that I wrote on the 26th of
2  December of 2002 to George Graham discussing our
3  rather startled views of Larry's letter of
4  November 24th of the same year.
5      Q  Is this a true and accurate copy of that
6  letter?
7      A  Well, this is, but eight pages long --
8      Q  As far as you know.
9      A  Yes, sir, it appears to be.
10     Q  In the one you actually sent to him, would
11 you have signed it or did you not typically signed
12 letters that you sent to Dr. Graham?
13     A  No, I -- I would have signed it sir, yes.
14     Q  Okay. Any reason to believe other than
15 the lack of signature, this is different than the
16 actual letter that was sent?
17     A  No, there's no reason to believe that.
18     Q  Okay. Turning your attention to the
19 fourth page of this which has been Bates-labeled
20 Mace 000007 -- sorry. By this I mean Mace Exhibit 5.
21     A  Yes, on page 4, sir.
22     Q  Turning your attention to the third

92

1  paragraph of that letter, towards the bottom it says
2  "By the time of the big trial of October 30, 31 and
3  November 1, 2000, he owed me $75,000."
4      Did I read that correctly?
5      A  That is what the letter says, that is what
6  you read, yes.
7      Q  Is the "he" referring to Larry Domash?
8      A  Yes.
9      Q  The letter continues, "How do I know,
10 because we talked about it just a day or two prior to
11 going to court and he had no difficulty with it at
12 all."
13     Did I read that correctly?
14     A  You did, indeed.
15     Q  Please describe for me the conversation or
16 conversations you had with Mr. Domash about this
17 $75,000.
18     A  I'd be happy to. This was the amount of
19 money that was outstanding up to that point and I
20 mentioned it to him because, again, I wanted just to
21 keep him apprized of kind of where we were with this,
22 and because I was hoping that shortly thereafter we

93

1  would be paid. And again, he didn't respond to it
2  specifically other than to joke that -- and this I
3  remember vividly that, you know, maybe he would give
4  me his daughter, Elizabeth in exchange for it. And
5  he said that he loves his daughter, he said that
6  in -- in good jest.
7      And he went right on with his conversation
8  about what was going to take place at that -- at that
9  legal proceeding. He didn't -- he -- it's
10 representative of a -- of a pattern of behavior where
11 he doesn't really focus on what I'm asking him to
12 focus on.
13     Q  What were you asking him to focus on at
14 that time?
15     A  I was asking him to pay heed to the fact
16 that this was $75,000. This was credit card debt.
17 This is where I was at that moment.
18     Q  Okay. You had spent $75,000 from
19 April '99 until on or about November 1st, 2000?
20     A  Yes.
21     Q  What had you spent the money on?
22     A  I spent the money on my living expenses,

94

1  pushing IFA forward, helping him and supporting my
2  cousin in California, the same -- same areas that we
3  enumerated in the agreement.
4      Q  Do you have a breakdown of how much you
5  spent on each of those areas?
6      A  That breakdown is being prepared right now
7  by an accountant which you obviously will get a copy
8  of.
9      Q  Was the $75,000 overdue at that point?
10     A  No, it was not overdue. No one was -- no
11 one was -- Larry was so highly stressed that it would
12 have been immoral to pester him with this kind of
13 thing.
14     Q  I understand it would have been immoral,
15 but under the contract, was it overdue?
16     A  No, it was not overdue under the contract.
17     (Mace Exhibit No. 6 was marked for
18 identification and retained by counsel.)
19     BY MR. BROOKS:
20     Q  Sir, I'm now showing you what's been
21 marked as Mace Exhibit 6 and Bates-numbered
22 Mace 000020 and 000021. Do you recognize this

95

1  document?
2      A  Thank you.
3      Yes, Mr. Brooks, I do recall this.
4      Q  What is it?
5      A  This is a letter that Steve Killion, the
6  man who has spoken with Larry and an employee of a
7  firm called "BEK TEK," wrote concerning some of his
8  thoughts about this case. Mr. Killion is a former
9  senior FBI special agent and he is the man who did
10 the tape recording analysis for Mr. Domash that his
11 attorney, Mr. Walsh, at one point had asked for.
12     Q  Did -- did you ask Mr. Killion to send
13 this letter on your behalf?
14     A  I asked Mr. Killion to put some of his
15 thoughts down on paper.
16     Q  Why?
17     A  Because I thought that they were important
18 to have been recorded.
19     Q  Did you help him draft this in any way?
20     A  No.
21     Q  If I can, turning your attention to the
22 second page, the last paragraph on the page.

96

1      A  Yes, sir, the last paragraph.
2      Q  It reads "With regard to Mr. Domash's
3  financial obligations to you, vis-a-vis BEK TEK, I am
4  directly aware of a March 2001 delinquent obligation
5  of approximately $2900 for work done by BEK TEK on
6  Mr. Domash's behalf. You personally covered this
7  obligation with a series of payments from your own
8  funds. You indicated to me at the time that this
9  BEK TEK obligation was only the latest in
10 Mr. Domash's pattern of unmet responsibilities to
11 financially reimburse you for your efforts to support
12 and assist him."
13     Did I read that correctly?
14     A  You did, indeed.
15     Q  Did you, in fact, have a conversation with
16 Mr. Killion in March 2001 where you indicated to him
17 that Mr. Domash's obligation to BEK TEK was only the
18 latest in his pattern of unmet responsibilities to
19 financially reimburse you for your efforts to support
20 and assist him?
21     THE WITNESS: Would please play that back?
22     (The reporter read the requested portion

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

26 (Pages 101 to 104)

101

1        BY MR. BROOKS:
2        Q  Sir, I'm showing you what's been marked as
3    Exhibit Mace 7. Do you recognize this document? For
4    the record, sir, this is also Bates number
5    Graham 0671.
6        A  Yes, I do remember this.
7        Q  Okay. And is it a -- is it fair to say
8    that it's a copy of your MBNA America credit card
9    bill with a closing date of 8/7/01 and it also has a
10   handwritten note from you to Dr. Graham?
11       A  Yes, that's accurate.
12       Q  The handwritten note says "9/28"?
13       A  It does, Mr. Brooks.
14       Q  Do you know whether that was 9/28/2001?
15       A  I don't know that, Mr. Brooks, but I would
16   suggest that that is 2001 date, yes.
17       Q  The note says "Dear George, we need to
18   speak about this." What did you need to speak about?
19       A  We needed to speak about the amount of
20   money that was outstanding since George was the
21   person who was kind of heading the band at that time.
22   And my understanding is that George did, in fact, at

102

1    some point talk to Larry about this and that Larry
2    said he would see to it that we were paid and
3    that I was not to worry about it.
4        Q  Did you talk to Mr. Domash about it --
5        A  I talked to --
6        Q  -- this bill?
7        A  I talked to George about that and George
8    spoke with Larry.
9        Q  Why didn't you speak directly to Larry
10   about that?
11       A  When I tried to talk to Larry
12   about -- when I tried to talk to Larry about these
13   kinds of issues, Larry was not particularly
14   communicative other than to give me broad statements
15   about he assured we'd all be repaid.
16       Q  Okay. But the second sentence of your
17   handwritten note to Dr. Graham reads "We need a
18   solution to this." What did you mean by that?
19       A  That mean -- I meant exactly what this
20   says, "that we need a solution to this issue."
21       Q  What issue was that?
22       A  The issue of the amount of money that was

103

1    being -- was being used by 9/28/2001.
2        Q  Were you concerned about the amount of
3    money?
4        A  I was not overly concerned, but I was -- I
5    was certainly aware of it. I wouldn't say it was
6    something that I would ignore.
7        Q  Did you feel Mr. Domash had reimbursed you
8    by this point?
9        A  Over time, especially in 2002, we came to
10   believe that he was in a position to do that.
11       Q  When did that happen?
12       A  As I said, sometime in 2002.
13       Q  Do you remember when in 2002, best
14   estimate?
15       A  The triggering event for the -- the real
16   question arose in December or January of 2002 when he
17   bought a motor boat.
18       Q  Do you mean December 2001, January 2002?
19   You said December --
20       A  Thank you. Thank you. January -- right.
21   December of 2001, January of 2002 when he bought a
22   speedboat. And originally, he had said to me that he

104

1    was taking out a bank loan for that. And then later
2    he told me that he paid cash for it.
3        Q  When did he tell you that he paid cash for
4    it?
5        A  I'm going to guess without searching
6    through the records. Sometime between December
7    through February.
8        Q  December 2001 to February 2002?
9        A  Thank you. Yes, thank you.
10       Q  When you found out he paid cash for it in
11   that time frame, did you feel that he should
12   reimburse you?
13       A  I was perplexed why -- why he was acting
14   the way he was acting. He had begun drinking again
15   and it was hard for me to get a read on -- on his
16   health.
17       Q  But you understood under the contract that
18   if he had the financial wherewithal to reimburse you,
19   that he was obligated to do so, correct?
20       MR. TREVELLINE: Objection, you're
21   misstating the testimony.
22       THE WITNESS: Do I respond to that or not?

Case 1:05-cv-02244-HHK    Document 44-4    Filed 07/18/2008    Page 19 of 43
DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

27 (Pages 105 to 108)

105

1        MR. TREVELLINE: You can respond. It's
2    nonsensical.
3        MR. BROOKS: I wasn't stating any
4    testimony. I'm asking him a question.
5        THE WITNESS: Miss, would you be kind
6    enough to play it back for me.
7        And I'll try to answer your question,
8    Mr. Brook.
9        MR. BROOKS: Thank you.
10        THE WITNESS: You're welcome, sir.
11        (The reporter read the requested portion
12    of the record.)
13        MR. TREVELLINE: My objection is that
14    you're saying that Mr. Mace testified that if
15    Mr. Domash had the financial wherewithal to reimburse
16    him, then Mr. Domash was so obligated. But the
17    testimony for Mr. Mace was that Mr. Domash was
18    obligated to pay -- to pay Mr. Mace when the dust
19    settled on the divorce and child custody proceedings.
20    It had nothing to do with --
21        MR. BROOKS: You know, an objection under
22    the rules and under the specific order in this case

106

1    is all that's necessary and that's coaching. But
2    anyway, the question remains and Mr. Mace can answer
3    it in any way that he so chooses.
4        THE WITNESS: Miss, would you please play
5    that back again.
6        (The reporter read the requested portion
7    of the record.)
8        THE WITNESS: That is my understanding,
9    and I think that what we came to suspect much later
10    than this document was that he had had significant
11    resources for a considerable period of time.
12        MR. BROOKS: Okay. Now's a good time for
13    the lunch break.
14        (Whereupon, at 12:33 p.m., the deposition
15    was recessed to reconvene at 1:15 p.m. that same
16    day.)
17
18
19
20
21
22

107

1        AFTERNOON SESSION
2            (1:21 p.m.)
3    Whereupon,
4            PETER M. MACE
5    having been previously duly sworn, was further
6    examined and testified as follows:
7        EXAMINATION BY COUNSEL FOR THE DEFENDANT
8        THE WITNESS: May I?
9        MR. BROOKS: Yes.
10        THE WITNESS: Thank you. I made an error
11    in that shot and shell between the two you and my
12    mistake. I do want to correct that.
13        The triggering event is the dust settling
14    or the company getting up and running. Wherewithal
15    has nothing to do with that and I didn't want to
16    leave you with that impression.
17        MR. BROOKS: Could you either repeat that
18    or read that back?
19        (The reporter read the requested portion
20    of the record.)
21        BY MR. BROOKS:
22        Q In that case, what was your concern over

108

1    his wherewithal then? You're the one who brought up
2    the bank loan and cash. How did that all fit into
3    this?
4        A He had -- we were waiting for the dust to
5    settle and/or the company to get up and running if
6    one of us were successful.
7        Q What do you mean by "dust settling" in
8    these circumstances?
9        A In these circumstances, I mean the
10    divorce, the child custody issue, and his emotional
11    well-being and that he could focus on business
12    matters.
13        Q Has that ever happened in the time that
14    you've known Mr. Domash?
15        A Has what ever happened, Mr. Brooks?
16        Q The dust settling.
17        A Not as I thought it would.
18        Q I noticed that a lot of your changes had
19    come after we've taken breaks, Mr. Mace. Without
20    getting into any specifics, did you have
21    conversations with your attorney during these breaks
22    about your deposition testimony?

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

28 (Pages 109 to 112)

109

1    A I had a conversation just now with my
2  attorney about the deposition testimony.
3    Q And the other times when we've come back
4  after breaks and you've changed your testimony, did
5  you have conversations with your attorney about your
6  deposition testimony as well?
7    A I've had advice about how to conduct
8  yourself in a deposition with my attorney.
9    (Mace Exhibit No. 8 was marked for
10  identification and retained by counsel.)
11    BY MR. BROOKS:
12    Q Sir, I'm showing you what's been marked as
13  Exhibit Mace 8. It is Bates numbered Graham 0046 and
14  0047. I ask you to look at that and tell me if you
15  recognize this document.
16    A Yes, I have seen this. This is my
17  handwriting.
18    Q Is this a true and accurate copy of a fax
19  that you sent to John Stein on November 6, 2001?
20    A I believe it to be.
21    Q And who is Mr. Stein?
22    A Mr. Stein used to be the deputy director

110

1  of the Central Intelligence Agency and he's the chief
2  of the director of operations.
3    Q What, if any, role did he play with IFA?
4    A John sought to introduce us to some money
5  interests who would act as investors.
6    Q Judging from the documents produced, is it
7  fair to say that you sent a lot of correspondence to
8  Mr. Stein over the years?
9    A Not a lot of correspondence over the
10  years, no.
11    Q Did you have a falling out with Mr. Stein?
12    A No.
13    Q Did he drop out of his role with IFA at
14  some point?
15    A No.
16    Q He's still involved?
17    A He is.
18    Q How come, Mr. Mace, then you didn't list
19  him as one of the people who might have relevant
20  information in your initial disclosures?
21    A Because I don't believe that he has any
22  relevant information. He's not actively involved. I

111

1  mean, he wishes us well in every success but he's not
2  actively involved and he has not been for several
3  years. He doesn't have, you know, documents that I
4  can give you.
5    Q Turning your attention to the bottom of
6  the first page and then onto the second page, it says
7  "That doesn't change in any way my opinion regarding
8  what we spoke of yesterday. Larry has to be
9  accountable if he's going to work with us." What did
10  you mean by that, what did Mr. Domash have to be
11  accountable for?
12    A He had to be responsible. In November of
13  2001, if I recall correctly, there was to be a
14  conference call that Larry had asked to be set up and
15  if I remember correctly, he had asked me to set it up
16  with Mr. Stein and I did that. He just wasn't there.
17  There was no call back, "excuse me, I'm sorry, I
18  can't make the meeting." I tried to get him later,
19  was unable to reach him. That's what I believe that
20  refers to.
21    Q What did you mean "if he's going to work
22  with us"? And by that, I mean, what did you mean by

112

1  the word "if"?
2    A I was concerned -- by 2001, November of
3  2001, it was as is reflected in many of the
4  documents, certainly our hope that he would be there
5  but I was concerned about the fact that he had begun
6  to drink again, he's a -- excuse me, an epileptic and
7  he was telling me that he was consuming a lot of
8  alcohol. And that frightened me.
9    Q If he was consuming a lot of alcohol, did
10  that concern you about whether or not he would make
11  good under the contract to reimburse you?
12    A I didn't even think about that issue. I
13  was concerned about his health.
14    Q Never crossed your mind? How much did he
15  owe you at this point?
16    A When we get the study back, we can find
17  out but in all honesty, no, it did not cross my mind.
18  That's not what I was -- that's not what I was
19  driving at.
20    Q The letter continues, "Too much is at
21  stake. If deadlines are set, he has to meet them."
22  What deadlines were you speaking of?

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

29 (Pages 113 to 116)

---

113

1    A Phone calls.

2    Q Phone calls?

3    A Yes.

4    Q That's it? Any other kind of deadlines?

5    A Well, he had never produced -- he was

6  going to produce a document for Mr. Stein on Domash

7  and associates and he never produced that, but if my

8  memory is correct, we're talking about the phone

9  calls.

10    Q So he wasn't meeting his obligations for

11  IFA at this time?

12    A I wouldn't say that. I would say that I

13  was concerned about what he had said was his drinking

14  and that he didn't make a telephone conference that

15  he had asked me to set up.

16    Q Wasn't that an obligation?

17    A Yes, but let's not put too fine a point on

18  it. I mean, anyone can miss something like this.

19  You can get a flat tire. I don't want to elaborate

20  on that. He didn't respond. There were times when I

21  would call and I couldn't get him and I was just

22  concerned.

---

114

1    Q Okay. But as of November 6, 2001, you

2  didn't think this was a big deal?

3    A No, I didn't think it was a big deal but I

4  was concerned.

5    Q Okay.

6    (Mace Exhibit No. 9 was marked for

7  identification and retained by counsel.)

8  BY MR. BROOKS:

9    Q Sir, I'm now showing you what's been

10  marked as Exhibit Mace 9 and it's Bates numbered

11  Mace 00020 and 000203. Do you recognize this

12  document?

13    A Yes, sir, I wrote this.

14    Q This is your letter, an accurate copy of

15  it?

16    A It is, sir.

17    Q And for the record, it's a letter that you

18  wrote to Bruce Koenig that was back on January 17,

19  2007?

20    A That is correct.

21    Q Okay. Turning your attention to the third

22  paragraph on the first page where it begins, "Were

---

115

1  you not aware that Messrs. Stein and Martin planned

2  to employ Larry in a global commercial venture with

3  significant national security import?" What venture

4  were you speaking about?

5    A The venture that we're talking about at

6  that point was IFA and having IFA founded and funded

7  and having a global insurance dimension to it.

8    Q What did Messrs. Stein and Martin have to

9  do with that?

10    A They were wise men. They were people who

11  were interested in seeing this succeed and

12  unfortunately they weren't successful.

13    Q But it says they planned to employ him, so

14  were they working for IFA at the time?

15    A I think they were working in the spirit of

16  IFA. They weren't salaried employees, no.

17    Q How were they going to employ him then,

18  with what funding?

19    A Well, with money they would acquire. We

20  would get IFA up and running and then IFA would have

21  various kinds of duties to conduct which they would

22  then turn to someone with his great financial ability

---

116

1  to help channel.

2    Q Okay. As of January 17, 2002, how far was

3  that from happening?

4    A Well, we say on the second page that we're

5  hoping to begin in 30 to 45 days, if not sooner.

6    Q Was that realistic?

7    A We had been told that it was, yes.

8    Q Okay. And if that happened, did you ever

9  assume that you would be reimbursed, correct?

10    A If it had happened, we would hope so, yes.

11    Q So on January 17, 2002, you think you're

12  going to be reimbursed within 30 to 45 days; is that

13  correct?

14    A That's what this says, yes.

15    Q I know that's what it says, but is it

16  true?

17    A Yes, it's true.

18    Q How come that didn't happen?

19    A Because the funding was not available.

20    Q Why did you believe the funding would be

21  available?

22    A Because we had been led to believe that it

---

Case 1:05-cv-02244-HHK    Document 44-4    Filed 07/18/2008    Page 22 of 43
DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

30 (Pages 117 to 120)

**117**

1  was going to be available.
2      Q  As of January 17, 2002, how many previous
3  times had you thought that IFA would be funded?
4      A  I think we all thought it would be funded
5  a number of times.
6      Q  But this time you really thought it?
7      A  I really thought it on each of the
8  occasions. I had reason to believe that it would be
9  funded.
10     Q  So how come it failed specifically on this
11  time?
12     A  If, and I have to go back through the
13  record to look and I can do that sometime, if I
14  recall this correctly, what was being discussed here
15  was funds coming from a very wealthy Korean American,
16  a man named Dr. Sunny Lee.
17     Q  Why didn't that work out?
18     A  Why didn't that work out. I think the
19  political climate played a role in it. There was a
20  new government in Korea. Mr. Lee was involved in
21  that new government. And there was great reluctance
22  politically and culturally to have Mr. Lee use his

**118**

1  ability to get money to us.
2      Q  How long after this letter on January 17,
3  2002 did you find that out that IFA would not be
4  funded by Mr. Lee or his company?
5      A  Certainly beyond 45 days.
6      Q  Okay. So within 45 days you still thought
7  that was going to happen?
8      A  I did.
9      Q  In general, Mr. Mace, is it fair to say
10  that this letter deals with money that you're saying
11  Mr. Domash owes to BEK TEK?
12     A  Yes.
13     Q  Okay. Can I turn your attention, please,
14  on the second page to the first full paragraph. So
15  the second paragraph where it says, "If you're
16  frustrated after 13 months and partial payment,
17  imagine how we feel after years and years and no
18  payment." What did you mean by that?
19     A  Just what it said. If you're frustrated
20  after 13 months and partial payment, imagine how we
21  feel after years and years and no payment. We hadn't
22  gotten the -- the dust hadn't settled yet and we

**119**

1  hadn't gotten the company up and running yet.
2      Q  No payment, you mean no payment from
3  Mr. Domash?
4      A  Yes.
5      Q  The next sentence says, "And may I add
6  parenthetically little justice." What did you mean
7  by that?
8      A  I'm not sure what I meant by that at this
9  time. Perhaps that was a remark made about the
10  frustration that we all felt about how much time it
11  had taken to get the company up and running.
12     Q  It appears to be referring to the "no
13  payment," doesn't it, Mr. Mace?
14     A  I wouldn't characterize it that way. I
15  don't think that's what it was referring to at all.
16  I don't think I would have used a phrase like that
17  referenced to payment.
18     Q  What little justice was there about the
19  fact that IFA hadn't been funded yet?
20     A  I think it addresses the issue that you
21  touched on a moment ago and that's how many
22  times -- how close we've come, at least how close we

**120**

1  thought we had come.
2      Q  What does that have to do with whether or
3  not BEK TEK got paid by Larry Domash?
4      A  I don't know what it has to do with
5  whether or not BEK TEK got paid by Larry Domash.
6  Larry Domash owed them some money.
7      Q  Okay. Turning your attention to the next
8  paragraph, it begins "Look, I know all of this must
9  seem crazy to you. It does to us. None of us have
10  ever" -- with "ever" being underlined -- "seen a
11  situation like this. All I can tell you is the truth
12  as I understand and believe it to be. This long
13  nightmare is going to end and end soon. It has to."
14  Did I read that correctly?
15     A  You did indeed.
16     Q  What long nightmare were you talking
17  about?
18     A  Getting the company up and running, seeing
19  that Larry, you know, was whole and could join us.
20     Q  What were you basing the fact that it was
21  going to end soon on?
22     A  On the anticipated money coming in from

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

31 (Pages 121 to 124)

121

1    Dr. Lee.
2        Q  Okay.
3          (Mace Exhibit No. 10 was marked for
4    identification and retained by counsel.)
5          BY MR. BROOKS:
6        Q  Sir, I'm showing you what's been marked as
7    Exhibit Mace 10 and Bates numbered Graham 1258. Do
8    you recognize that document?
9        A  Well, I believe it is --
10       Q  I'm sorry, are you answering the question
11   "Do you recognize it?"
12       A  I apologize. Yes, I believe that is my
13   handwriting. I'm not quite sure what it refers to.
14   It may very well refer to the motorboat incident.
15       Q  Let's -- for the record's sake, let's put
16   on -- it says -- am I correct, first of all, that
17   it's a handwritten note?
18       A  Yes, it is.
19       Q  Dated 1/23/02?
20       A  Uh-huh.
21       Q  And it's written from you to Dr. Graham?
22       A  It is.

122

1        Q  Begins, "There's a part of this story that
2    you knew about and I didn't, and a part of this story
3    that Gene and I have just uncovered that you need to
4    be apprised of." Do you know what that was about?
5        A  No, I honestly don't remember what that
6    might have been other than a reference to the boat.
7        Q  It continues "That Larry may have been,
8    quote, somewhat less than forthcoming, end quote, is
9    an understatement."
10       A  Uh-huh.
11       Q  Then in capital letters, it says, "This
12   crap is going to stop. Do nothing" -- "nothing" is
13   underlined -- "until we speak." What was this
14   referring to?
15       A  I'm not sure. The only thing I can tell
16   you is I think that it has to do with the issue about
17   the motorboat and about, as I said earlier, his
18   acquiring this vessel.
19       Q  The next sentence reads, "He has put
20   everything at risk." Was he referring to Larry?
21   That's Mr. Domash?
22       A  I think that I was referring to Larry.

123

1    He, Larry, has put everything at risk.
2        Q  What did you mean by that?
3        A  I think that it was a reference to his
4    conduct with regard to the rest of us.
5        Q  What had he put at risk?
6        A  His good name, I think his -- the regard I
7    think that we held for him.
8        Q  How does that relate to the fact that you
9    wrote "this crap is going to stop" related to a
10   motorboat?
11       A  In the file there is a letter from
12   Dr. Graham to Larry asking Larry to begin to repay
13   him. And Dr. Graham received no response from Larry
14   with regard to that correspondence and follow up
15   correspondence for several months. I did not know at
16   this time that Dr. Graham had sent that letter. I
17   didn't find out about it until the summer of 2002.
18       Q  So what was --
19       A  And I think -- I'm sorry.
20       Q  So what were you so concerned about --
21       A  I think what I was concerned about was
22   Larry not being straightforward with us. I mean, you

124

1    know, you can't say that you don't have it when
2    you're going off and buying a speedboat. Beyond
3    that, I'd really have to think about -- and I'd be
4    happy to. I'd have to think more about the context
5    of this.
6        Q  Under the contract that you entered into
7    with Larry, should he have reimbursed you before he
8    went out and bought a speedboat?
9        A  You have to give me the question again.
10   Ive had the dust settled and the case and then his
11   whole life. And had the company been up and running
12   yet? And the answer to that is apparently no. I
13   mean, would I have bought a speedboat? No. But
14   that's me and that's not within the context of the
15   agreement that he and I had.
16       Q  So why are you writing letters about him
17   buying a speedboat if it has nothing to do with the
18   contract that you entered into with him?
19       A  I think it's indignation and I think it's,
20   again, frustration in that I had a difficult time
21   understanding what he was at that moment about. I
22   mean, why did George have -- I don't know why George

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

34 (Pages 133 to 136)

133

1    Q And you've seen her handwriting in the
2  past, correct? And you're generally familiar --
3    A Yes. And I truly believe this is
4  Ms. Tonn's handwriting.
5    Q It begins, "Larry-Martini-Bret called and
6  no response from Martini within 72 hours. Believes
7  Larry living in fantasy." What did you believe Larry
8  living in a -- what were you referring to when
9  you -- strike that.
10    Did you tell Ms. Tonn that you believed
11  Larry was living in a fantasy?
12    A Yes, I did.
13    Q What did you mean by that?
14    A I meant that Larry was -- if you had a
15  conversation with Larry, it was not always rational.
16  That he would -- 5/3/02. He would -- I think he was
17  drinking. I think he was drinking. And I think he
18  was mixing medication. And I would get him
19  frequently late at night. And he was just not on an
20  even keel.
21    Q And he owed you a lot of money at that
22  time?

134

1    A He did.
2    Q Were you concerned at all that he was
3  drinking and mixing medication, was not on an even
4  keel?
5    A Yes, I was always concerned about his
6  health. His health has never been in my years of
7  knowing him particularly good.
8    Q Did you have any concern about his
9  financial obligation to you as of May 3, 2002?
10    A I had no reason to think that it would
11  have been any different than on the 1st of May of
12  2002, that he was going to honor his commitments.
13    (Mace Exhibit No. 13 was marked for
14  identification and retained by counsel.)
15    BY MR. BROOKS:
16    Q Sir, I'm showing you what's been marked as
17  Exhibit Mace 13. Tell me if you recognize that
18  document.
19    A Yes, I do recognize this document.
20    Q What is it?
21    A It's a letter that I wrote to Larry on the
22  24th of June, 2002.

135

1    Q Is this a true and accurate copy of that
2  letter?
3    A I believe it to be.
4    Q Did you send it to him on June 24, 2002?
5    A If not that day then the next, yes.
6    Q What was the purpose of this letter?
7    A I was trying to -- I was trying to hit a
8  mule in the head with a two by four. I was trying to
9  catch his attention and trying to get him to get into
10  some care in New York, get him to call George Graham
11  so that he could emotionally be well.
12    Q It starts off "Larry, a cautionary note.
13  You've described yourself as weak, a coward, a wizen,
14  and someone who lacks character"?
15    A Yes.
16    Q Had he in fact described himself in that
17  way?
18    A He had indeed.
19    Q On June 24, 2002, did you agree with that
20  assessment?
21    A I was reluctantly coming to that
22  conclusion, yes.

136

1    Q Turning your attention now to the fourth
2  line down it says "Anyone who spent a considerable
3  period of time with you, would add that you don't do
4  what you say you're going to do or what you've agreed
5  to do. That you're deceitful, frequently confused,
6  and have a serious problem with selfishness." Did I
7  read that correctly?
8    A You did indeed.
9    Q And as of June 24, 2002, was that a true
10  statement?
11    A That was my belief as of June 24th.
12    Q That Mr. Domash was not somebody who said
13  he would do what he was going to do?
14    A Yes, I understand.
15    Q And that he was deceitful?
16    A That's exactly right.
17    Q And this is very different, is it not,
18  than what you believed in January 2002?
19    A Very different. Very, very different. No
20  question about it.
21    Q "It goes on for someone whose public
22  mantra is to always tell the truth, always do the

Case 1:05-cv-02244-HHK    Document 44-4    Filed 07/18/2008    Page 25 of 43
DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

35 (Pages 137 to 140)

**137**

1  right thing, always turn the other cheek. In private
2  you are the essence of hypocrisy and denial. In some
3  deep essential way, Larry, you have let your life
4  become a lie."
5      Did I read that correctly?
6      A You did, sir.
7      Q Is that a true statement in your belief as
8  of June 24, 2002?
9      A As of that date it is.
10     Q Bear with me here.
11     A Please, take your time.
12     Q Turning your attention to the third page
13 of the document, Bates number Mace 000044. Second
14 sentence says "and remember this, whether you" --
15     A Excuse me, I'm sorry, forgive me.
16        Second sentence from where, sir?
17     Q In the first full paragraph.
18     A Yes, sir, okay.
19     Q  "And remember this, whether you heed my
20 warning or not, you have a number of outstanding
21 responsibilities to the people that have gotten you
22 this far. And whether you take my advice or not, you

**138**

1  are not going to get a pass from any of us."
2      A Sir, I'm not trying to be argumentative,
3  but did you say 044?
4      Q 000044. It's the second sentence in the
5  first --
6      A Okay.
7      Q Why don't I read it one more time so it is
8  all clear. "And remember this, whether you heed my
9  warning or not, you have a number of outstanding
10 responsibilities to the people that have gotten you
11 this far. And whether you take my advice or not, you
12 are not going to get a pass from any of us."
13        What were you referring to?
14     A I was referring to the amount of money
15 that he owed us by June 24 of '02, and by his
16 conduct.
17     Q The money that he owed you on June 24,
18 2002, you consider that an outstanding responsibility
19 under the contract, correct?
20     A I believe that he had outstanding
21 responsibilities, and he had to meet them.
22     MR. BROOKS: Could you read back my

**139**

1  question.
2      (The reporter read the requested portion
3  of the record.)
4      THE WITNESS: Under the contract, if the
5  dust had settled, then, yes, it would have been an
6  outstanding responsibility.
7      MR. TREVELLINE: I need to take a break.
8      MR. BROOKS: You need to take it right now
9  in the middle of his questioning?
10     MR. TREVELLINE: There's no question
11 pending.
12     (Off the record.)
13     BY MR. BROOKS:
14     Q Mr. Mace, as of the time you wrote this
15 June 24, 2002 letter, was Mr. Domash's obligation to
16 reimburse you an outstanding responsibility as you
17 said it was in this letter?
18     A Yes, it was an outstanding responsibility
19 which I was still anticipating it would be paid.
20     Q What was Mr. Domash's response to this
21 letter?
22     A His letter of the 22nd, I believe of

**140**

1  November 2002.
2      Q That was his first response to this?
3      A I never got a response that I recall. We
4  sent this I believe a couple of times, if I'm not
5  mistaken.
6      (Mace Exhibit No. 14 was marked for
7  identification and retained by counsel.)
8      BY MR. BROOKS:
9      Q Before we get to this, in that letter you
10 referred to Mr. Domash as deceitful, what did you
11 mean by that?
12     A I meant deceitful. I think he was not
13 telling the truth to himself. And I think there were
14 times when he wouldn't tell the truth to his friends.
15     Q What did he not tell the truth about?
16     A His behavior.
17     Q What does that mean?
18     A It means his behavior. His conduct, his
19 willingness to manipulate people or trying to.
20     Q How did he manipulate people?
21     A I think he was selfish.
22     Q But my question was --

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

36 (Pages 141 to 144)

141

1    A He monopolize people's time.
2    Q That's what you meant by deceitful?
3    A Yes.
4    Q Sir, I'm showing you what's been marked as
5    Mace 14. Do you recognize this document?
6    A Yes, I do recognize this.
7    Q Is that your handwriting on this document?
8    A I believe it to be.
9    Q For the record, is it a fax cover sheet
10    dated July 5, 2002 from you to Dr. Graham?
11    A Yes, it is, sir.
12    Q Is it a true and accurate copy of that fax
13    cover sheet?
14    A It appears to be, yes.
15    Q Did you in fact send this to Dr. Graham on
16    July 5, 2002?
17    A Yes, I believe I did.
18    Q Turning your attention to the comments
19    section which is on the upper right hand corner, and
20    just for the record, this document has been Bates
21    numbered Mace 000039. Then turning your attention to
22    the comments section at the right-hand corner, it

142

1    says, "Thank you for your call of this morning. One
2    day guaranteed UPS Air EXP. This date would certify
3    green RR card."
4        First of all, Is EXP, express?
5    A Excuse me?
6    Q The EXP, is that short for express, air
7    express?
8    A Yes, sir.
9    Q And the RR is return receipt?
10    A Yes, sir, it is.
11    Q "Mailed to his home." Whose home were you
12    referring to?
13    A Larry Domash's home.
14    Q "Ditto accompanying cover letter.
15    Original 6/24 correspondence marked in red ink.
16    Quote, Second notice, 7/5/02, closed quote." Did I
17    read that correctly?
18    A You did.
19    Q So is this indicating that you had resent
20    the June 24, 2004 letter because you had not got a
21    response?
22    A That is true.

143

1    Q Why did you label it second notice?
2    A Only because it was the second time we had
3    sent it. Larry has a history, he's told me of not
4    opening letters that he thinks are worrisome the
5    first time he gets them. So I said "Well, this is
6    interesting, what should I do?" And George said,
7    "Send the letter again."
8    Q Had you ever before resent Mr. Domash a
9    letter you had already sent to him?
10    A No, I sent him multiple copies of the
11    BEK TEK bill.
12    Q I'm sorry. So you had done that in the
13    past?
14    A Yes.
15    Q Had you ever before written second notice
16    on it?
17    A I can't tell you. There was an
18    accompanying letter from the people from BEK TEK.
19    They were sending him correspondence directly.
20    Q The second notice referred to the fact
21    that he owed you money, correct?
22    A The second notice was not that he owed me

144

1    money. The second notice was to the content of the
2    letter about getting some help.
3    Q But this was -- how many times in the past
4    had you sent him correspondence for a second time?
5    A Several times.
6    Q How many -- on those occasions, on how
7    many -- strike that.
8        On those occasions, how many times did you
9    write second notice on the correspondence to him?
10    A I don't think that -- how many times did I
11    write it? Excluding the BEK TEK thing which came
12    right from BEK TEK, what I had sent him before were
13    copies of the executive summary, the memorandum,
14    things like that.
15    Q So how many times had you written second
16    notice?
17    A The answer -- this is the only time I
18    think I had in my dealings with Larry I ever wrote
19    that. I was trying in red ink to catch his
20    attention.
21    Q You spoke to Dr. Graham about this before
22    you sent it?

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

37 (Pages 145 to 148)

---

145

1    A Dr. Graham approved the letter before I
2 sent it.
3    Q Did you talk to Dr. Graham about the
4 second letter, resending it?
5    A He's the one who suggested I send it.
6    Q For the second time?
7    A Yes.
8    Q During that conversation about the issue
9 of Mr. Domash's -- did the issue of the amount of
10 money that Mr. Domash owed you come up?
11    A No, not directly.
12    Q Going into the second paragraph of your
13 note. It says "Hope you had a safe and happy fourth.
14 Steve and Gene send their regards. By 7/6 all" --
15 and all is underlined IFA members -- "notified of
16 company search we're on our way."
17        Who were the IFA members at this point?"
18    A Gene and John Miller and myself. Again in
19 the rooting section, people like John Stein and John
20 Martin, people like Darryl Wright. I would think
21 that that would pretty much cover it.
22    Q What did you mean by "company search"?

---

146

1    A I believe we were talking about looking at
2 companies that were available for purchase,
3 insurance --
4    Q Did that ever work out?
5    A No, it did not.
6    Q Also with that document, if I can, I'm
7 going to turn your attention back to Mace Exhibit 13,
8 specifically the page Bates numbered Mace 000045?
9    A Sure.
10    Q That on the first full paragraph on that
11 page, six lines down the sentence begins, "How ironic
12 that just as George and Mr. Stein go out to raise
13 money, that you can't incite a billion dollars a year
14 to manage, that EOA comes back onto the field and
15 that Mr. Martin and I am to meet next week to join
16 forces with George and Mr. Stein, that you choose
17 that exact moment to harass and annoy one of the very
18 people that made it possible."
19        Did I say that right?
20    A I believe you did.
21    Q And you're speaking to Mr. Domash here?
22    A Yes, I am.

---

147

1    Q Did George -- did Dr. Graham and Mr. Stein
2 have any success going out and raising money?
3    A No, they did not.
4    Q Did the billion dollars a year that
5 Mr. Buchanan cites that would be managed, did that
6 ever coming to fruition?
7    A No, you needed an insurance company to
8 realize that. He was talking -- he was talking about
9 the productive capabilities of the design. It was
10 that billion dollars of cash flow that would be
11 coming in that would be the cornerstone of Larry's
12 practice in Domash & Associates.
13    Q How did Bank of America come back onto the
14 field?
15    A If I remember correctly, they had said
16 that they continued to have an interest in this
17 project and wished us well on it and wanted us to
18 keep working towards its conclusion.
19    Q But none of it ever happened?
20    A That's correct.
21    Q Thanks.
22        (Mace Exhibit No. 15 was marked for

---

148

1 identification and retained by counsel.)
2    BY MR. BROOKS:
3    Q Sir, I'm showing you what's been marked as
4 Exhibit Mace 15. Do you recognize this document?
5 It's Bates numbered Mace 00012.
6    A Yes, sir.
7    Q Is that your handwriting?
8    A It is indeed, I believe it to be.
9    Q Is it a true and accurate copy of a letter
10 that you wrote to Mr. Domash on July 10, 2002?
11    A Yes, I think it is.
12    Q Did you send it to Mr. Domash on or around
13 that date?
14    A I would think I would have, yes.
15    Q Turning your attention to the second
16 paragraph, it says "To say that you don't owe BEK TEK
17 and yours truly money is as absurd as suggesting you
18 don't owe George money." When did Mr. Domash say
19 that he didn't owe BEK TEK money?
20    A My understanding of this is that Larry had
21 called George and had said that -- as George related
22 the story, said that he, Larry, was going to get some

---

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

39 (Pages 153 to 156)

153

1 understanding that Larry denied owing you any money?
2    A Did I have an understanding that he
3 denied -- no, I had an understanding that he denied
4 owing me any money when he sent me that letter.
5    MR. BROOKS: Can we go off the record.
6    (Off the record.)
7    BY MR. BROOKS:
8    Q Just want to be clear, sir, that it's your
9 testimony that on July 10, 2002 you understood that
10 Mr. Domash had denied owing BEK TEK money; is that
11 correct?
12    A I got a brief message from George Graham
13 and that's what I took away from it. But, you know,
14 I can't even tell you from July 10th of 2002 whether
15 I pulled the message which may have happened or
16 whether Gene pulled the message.
17    Q My question isn't whether you heard it.
18 My question is yes or no, as of July 10, 2002, did
19 you have an understanding from whatever source that
20 Mr. Domash was claiming he didn't owe BEK TEK any
21 money?
22    A I don't know what he was suggesting. I

154

1 was not part of the conversation.
2    Q That's not my question. My question is,
3 did you have an understanding that he was --
4    A I had a statement. I wouldn't say I had
5 an understanding. I was not part of the
6 conversation.
7    Q Why did you write this sentence, the
8 sentence that reads, "To say that you don't owe
9 BEK TEK and yours truly money is as absurd as
10 suggesting you don't owe George money"?
11    A Mr. Brooks, my purpose being here is not
12 to be argumentative. I can't add to you anymore than
13 what I've already said. I wrote this. I believe
14 this to be my handwriting. Beyond that, I don't have
15 anything more to add.
16    Q Are you denying that you had an
17 understanding that he denied owing you money or are
18 you just saying you don't remember?
19    A I don't recall the circumstances of this.
20 You're talking about, you know, something that took a
21 second or two to write five years ago.
22    Q So it's possible that as of July 10, 2002,

155

1 you did have an understanding that Mr. Domash denied
2 owing you money?
3    A I did not have an understanding that
4 Mr. Domash denied owing me money as of July 10, 2002
5 based on this document or anything else that you've
6 shown me.
7    (Mace Exhibit No. 16 was marked for
8 identification and retained by counsel.)
9    BY MR. BROOKS:
10    Q As of the time you wrote that
11 July 10, 2002, did you have any concerns about the
12 amount of money that Mr. Domash owed you?
13    A I had concerns about the amount of money
14 and I had concerns most of all about his well-being.
15    Q Did you have any concerns that he hadn't
16 paid you a penny back even?
17    A I said to you I had concerns about those
18 two issues. That was what the June letter was about.
19    Q One of those issues being that he hadn't
20 reimbursed you at all?
21    A It certainly was the minor of the two.
22 The big thing was getting him to a doctor.

156

1    Q But yes or no, it was a concern that he
2 had not paid you back anything?
3    A It was a passing concern, the big issue
4 was getting him to the doctor. That was what George
5 wanted in that correspondence, that's what was
6 written in that correspondence. George couldn't get
7 him --
8    Q Sir, I'm showing you what's been marked as
9 Exhibit Mace 16. Take a look at it. Let me know if
10 you recognize this document. And just for the
11 record, it's actually -- it's a fax cover sheet and
12 then a letter attached. The fax cover sheet is
13 Bates number 2362 -- Graham 2362, the letter is
14 Graham 2363 through Graham 2367.
15    A Yes.
16    Q You do recognize this document?
17    A I do indeed.
18    Q And the first page, is that your
19 handwriting on the fax cover sheet?
20    A Yes, it is.
21    Q Would you agree that the fax transmittal
22 line indicates that this was faxed on October 27,

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

42 (Pages 165 to 168)

---

165

1    Q  If I could turn your attention to the next
2  page at the bottom paragraph that's Graham 2366. Let
3  me step back.
4    A  Sure.
5    Q  The faxed transmittal line we've agreed is
6  October 27, 2002, that's when you sent this letter to
7  Wendy Tonn?
8    A  That's when we think we sent it, yeah.
9    Q  When did you actually write this letter?
10    A  I don't know.
11    Q  Would you say on or shortly before
12  October 27, 2002?
13    A  There's no date to it.  I can't tell you.
14  I can tell you it was sent on the 27th, but I can't
15  tell you when it --
16    Q  Okay.  Turn your attention to the third
17  paragraph which -- the bottom paragraph, second full
18  paragraph.
19    A  Second full paragraph.
20    Q  To the bottom paragraph, "Regardless of
21  how that works however" -- "however that's resolved,
22  you have an obligation to me that is overdue."  What

---

166

1  did you mean by that?
2    A  I meant that he needed to address, he
3  needed to get on the phone, he needed to talk with us
4  about taking steps to meet his obligations.
5    Q  And at this point that obligation was
6  overdue, correct?
7    A  That's what it says.
8    Q  I know what it says.  I'm asking you was
9  it overdue.
10    A  Well, clearly, if we're talking about him
11  getting his life back together, then he had not yet
12  done that and we weren't out of the woods yet by a
13  long stretch and -- or we didn't have a company up
14  and running because I didn't have a company to bring
15  to him and say, "Look, this is a funded company, I
16  need you to tell me how it would've proceed."
17    Q  When you wrote this letter on or about
18  October 27, 2001, when were you expecting payment
19  from Mr. Domash?
20    MR. TREVELLINE:  Correction, that was
21  2002.
22    BY MR. BROOKS:

---

167

1    Q  I'm sorry, 2002.
2    A  Well, I suggested in this that he write me
3  a check for $100,000 within two weeks.
4    Q  You felt that's what was called for at a
5  minimum under the contract, correct?
6    A  I felt that that would be a healthy start
7  and a fair one.
8    Q  Did he in fact write you that check within
9  the next two weeks?
10    A  No, I didn't hear from Larry until the
11  22nd of November.  I didn't receive any phone calls,
12  I didn't receive any communication from him.
13    Q  At the time you wrote this, how overdue
14  was his financial obligation to you?
15    A  Well, he still wasn't healthy.  He still
16  wasn't really on his feet.  He was overdue in the
17  sense that it had been a long time and it would have
18  been nice to have seen some of it.
19    Q  Turning your attention a few lines
20  down -- let's start, "Larry, it's been two years,
21  indeed, almost exactly two years.  I've done what you
22  asked me to, what I said I would do and now you have

---

168

1  to meet your commitment.  You've made the promise to
2  repay me, live up to it."
3    A  That's right.
4    Q  When did he make the promise to repay you?
5    A  In April of '99 but he had to be well
6  enough, he had to be on his feet, he had to be out of
7  the woods, he had to be -- you know, through the
8  tremendous vail that he had been through.
9    Q  You don't mention that anywhere in this
10  letter, do you?
11    A  I had before.  We had talked about this
12  before.
13    Q  But in this letter that's not what you're
14  saying, is it?
15    A  Well, I -- it's a letter.  It's not a
16  compendium of correspondence.
17    Q  What do you mean by that?
18    A  I mean that it is exactly what I said it
19  is.  He had to get through what he was struggling to
20  get through in terms of the divorce, the child
21  custody cases, the emotional well-being on his feet,
22  financially.

---

Case 1:05-cv-02244-HHK    Document 44-4    Filed 07/18/2008    Page 30 of 43
DEPOSITION OF PETER V. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

45 (Pages 177 to 180)



177
1    A  Start an insurance company.  That's how
2  you do it.  It's a set of rules that you have to
3  follow.
4    Q  Did you actually begin to work on a
5  regular A filing?
6    A  We got the documents and then we were
7  waiting before we did anything like that to find out
8  where we were in terms of actually getting the money
9  from Dr. Lee.  So we'd actually have the money and
10  then we could move forward.
11    Q  Seeing Exhibit 17, sir, does that refresh
12  your recollection that you did send this to
13  Mr. Domash on October 30, 2002?
14    A  I can't tell you when I sent this to
15  Mr. Domash in 2002 but I do believe I sent it to him.
16    Q  What was Dr. Graham's response to the
17  draft that you sent to his assistant on October 27,
18  2002?
19    A  That's the same document as this document?
20    Q  Yes.
21    A  What was his response?  I think he
22  was -- well, Dr. Graham moves around a great deal.

178
1  He may not have seen this for some time, but he
2  certainly knew that we had an exciting prospect with
3  Sonny Lee and was happy to see us moving in that
4  direction.
5    Q  What was his response to the letter to
6  Mr. Domash?
7    A  He thought it was appropriate.
8    Q  Did you speak to anybody else about this
9  letter before you sent it to Mr. Domash?
10    A  I don't recall right now.
11    Q  What was the first response you received
12  to this letter from Mr. Domash?
13    A  I think it was Larry's letter of
14  November 22nd, 2002.
15    Q  I think you actually mean November 24th,
16  2002, right?
17    A  Sorry.  Right.
18    Q  You didn't speak to him by phone during
19  that interval, did you?
20    A  No, George didn't want me to speak with
21  him by phone.  George wanted Larry to call George
22  and --

179
1    Q  Why didn't George want you to speak to
2  Mr. Domash?
3    A  Because I'm not a doctor and George is,
4  and George had treated Larry, and George knew
5  privately things that are rightfully in the scope of
6  a doctor's knowledge.
7    Q  What does that have to do with you talking
8  to Mr. Domash about money owed?
9    A  I don't know.  That's what George asked me
10  to do and that's what I did.
11    (Mace Exhibit No. 18 was marked for
12  identification and retained by counsel.)
13    BY MR. BROOKS:
14    Q  Sir, I'm showing you what's been marked as
15  Exhibit Mace 18.  Bates numbered Graham 1426, 1427
16  and ask you if you recognize this document.
17    A  I do vaguely remember this, yes.
18    Q  Is this your handwriting?
19    A  It is indeed.
20    Q  Is it a true and accurate -- let's take a
21  step back and explain what it is.  Maybe that would
22  be easier.

180
1    Am I correct, sir, that an underlying
2  document is a letter that you wrote to the credit
3  services unit of First USA Bank on Saturday,
4  November 9, 2002 and then there is a handwritten note
5  on top of it that you wrote to Dr. Graham?
6    A  Yes.
7    Q  Do you know when you wrote the note to
8  Dr. Graham?
9    A  No, I don't.
10    Q  Would you assume that it was on or around
11  November 9, 2002?
12    A  It could have been, I just don't know.
13    Q  Turning your attention to the note itself.
14  It says -- well, let's -- actually, I take it back,
15  strike that.
16    Why did you write this letter to First USA
17  Bank?
18    A  They had closed an account and if I
19  remember correctly, they later reopened the account.
20    Q  But at the time you wrote this, were you
21  responding to the fact that they had closed your
22  account on October 31, 2002?

Case 1:05-cv-02244-HHK   Document 44-4   Filed 07/18/2008   Page 31 of 43
DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

46 (Pages 181 to 184)

181

1       A  I think I was and I think I was very
2  startled that they had done that.  We hadn't had any
3  problems and I think -- if I remember correctly,
4  later what ended up happening is that somebody in the
5  bank had made an innocent mistake and that they
6  reopened the account.
7       Q  But you forwarded this to George to let
8  him know that this had occurred?
9       A  Yes, there was a note to that.
10      Q  And the note says, "George, if we don't
11  put a stop to this, it threatens to jeopardize all
12  the good we can accomplish.  Damn Larry and his
13  selfishness and deceit."
14      Were you referring to Larry Domash?
15      A  I was indeed.
16      Q  What did you mean by "his selfishness and
17  deceit"?
18      A  I mean that Larry Domash would, for
19  example, claim to take steps to represent our
20  interest with every employer that I knew that he had
21  up until his letter of the 24th of November of 2002
22  and yet we would never get any feedback from that.

182

1  I'd get a phone call from Larry and he'd be
2  enthusiastic about what Susquehanna was doing and how
3  they were interested in putting trumpet an insurance
4  company.  It's this constant drumbeat of not getting
5  him to live up to his idea of what you refer to as a
6  dual track system of -- we would try to get the
7  company up and running, he would try to get the
8  company up and running.
9       In the meantime, the clock is running,
10  and, you know, time is dear and time is precious and
11  we're getting more and more stretched.  That's what I
12  believe this is about.
13      Q  What does any of that have to do with the
14  fact that your credit card got closed?
15      A  I don't know.  I don't know -- as I say, I
16  think that it was reopened.  I think it was an
17  innocent mistake.
18      Q  But when you wrote this to Dr. Graham, you
19  didn't know that?
20      A  When I wrote this and sent this, I'm
21  assuming that I sent it sometime near the 9th of
22  November of 2002.  I didn't know that.

183

1       Q  And so you're referencing that --
2       A  It's frustration.  That's exactly what it
3  is.  It's acute frustration and not being able to
4  have him respond to what we're trying to urge him to
5  respond -- to come back to us, get well and let's all
6  go on together.
7       Q  What does that have to do with First USA
8  Bank closing your account?
9       A  It has a lot to do with it in the sense
10  that Larry wasn't doing anything that was concrete on
11  his end to try to move us all forward, that, you
12  know, we would get phone calls about these different
13  institutions that he was contacted and that was
14  wonderful and I was grateful for that.  But just the
15  whole thing would just kind of collapse.
16      Q  As of November 9, 2002, when was the last
17  time you had even spoken to Mr. Domash?
18      A  It had been several months and we had been
19  trying to get him back on track.
20      Q  So what did he do in those several months
21  that you considered deceitful?
22      A  It wasn't those several months, it was

184

1  sometime before that when he wasn't really putting
2  his efforts forward in trying to get us launched.
3       Q  This is a direct response to getting your
4  credit card shut down?
5       A  Yes.
6       Q  The deceit you're talking about is that
7  Mr. Domash had promised to reimburse you for the
8  credit card?
9       A  Mr. Domash had agreed to reimburse a
10  number of people for a number of things.
11      Q  Including you?
12      A  Including me.
13      Q  And he hadn't done it as of November 9,
14  2002?
15      A  And he hadn't done it as of November 9,
16  2002 --
17      Q  And you considered that deceitful?
18      A  I consider Larry's conduct, about not
19  really putting his shoulder to the wheel, deceitful.
20      Q  Part of that conduct was not paying you
21  back?
22      A  That was a portion of it.

Case 1:05-cv-02244-HHK    Document 44-4    Filed 07/18/2008    Page 32 of 43
DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

47 (Pages 185 to 188)

185

1    Q I think we talked about this earlier but I
2  forget. When was the last time that you spoke to
3  Mr. Domash where he promised to pay you under the
4  contract?
5    A I don't remember discussing it before. We
6  may very well have. I seem to remember it was in
7  June of 2002 or May of 2002.
8    Q In this lawsuit, you're generally claiming
9  that your activities between April 1999 and
10  November 2002 conferred a benefit on Mr. Domash?
11    A Yes.
12    Q Are you claiming that he received a
13  benefit in connection with your work and the
14  expenditures that you made that were related to IFA?
15    A Well, IFA was part of it.
16    Q But did Mr. Domash benefit from that?
17    A IFA was never realized so what you had was
18  a good faith effort to people to achieve that name so
19  that he had the chance of benefitting from it.
20    Q But you would agree that -- at least as to
21  the IFA-related stuff, he didn't actually benefit?
22    A I don't know how he would characterize

186

1  that. There was some things that we did in that time
2  period where there was a clear benefit like
3  Val Diviacchi, for example, who had been able to get
4  in, I think it was $132,000 from an account or --
5    Q I'm sorry to interrupt. I just want to
6  break this apart. We'll get to that. I'm trying to
7  break it down. In terms of the IFA-related part of
8  the contract, did Mr. Domash end up benefitting from
9  that?
10    A I think Mr. Domash terminated his
11  involvement before he could have benefitted from it.
12    Q So that's no, he never ended up
13  benefitting?
14    A No, it's not no, he never ended up
15  benefitting. It's he willingly terminated his
16  benefit -- his participation in it.
17    Q Before he benefitted?
18    A Yes, he could have possibly and he chose
19  not to.
20    Q You also claim that he benefitted from the
21  work you performed in connection with his divorce
22  proceedings and his family -- and his personal

187

1  issues?
2    A Yes.
3    Q Can you quantify how much he benefitted in
4  that?
5    A Can I quantify how much he benefitted? He
6  told me that having me as a sounding board during
7  that process made the difference between him being
8  able to achieve what he achieved and not being able
9  to achieve it. And I know that Joe Walsh had said if
10  I had not been helping him and trying to keep him
11  focussed and on track, that Mr. Walsh's billing would
12  have been several times greater than it was.
13    Q Did he benefit in that way in 1999 as you
14  just described?
15    A No, because in 1999 we had -- we certainly
16  had the avalanche of communication between us. And
17  in 1999 I had taken him to Bob Ackerman, who's an
18  attorney, who had taken him then to Mr. Barkshak, who
19  was an attorney who was representing him.
20    Q So he didn't benefit in 1999. Did he
21  benefit in 2000?
22    A Yes, he did benefit in 2000.

188

1    Q Did he benefit in 2001?
2    A In terms of the issues about --
3    Q Divorce proceedings --
4    A And children?
5    Q Yes.
6    A Yes, because I was a sounding board for
7  him. I was a sponge. He would call and I would do
8  my best to be helpful and, yes, compassionate when he
9  was in a rough place.
10    Q When was the last time that you acted as a
11  sounding board for Mr. Domash?
12    A I would say May or June of 2002.
13    Q And after that, did you do anything after
14  May or June of 2002 that conferred a benefit on
15  Mr. Domash?
16    A I tried to get him back on track in terms
17  of his mental health.
18    Q Were you successful?
19    A I don't know. I never had a private
20  conversation with Larry after that point.
21    Q Are you aware of anything you did after
22  June of 2002 that conferred a benefit on Mr. Domash?

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

48 (Pages 189 to 192)

---

**189**

1    A I know that after June of 2002, he spoke
2  to Dr. Graham and he would not have done that had I
3  not tried to get him to talk to Dr. Graham. I know
4  that after June of 2002, he contacted BEK TEK and
5  completed the payments that he owed to them. I
6  suppose that confirmed the benefit in the sense that
7  he cleared his account with them.
8    Q And you were responsible for that?
9    A They think I was, yes.
10    Q Do you think you were?
11    A Yes.
12    Q So tell me everything specifically that
13  you did after June 2002 that conferred a benefit on
14  Mr. Domash?
15    A Well, I tried to get him back on track in
16  terms of his mental health, I tried to --
17    Q Did that work?
18    A He contacted George Graham and said that
19  he was going to go to some doctors in New York.
20    Q But you're not aware of whether that
21  happened or not?
22    A No, I can only tell you that he said to

---

**190**

1  George that he was going to do that.
2    Q What else?
3    A And the other thing I would think would be
4  the relationship with BEK TEK. He had already -- he
5  had already had the child custody issues resolved
6  regarding the children and from, say, June until --
7    Q That's a big difference. Were his child
8  custody issues resolved as of June of 2002?
9    A When I contacted Kelly, Libby & Hoopes, it
10  was to provide him services for a portion of that.
11    Q Do you remember when you contacted Kelly,
12  Libby & Hoopes?
13    A It's in the file. I contacted Mr. Kelly
14  at the recommendation of someone in the FBI.
15    Q And you would agree that was in December
16  of 2000, correct?
17    A I don't know when it was. It might be
18  dated in there.
19    Q You didn't have any communication with
20  anyone at Kelly, Libby & Hoopes in the year 2002, did
21  you?
22    A Not that I recall, not at all.

---

**191**

1    Q So again, I'm asking what you did after
2  June of 2002 that conferred a benefit to Mr. Domash.
3    A I told you those two things. If Larry
4  was -- had and I hope he did, you're a witness to
5  that, you and I met one another -- well, we had
6  spoken briefly once or twice possibly on the phone,
7  but when we met one another in front of the Norfolk
8  courthouse, I'm hoping that your people brought
9  whatever the precise issues that you were
10  representing to him to a successful conclusion.
11    Q I'm sorry. Maybe I'm not being clear.
12  I'm focusing on acts that you undertook after June of
13  2002, were there any that conferred a benefit on
14  Mr. Domash?
15    A Only the correspondence and the business
16  about the BEK TEK bill because Larry wasn't talking
17  to me. We set in motion some other things and we
18  certainly hoped that those worked out to his
19  advantage and children's advantage but I don't know
20  the details and I -- Mr. Brooks, I truly don't recall
21  when I first contacted Mr. Kelly. We might --
22    Q I'm not trying to hide it. I can

---

**192**

1  represent to you it was around December of 2000.
2    A Okay.
3    Q You claim that Mr. Domash left recorded
4  messages for you where he acknowledged owing you
5  money?
6    A Yes.
7    Q And he also said in these messages that he
8  would pay you money?
9    A Yes.
10    Q Were these recordings made on a manual
11  tape, phone answering machine, voice mail? How did
12  it work?
13    A It was a radio shack answering machine.
14  It had -- it had reel-to-reel tapes. Little
15  cassettes.
16    Q Did you ever play these tapes for anyone
17  else to hear?
18    A Oh, yeah, a lot of people heard them.
19    Q Who heard them?
20    A George Graham heard them, Gene Sierzant
21  heard them, Darryl Wright heard them, Steve Killion
22  heard them.

---

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

49 (Pages 193 to 196)

---

193

1    Q Anyone else that you can remember?

2    A No, not off the top of my head.

3    Q Why did you play these tapes for these

4    people?

5    A Because I was interested in someone else

6    hearing these representations and in the course of

7    whatever those conversations included over a lengthy

8    period of time, I was interested in those other

9    people hearing what Larry was talking about, whether

10   Larry was talking about something he was involved in

11   or perhaps someone he spoke to about us, just the

12   same way, you know, if you and I were perhaps at some

13   point working together and I'd say "Doug, listen to

14   this."

15   Q So you didn't play the tape specifically

16   so they would hear his acknowledgement of owing you

17   money?

18   A Well, Larry had -- the answer to that

19   is -- no, not specifically. Larry had said that he

20   recognized he owed us money to a lot of

21   different -- I mean, in meetings, on the tapes, in

22   person. It wasn't a secret.

---

194

1    Q And again, I think you've -- have you

2    spoken about all the various times that he did that

3    that you recall?

4    A Yes, somewhere in the record we have -- I

5    can go back.

6    Q What happened to these tapes?

7    A They were erasable. You just -- they were

8    cassette tapes like you use in your car -- you don't

9    use them anymore. It's very rare.

10   Q I know. When you play these tapes for

11   people, was it typically soon after he had left the

12   message?

13   A Well, we didn't have an inventory or a log

14   of tapes if that's what you mean. I mean, we had

15   other things coming in so I'm going to guess and say

16   yes, within a few days. A week at the most.

17   Q What happened to that tape recording

18   machine?

19   A I think that Gene destroyed it.

20   Q When?

21   A In fact, I know Gene destroyed it. When?

22   I'm going to guess and say 2003, somewhere in there.

---

195

1    I just don't remember. I could ask him.

2    Q Leaving aside the calls where he claimed

3    to owe you money, do you remember the last time

4    Mr. Domash called you at all?

5    A Yes.

6    Q When was that?

7    A In May or June of 2002. I do certainly

8    remember that.

9    Q Other than Mr. Graham, Mr. Sierzant,

10   Mr. Wright, and Mr. Killion, is anyone else aware of

11   Mr. Domash's alleged promise to reimburse you?

12   A I could search my memory but those are the

13   people that stick out most clearly.

14   MR. TREVELLINE: Excuse me, I need to use

15   the restroom.

16   (Off the record.)

17   BY MR. BROOKS:

18   Q Mr. Mace, when did you first come into

19   contact with Dr. Graham?

20   A When did I first come into contact with

21   Dr. Graham? I'm going to guess -- I'm going to guess

22   sometime in 1998. I could ask him. I don't really

---

196

1    recall.

2    Q What was the circumstances behind your

3    meeting Dr. Graham?

4    A Larry had sent me out to meet him. He was

5    in Chicago -- well, he was in Milwaukee and I met him

6    in Chicago.

7    Q Why did Larry want you to meet him?

8    A Because he was someone who Larry trusted

9    and someone Larry respected. And I think Larry

10   respected and trusted me and he wanted to bring us

11   together. I had never met him before, whenever that

12   was, I can ask him I just don't remember.

13   Q Did Larry want to bring you two together

14   for business reasons or personal reasons?

15   A Both. Primarily business. I don't think

16   that Larry thought that George and I -- I don't know.

17   That's not fair to say.

18   Q What business?

19   A What business? IFA and --

20   Q I'm sorry. In about 1998 Mr. Domash sent

21   you to meet Dr. Graham to discuss IFA?

22   A Yes.

---

DEPOSITION OF PETER W. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

53 (Pages 209 to 212)

209

1  discuss the report. My -- it was just set in motion
2  and be sure that it was done and then get whatever
3  the report was to the proper authorities.
4      Q  During this time period pursuant to the
5  contract, you say you had with Mr. Domash, you paid
6  certain of his expenses. correct?
7      A  Some, yes.
8      Q  Why didn't you pay this one?
9      A  Why didn't I pay this one.  Good question.
10 I don't know.  He paid it.  I can't tell you why.  He
11 just said to -- that he would pay it and send it off.
12 Would you like me to ask the Bank of America about
13 this? I would be happy to do it.
14     Q  I would.  I would like you to do that.
15     A  Okay. I will.  Can I make a note to that
16 effect?
17        Thank you very much.
18        (Mace Exhibit No. 21 was marked for
19 identification and retained by counsel.)
20        BY MR. BROOKS:
21     Q  Sir, I'm now showing you what's been
22 marked as Exhibit Mace 21 and Bates numbers

210

1  Mace 000199 and 000200.  And ask if you recognize
2  that document.
3      A  Thank you.
4         Yes, sir, it looks --
5      Q  What is it?
6      A  It's an invoice from BEK TEK.
7      Q  As far as you know, it's a true and
8  accurate copy?
9      A  Yes, sir, I believe it is.
10     Q  What was this -- what did this BEK TEK
11 invoice relate to?
12     A  In the course of litigation support like
13 Chris Rush's investigation, in the course of the
14 struggle with regard to the divorce and child custody
15 issues, if I recall correctly, Judge Kopelman had
16 allowed Larry and Mrs. -- the then Mrs. Domash to
17 tape-record messages between one another and the
18 children. There were quite a number of them.  There
19 was at least one whole big box full.  I was asked, if
20 I remember correctly -- I'm going to say by the judge
21 and Mr. Walsh to see if I knew of anyone who could
22 provide technical analysis of these tape recordings

211

1  to see if there were any willful attempts by anyone
2  to change the content of the tape recordings, to
3  monkey around, erase things, tape-record things
4  over --
5      Q  Let me get this straight.  You had a
6  direct conversation with the judge in this matter?
7      A  No, I won't say that I had a direct
8  conversation.  I remember the judge saying something,
9  perhaps it was directed to Mr. Walsh about that and I
10 was asked to help.
11     Q  Were you actually in the courtroom?
12     A  I have been once or twice in the courtroom
13 with Larry.  But to go back to your question about
14 this, I was asked to take these tape recorders of
15 which there were many and then to faithfully deliver
16 them to BEK TEK's address and then they were going to
17 do a study of whether these were whole or not.  I
18 don't know what the correct term is in their art or
19 science.  And then they were then to write a report
20 about them and return that report to Larry's counsel
21 and that's what that was about.
22     Q  Why did BEK TEK send the bill to you as

212

1  opposed to Attorney Walsh or Mr. Domash directly?
2      A  Good question.  Perhaps it was because
3  they knew that I was trying to help Larry.  They
4  had -- if I'm not mistaken, I think there's a letter
5  somewhere from Joe Walsh asking me to do this which
6  they may have a copy of.  Perhaps it was because
7  Mr. Walsh wanted, again, a firebreak.  Our job was to
8  help Larry if we could and so that's what we did.  We
9  got that and that was done and the contents were
10 returned to Mr. Walsh.
11     Q  Mr. Walsh on occasions such as this asked
12 you to help out?
13     A  Uh-huh.
14     Q  Is that right?
15     A  Uh-huh.
16     Q  As far as you know, did he have an
17 understanding that you were being paid for your
18 services?
19     A  Being paid for my services, I mean -- I
20 wasn't an employee of Larry's. I was Larry's -- he
21 would describe it as kind of coordinator, switchboard
22 between all these different parties. I wasn't paid

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

54 (Pages 213 to 216)

213

1  for it. My goal was to try to get IFA up and
2  running.
3      Q  Do you know if Mr. Walsh knew that?
4      A  Knew what?
5      Q  Knew that you were doing that as part of
6  hopes that you would get IFA up and running?
7      A  I don't recall -- I know we talked about
8  it but I don't remember really what was said. The
9  meetings with Mr. Walsh were very, very serious
10  meetings concerning Larry and Larry's position in
11  terms of the children and the divorce. It was
12  important I think that -- you know, that we focus on
13  those kinds of things.
14      Q  Turning your attention to the second page
15  of Exhibit Mace 21.
16      A  Yes, sir.
17      Q  You see where it indicates that on
18  November 22nd, 2001, a retainer of $12,000 was
19  applied?
20      A  The only thing that I know --
21      Q  Let start with the question. Do you see
22  where it says that?

214

1      A  Yes, I do. I'm sorry.
2      Q  Do you know who paid the retainer?
3      A  No, and the only amount that I have any
4  recollection of that was ever billed to Larry was a
5  $5,920.21.
6      Q  So until reviewing this today you don't
7  know that Mr. Domash paid a $12,000 retainer to
8  BEK TEK?
9      A  No, I have not spoken to them about that
10  and I have no recollection, memory of that at all.
11      Q  But you did receive this invoice?
12      A  Well, it's sent to me at the business
13  address.
14      Q  And you produced it in connection with
15  this case?
16      A  I did indeed, but I have no memory and I
17  certainly can ask about that.
18      (Mace Exhibit No. 22 was marked for
19  identification and retained by counsel.)
20      BY MR. BROOKS:
21      Q  Sir, I'm now showing you what has been
22  marked as Exhibit Mace 22. Do you recognize that

215

1  document?
2      A  Yes, I do indeed.
3      Q  What is that?
4      A  It's a letter to me from Bruce Koenig at
5  BEK TEK.
6      Q  Is that a true and accurate copy of the
7  letter that he sent you on or about January 14, 2002?
8      A  Yes, I believe it is, sir.
9      Q  And this indicates, does it not, that
10  after you received that, you made -- after you
11  received the bill in the amount of $5,920.21, you
12  made a partial payment on March 8, 2001 of $2,961?
13      A  I did.
14      Q  Do you remember doing that?
15      A  I certainly do.
16      Q  Why did you make that partial payment?
17      A  Because Larry was screaming -- Larry had
18  promised to make this payment and did not make the
19  payment. And I wanted to keep Larry's good name
20  intact with these people because something else might
21  come up and because I thought it was the just thing
22  to do. And because Larry had -- was one day on the

216

1  phone was yelling at me, "Take care of it, just take
2  care of it." And I did.
3      Q  So Larry had promised to pay them directly
4  but did not?
5      A  Larry had been billed directly by them for
6  the $5,920 and change by Mr. Koenig and I had also
7  sent Larry those bills. What I don't know about is
8  the $12,000 retainer.
9      Q  I'm sorry. Are you saying that Mr. Koenig
10  sent both you a bill and Mr. Domash a bill directly?
11      A  Yes.
12      Q  How do you know that?
13      A  Because Bruce Koenig told me they did
14  that.
15      Q  Getting back to -- anyway, that you -- you
16  claimed that Mr. Domash said he would pay and didn't.
17  When was that? Let's break that up. When did he say
18  he would pay?
19      A  Well, well before this. I can remember we
20  have a conversation --
21      Q  Let's stop because we're both doing this.
22  Well, you said before you made the partial payment of

1 (Pages 255 to 258)

255

1    VOLUME II
2    UNITED STATES DISTRICT COURT
3    FOR THE DISTRICT OF COLUMBIA
4    --------------------------------x
5    PETER M. MACE,              :
6        Plaintiff    :   Case No.
7        v.           : 1:05CV02244 (HHK)
8    LARRY A. DOMASH,          :
9        Defendant    :
10   --------------------------------x
11
12       Deposition of PETER M. MACE - VOLUME II
13            Washington, D.C.
14        Thursday, February 22, 2007
15              2:00 p.m.
16   Job No.: 1-97084
17   Pages: 255 - 372
18   Reported by: Alda Mandell, RPR
19
20
21
22

256

1       Deposition of PETER M. MACE, held at the
2    offices of:
3
4        EMPLOYMENT LAW GROUP
5        888 17th Street, Northwest
6        Suite 900
7        Washington, D.C. 20006
8        (202)331-2883
9
10       Pursuant to agreement, before Alda Mandell,
11   Registered Professional Reporter and Notary Public of
12   the District of Columbia.
13
14
15
16
17
18
19
20
21
22

257

1           A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFF:
4        MICHAEL J. TREVELLINE, ESQUIRE
5        1823 Jefferson Place, Northwest
6        Washington, D.C. 20036-2504
7        (202)737-1139
8
9    ON BEHALF OF DEFENDANT:
10       DOUGLAS S. BROOKS, ESQUIRE
11       KELLY, LIBBY & HOOPES
12       175 Federal Street
13       Eighth Floor
14       Boston, Massachusetts 02110
15       (617)338-9300
16
17   Also Present: LARRY A. DOMASH
18
19        C O N T E N T S
20   EXAMINATION OF PETER M. MACE        PAGE
21   By Mr. Brooks          259
22

258

1           E X H I B I T S
2        (Attached to the Transcript)
3    DEFENDANT'S                    PAGE
4       25  Fax - 5/13/02 - Brett to Stein      308
5       26  Letter - 5/24 - Brett to Larry      312
6       27  Organizational Chart          328
7       28  Document Bates stamped Graham 1776    331
8       29  Letter - 5/14/02 - Mace to MBNA      338
9       30  Letter - 6/16/00 - McSweeny to Mace    348
10      31  IFA's Financial Team          354
11      32  Complaint              361
12
13
14
15
16
17
18
19
20
21
22

Case 1:05-cv-02244-HHK   Document 44-4   Filed 07/10/2008   Page 38 of 43
DEPOSITION OF PETER M. MACE, VOLUME II
CONDUCTED ON THURSDAY, FEBRUARY 22, 2007

2 (Pages 259 to 262)

---

259

1    PROCEEDINGS
2    PETER M. MACE
3    having been duly sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR DEFENDANT
5  BY MR. BROOKS:
6    Q   Good afternoon, Mr. Mace.
7    A   Good afternoon, Mr. Brooks.  And Larry.
8    Q   Are you still in contact with Dr. Graham?
9    A   Yes, I am.
10   Q   When's the last time you spoke with him?
11   A   I believe it was last Friday.
12   Q   You didn't speak to him yesterday after your
13 deposition though?
14   A   Oh.  No.  I had no reason to.
15   Q   When you spoke to him last Friday, did you
16 discuss this case at all?
17   A   No.  Not at all.  We had other matters to
18 discuss.
19   Q   When is the last time that you discussed
20 this case in any way with Dr. Graham?
21   A   Mr. Brooks, I would think it would be about
22 two weeks ago.

---

260

1    Q   Please describe that discussion for me.
2    A   Please describe that discussion for me.
3    Q   What was said?
4    A   Yes.  I'll need a moment to think.  I
5 believe that I commented that I had never been in a
6 deposition before and his comment to me was it can be
7 somewhat tedious but he thought that I'd respond
8 thoroughly.  And then we went on to other matters.  It
9 wasn't a conversation that was really pointed in this
10 subject matter.  It was about things that we were
11 planning to do other than this.
12   Q   Does Dr. Graham have any possibility of
13 financial gain as a result of this litigation?
14   A   I can't imagine -- I can't imagine any
15 circumstance in which he would gain from this.  He's
16 not a participant in it and he's not -- I'm sorry.  Go
17 ahead.
18   Q   Have you promised anybody money if you were
19 to recover in this lawsuit?
20   A   Promise anyone money if I recover.  The
21 money would go -- all of the money would go to pay
22 back the credit card bills.  I mean I can't imagine

---

261

1 that there would be any money left over.  I've got to
2 pay Mike and I certainly am not interested in
3 pocketing any of the money.  The focus is exclusively
4 on returning the money to the credit card companies.
5    Q   Sir, I'm going to show you a document which
6 I showed you yesterday which is Exhibit Mace 5.  It's
7 your December 26, 2002 letter to Dr. George Graham.
8    A   Yes.
9    Q   And yesterday you had indicated that this
10 was a true and accurate copy of that, correct?
11   A   Yes, sir.  I did.  This is I'm sure the same
12 document that you were kind enough --
13   Q   Yes.
14   A   -- to give me yesterday.
15   Q   It is.  Turning to the second page which is
16 Bates number Mace 000005.
17   A   The second page.  Yes.
18   Q   The first paragraph on that page, four lines
19 down.  See it?  It starts with even without this.
20   A   Uh-huh.
21   Q   Steve has long suspected that Larry had
22 quote, two pockets, end quote, that he has been far

---

262

1 from honest about the true state of his financial
2 resources.  Who is Steve?
3    A   That is Steve Killion, the man that did --
4 or Bek Tek -- the analysis of Larry's tapes.
5    Q   How long had Steve suspected that Larry had
6 quote two pockets, end quote?  And to be clear, I'm
7 asking, Mr. Mace, for your understanding of how long
8 Steve knew based on what he told you.
9    A   Yes, sir.  I appreciate you clarifying that.
10 I would say for at least a year, possibly somewhat
11 longer than that.  Possibly -- it's just a guess but I
12 would say perhaps two years then.
13   Q   You mean two years before December 26, 2002
14 when you were writing this letter?
15   A   Yes.  He had long suspected -- you can also
16 ask Steve that.
17   Q   What did Steve tell you about that in the
18 two years before December 26, 2002?
19   A   His experience and training led him to
20 believe that Larry hadn't been truthful about always
21 describing the state of his financial affairs.
22   Q   When did he tell you that for the first

Case 1:05-cv-02244-HHK   Document 44-4   Filed 07/03/2008   Page 39 of 43
DEPOSITION OF PETER MACE
CONDUCTED ON THURSDAY, FEBRUARY 22, 2007

3 (Pages 263 to 266)

263

1  time?

2      A   I can't give you an absolute date,

3  Mr. Brooks, but I'm going to guess and say at least --

4  at least a year or year and a half.  Possibly longer.

5      Q   On how many occasions did he make comments

6  such as that to you?

7      A   How many occasions.  It was not said often

8  but it certainly had been commented on.

9      Q   What was the context?  In other words, why

10  was Mr. Killion making these statements about Larry

11  having two pockets to you?

12      A   I think Mr. Killion was suspicious of

13  Larry's veracity in a way that I was not.

14      Q   Do you mean Larry's veracity as it related

15  to his --

16      A   Financial situation.

17      Q   As it related to his financial situation?

18      A   Yes.  Yes.

19      Q   I'm sorry.  Are you finished with that

20  answer, sir?

21      A   Yes, Mr. Brooks.

22      Q   Okay.  If you can turn your attention now to

264

1  the fifth paragraph on the second page of Mace Exhibit

2  5.  You'll see it begins with the underlined why is

3  this important.  What I'd like to do is turn your

4  attention to the third to bottom line of that

5  paragraph and specifically the sentence states,

6  sometime between the start of the new year and

7  January 10th, Larry tells me he's formed a

8  corporation, open parentheses, I think in New York and

9  possibly in the children's names, closed parentheses,

10  and there's $1,130,000 in it.  Did I read that

11  correctly, sir?

12      A   Yes, sir, you certainly did, except that

13  it's sometime between the start of the new year and

14  January 10th.

15      Q   I'm sorry.  What did I say?

16      A   You just said year.

17      Q   I apologize.

18      A   No.  Not at all.

19      Q   It does say new year.  From the preceding

20  sentence would you agree that you were talking about

21  the new year and January 10th of the year 2002?

22      A   I believe it's 2001, sir.

265

1      Q   The preceding sentence states that Larry's

2  going to get a check which he'll have on January 3rd,

3  2002.  Do you see that?

4      A   Yes, I do.

5      Q   Okay.  Do you think that's a typo or am I

6  just misreading this?

7      A   I don't know, sir.  If I could take a moment

8  and let me carefully read this and I'll try to give

9  you an honest answer to it.

10      Q   Okay.

11      A   I think, sir, that in regard to the last

12  three lines, it would appear that we're talking about

13  2002.

14      Q   Okay.  So as of January 2002, based on what

15  Larry told you, you had the understanding that he had

16  a corporation with $1.13 million in it?

17      A   That's what this says, sir.  Yes.

18      Q   Did you ever ask that he reimburse you with

19  the money in that corporation?

20      A   No, sir.  I did not.

21      Q   Was that contrary to other comments Mr.

22  Domash made around that time in early 2002 that he

266

1  didn't have enough money to reimburse you?

2      A   He left us with the impression that he was

3  meeting many obligations and seriously strapped for

4  money.

5      Q   And that impression was inconsistent with

6  this statement he made to you in early January,

7  correct?

8      A   Yes.  I would say that it would be.

9      Q   Can I turn your attention, sir, to the last

10  page of this document.

11      A   Yes, sir.  The last page.  Uh-huh.

12      Q   Specifically the last two lines of the

13  letter before the PS.  So specifically the sentence

14  that reads we have to present a united phalanx, turn

15  up the heat and roll him up.  He will fold under

16  pressure.  You've said it yourself, he always does,

17  end quote.

18      A   Yes.

19      Q   Were you referring to Mr. Domash?

20      A   I was indeed.

21      Q   What did you mean, he will fold under

22  pressure?

5 (Pages 271 to 274)

271

1  I felt -- this was something that he asked me to have.
2  It was never something that I asked him to give me.
3     Q   Was there an understanding between the two
4  of you that you would be paid for your role in taking
5  over his power of attorney for Mr. Domash?
6     A   No. Not at all. I never would have
7  accepted money for something like that.
8     Q   Mr. Mace, you've been in the business world
9  ever since you graduated from law school, is that
10 correct?
11    A   Business world ever since I graduated law
12 school. Well, for a few years I was doing other kinds
13 of work before I got involved in the insurance
14 business.
15    Q   Okay. Well, do you consider yourself fairly
16 experienced in the insurance business?
17    A   I do consider myself fairly experienced. I
18 consider myself knowledgeable about some aspects of it
19 and experienced in the agency side of the business and
20 in being knowledgeable about the human sales aspect of
21 the business. The business is highly fragmented.
22    Q   So what areas specifically are you

272

1  experienced in?
2     A   In issues of product development in some
3  areas. In issues of working with field forces and
4  developing field forces. That was part of what I did.
5     Q   Anything else?
6     A   Anything else. No. I think that -- I think
7  that that's the strength that I brought to the effort.
8     Q   In all of the time that you've been in the
9  insurance business, are you aware of anyone else
10 entering into a reimbursement contract like the one
11 that you say you entered into with Mr. Domash?
12    A   I am not someone who deals with people like
13 Mr. Domash very often and my relationship was to get
14 this up and running.
15    Q   What do you mean when you say people like
16 Mr. Domash?
17    A   Larry has a financial background which I
18 don't have.
19    Q   Mr. Mace, turning to the year 1999, did you
20 have an effective license to sell insurance at that
21 point in time?
22    A   1999. I don't think I was selling insurance

273

1  at that point in time. I think my efforts were -- I'm
2  almost certain that I was not. My efforts were
3  focused on this project.
4     Q   My question was did you have an effective
5  license to sell insurance at that time?
6     A   And I thought -- excuse me. I thought I
7  answered it. I don't believe that I was licensed to
8  sell insurance in 1999 at that particular time.
9     Q   Would the same go for the years 2000 to the
10 present?
11    A   Yes. I think that's true.
12    Q   In the year 1999 did you have an effective
13 and valid license to engage in investment sales
14 activities?
15        THE WITNESS: Could you please repeat the
16 question?
17        (The Court Reporter read the last question.)
18    A   Not that I was aware of. No.
19 BY MR. BROOKS:
20    Q   And the same holds true for the years 2000
21 to the present?
22    A   Yes, sir.

274

1     Q   Mr. Mace, you were married when the alleged
2  contract was formed?
3     A   I was married?
4     Q   Yes. At that time?
5     A   Yes.
6     Q   And for 1998 you filed a joint tax return?
7     A   Uh-huh. I'm sure we did.
8     Q   Do you recall approximately what your
9  household income was for 1998?
10    A   No, I do not.
11    Q   In 1998 did you have any joint checking,
12 savings or any asset accounts?
13    A   I don't believe we did. Or if there was
14 one, there may have been three or four dollars in it.
15    Q   Did you or your wife have anything
16 individually?
17    A   Our finances were completely separate. As
18 far as I recall, that's the case.
19    Q   When you entered into this contract, you
20 stated that you had exhausted your own financial
21 resources?
22    A   Yes.

Case 1:05-cv-02244-HHK    Document 13-14    Filed 07/18/2008    Page 41 of 43
DEPOSITION OF PETER M. KRAUS, ESQUIRE
CONDUCTED ON THURSDAY, FEBRUARY 22, 2007

12 (Pages 299 to 302)

299

1    contract, how much was left from the inheritance?
2       A  My recollection is that there was very
3    little left from the inheritance.
4       Q  Can you more specifically describe very
5    little, please?
6       A  A fair question if you're saying could I
7    quantify it. A few thousand dollars. Perhaps less.
8    Certainly less than $10,000. Possibly less than five.
9       Q  Other than that, did you have any assets?
10      A  No. I would have, as I said, had to have
11   stopped work and started to look for other employment.
12      Q  When you entered into the alleged contract,
13   did you and Mr. Domash discuss and agree upon how the
14   reimbursements would be treated from a tax standpoint?
15      A  No. We never did.
16      Q  When you entered into the alleged agreement
17   with Mr. Domash, did you and he discuss and agree upon
18   how the interest from the credit cards would be
19   calculated from a tax perspective?
20      A  No. I don't recall, Mr. Brooks, Larry and I
21   ever having any conversation about the tax
22   implications of anything. He was just going to

300

1    reimburse me and I was going to turn around and
2    reimburse the credit card companies and the banks.
3       Q  At the time that you entered into the
4    alleged contract with Mr. Domash in April 1999, did
5    you and he discuss and agree upon how any partial
6    payment that he made would be applied to the various
7    credit cards?
8       A  No, sir. I don't recall that ever being
9    discussed.
10      Q  At the time you entered into the alleged
11   contract in April '99, how many credit cards did you
12   have in your name?
13      A  I believe -- I'm going to guess. I'm going
14   to say anywhere from -- possibly as many as ten.
15      Q  What was the amount of debt on those cards
16   as of April 1999?
17      A  I don't think that there was very much at
18   all, if any.
19      Q  Did you open up any new credit cards after
20   you entered into the alleged contract with Mr. Domash
21   in April 1999?
22      A  I don't believe so.

301

1       Q  In April 1999, other than any credit card
2    debt, did you have any other debt?
3       (A drink spilled)
4       MR. BROOKS:  We'll take a short break while
5    we're cleaning up.
6       (A recess was taken.)
7       MR. BROOKS:  Where were we? There was a
8    question pending.
9       THE WITNESS:  You were asking me about -- I
10   think you were asking me about credits cards. And I
11   said I don't recall having applied for any. I think
12   we just went with what we had and what we had was
13   worth at least -- at least 200 -- I'm going to say at
14   least 200 -- just off the top of my head, at least
15   $225,000. Possibly a little bit more than that.
16   BY MR. BROOKS:
17      Q  When did you first apply for those credit
18   cards?
19      A  Years before.
20      Q  Did you apply for them when you had an
21   income?
22      A  Yes. And then -- yes. And they just kept

302

1    coming.
2       Q  Did you apply for any at the time when you
3    had no income?
4       A  I don't recall having done that but I may
5    have. As I said, they just -- you just get them in
6    the mail.
7       Q  Every time you got an offer for a credit
8    card, did you take it?
9       A  No. Not every time. I got an awful lot of
10   them though.
11      Q  Why did you need ten credit cards during the
12   time when you were living off your inheritance?
13      A  I didn't need ten credit cards. I just
14   ended up with them. It never occurred to me that --
15   perhaps I should have asked the question why did I
16   need them but I would get a credit card and take
17   someone to dinner or buy someone a small gift with it
18   and then pay the bill and that was it and I just ended
19   up with a bunch of them. I remember Gene has a bunch
20   of them too. We just ended up with a bunch of them.
21   Maybe we shouldn't have but we did.
22      Q  Did you use them all?

339

1  to MBNA?
2     A  Yes, sir.
3     Q  And the second page is a notice that you
4  received from MBNA?
5     A  Yes, sir. That appears to be what it is.
6     Q  And is it a true and accurate copy of those
7  two documents?
8     A  I believe it to be. Yes.
9     Q  Go ahead and describe the document for me,
10 please.
11    A  It's correspondence that I sent to MBNA,
12 sir, dated the 14th of May of 2002 about rejecting an
13 offer that they had made about changing the credit
14 card agreement. I seem to -- I recall that I got a
15 phone call from MBNA where I had, if I recall, two
16 accounts, and the company wanted to merge the two
17 accounts and I said, well, I'd really rather not, you
18 know, change anything. And that's what I recall this
19 was about. And they left it the way it was.
20    Q  Were they seeking to increase the annual
21 percentage rate on the card?
22    A  I don't remember that being discussed. I

340

1  notice in the second -- I notice -- and I just noticed
2  it now -- in the second -- if you look on the second
3  page, 2357, the second paragraph says your account --
4  it says several things but corresponding average
5  percentage rate of 19.98 percent. Beyond that, I
6  can't tell you if they ever changed that or not. I
7  found them to be very -- very good people to work
8  with. Very accommodating.
9     Q  Well, do you remember at anytime during the
10 life of the alleged contract with Mr. Domash that the
11 interest rates on your cards increased?
12    A  Yes, they did. Some of them. Not all of
13 them. Some of them did float upward.
14    Q  What steps did you take from April 1999
15 through 2002 to try to get the best interest rates
16 possible?
17    A  Well, I spoke with these -- I spoke with
18 these different firms and many of them left the
19 interest rates, as I recall, where they were. I don't
20 recall the circumstance with MBNA other than to say
21 that the relationship with MBNA was professional and
22 very cordial.

341

1     Q  But you did try to get lower interest rates?
2     A  My recollection is I didn't try to get lower
3  interest rates. I tried to hold what we had.
4     Q  How come you didn't try to get lower
5  interest rates?
6     A  How come I didn't try to get lower
7  interest -- um, because the cards that I had, those
8  were the interest rates that they were being charged.
9  So I didn't try to -- I didn't try to -- I didn't try
10 to manipulate that. I just was a consumer and --
11    Q  Hold on to that.
12    A  Excuse me. I'm sorry.
13    Q  If I can turn your attention --
14    A  Sure.
15    Q  -- to the fourth line down in your letter.
16    A  Right.
17    Q  The sentence that begins I don't understand
18 why this decision was taken and as far as I know, I've
19 never -- and never is underlined -- been late, even
20 once, with a payment.
21    A  Yes.
22    Q  Were you speaking about your MBNA account or

342

1  any credit card account?
2     A  Well, certainly the MBNA account. Now, it's
3  possible -- I mean I tried to be very conscientious.
4  I would never say with all the different credit cards
5  that were involved in this that I had never been late.
6  But I really tried diligently not to be late with
7  these payments. And I don't recall ever being -- and
8  that was perhaps one of the reasons why MBNA was so
9  courteous to me. But that's just a hunch on my part.
10 I mean I'm just another consumer. It's a big company.
11    Q  From April 1999 through 2002 you made
12 payments on certain of the credit cards that you had,
13 correct?
14    A  Sure.
15    Q  Where did that money come from to make the
16 payments?
17    A  From the other credit cards. So that money
18 was coming from those sources. As Larry knew, we only
19 had the money that was available -- so if you had,
20 let's say that you had -- you used a credit card and
21 you had $20 interest charge on it. You took $20 and
22 you applied it to the interest charge.

Case 1:05-cv-02244-HHK    Document 49-2    Filed 07/18/2008    Page 43 of 43
DEPOSITION OF PETER M. FIELD
CONDUCTED ON THURSDAY, FEBRUARY 22, 2007

23 (Pages 343 to 346)

343

1    Q   No. I mean you actually wrote out checks to
2    pay off part of the credit card debt that you had.
3    A   Yes. Every month.
4    Q   Where did that money come from to pay off
5    the debt?
6    A   It came from the other credit cards. Credit
7    cards were paying for credit cards.
8    Q   So were you taking cash advances from some
9    credit cards --
10   A   Yes.
11   Q   -- to pay off other credit cards?
12   A   Yes. I certainly was, and that will all be
13   produced for you in the report the CPA is creating.
14   Q   Did you pay for those credit cards in any
15   other way?
16   A   I don't believe so, sir.
17   Q   So you never actually used your own assets
18   to pay off any of those credit cards?
19   A   The assets that I had were the credit cards,
20   Mr. Brooks.
21   Q   Did you borrow money from anybody other than
22   credit card companies from April 1999 through 2002?

344

1    A   April '99 through -- no, I did not.
2    Q   In some of the documents you produced there
3    have been cashier's checks?
4    A   Yes.
5    Q   Were the funds from those also cash advances
6    from credit cards?
7    A   They were.
8    Q   Did most of your credit cards have higher
9    interest rates for cash advances than they had for
10   normal purchases?
11   A   Some did. But you'll get all of that in the
12   report.
13   Q   That's a pretty expensive way to spend
14   money. Would you agree?
15   A   Well, it certainly isn't the preferred way
16   to do it but it's the only way I had.
17   Q   We talked yesterday about the Bek Tek
18   report?
19   A   Yes.
20   Q   Do you know what I'm referring to?
21   A   Absolutely.
22   Q   Were you aware that that was never used in

345

1    Mr. Domash's litigation?
2    A   Was I aware that it was never used in the
3    litigation. I was -- I believe the report showed no
4    irregularities in the tape recordings and now that
5    you've mentioned it, I do think that someone said to
6    me that there had been I'll say no need to use it.
7    But I could be mistaken about that. Perhaps they said
8    to me that it was just not used. I know that it was
9    thought to be -- at the time the request was made, it
10   was thought to be important. But I listened to one or
11   two of the tapes and it was beyond me as to -- clearly
12   someone who was much more knowledgeable and had the
13   scientific equipment needed to do this than someone
14   like myself.
15   Q   What is your current credit card debt?
16   A   A couple of hundred thousand dollars. I can
17   find out exactly. It will be in the report.
18   Q   Have you settled with any of the
19   insurance -- sorry -- with any of the credit card
20   companies on this debt?
21   A   No.
22   Q   Are you currently paying off your credit

346

1    card debt from the income you've got from your
2    employment?
3    A   Yes.
4    Q   Have you ever borrowed --
5    A   I'm sorry.
6    Q   Go ahead.
7    A   What we did was we wrote the companies and
8    in a sense are flying a holding pattern. And I'm
9    making minimal good faith payments but not paying the
10   amounts down. I'm just -- they've accepted the fact
11   that I'm making these regular payments.
12   Q   Has the interest stopped accruing? Have
13   they agreed to do that?
14   A   I believe they have. Yeah.
15   Q   You said we wrote to them. Who is we?
16   A   Well, I wrote to them.
17   Q   Is anyone assisting you in that process?
18   A   Well, the person that assisted me in the
19   process was a man named Dan Sullivan who was an
20   attorney -- is an attorney for Leclair Ryan. I
21   believe you have that correspondence.
22   Q   Yeah. I just don't want to get into any