**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Peter M. Mace )<br>Plaintiff, )<br>vs. )<br>Larry A. Domash )<br>Defendant ) | Case No. 1: 05-02244 (HHK  DAR)<br>Judge Henry H. Kennedy, Jr.<br>Next Event:  Opposition Brief Due by 18<br>August 2008 |

## Memorandum of Points & Authorities

## in Opposition to

## Defendant Larry Domash's Motion for Summary Judgment

### I. Summary

Defendant indicated to the Court that his jurisdiction

argument would dispose of the litigation.  Now, he is left in the

unenviable position of having to rely on his "second string"

arguments.  His first main argument, that the contract alleged is

too vague to enforce, ignores the language of the contract, asks

the Court to ignore the fact that the contract has been

performed in its entirety—except for Defendant's payment!—

so that no dispute about its terms exists.  Defendant fails to

apprise the Court of and to discuss contract law principles that

counsel in favor of finding an enforceable contract in such a

situation of completion.

His second main argument is that the statute of

limitations has run since Plaintiff showed suspicion of

Defendant's truthfulness in 2002 before the three-year statute

of limitations. This is an have-your-cake-and-eat-it-too

argument. Defendant argues that the statute of limitations

began to run when Plaintiff started to express suspicion of

Defendant earlier in 2002 (the cake), but at the same time

Defendant never sent Plaintiff notice that Defendant was

denying the agreement until 24 November so that he could take

advantage of the agreement if IFA obtained financing (eating

the cake too). Defendant was well aware that likely prospects

of financing were at hand in 2002 and even told at least two

people in late 2002 that he would be honoring his debt, making

these statements after learning of IFA's prospects of obtaining

financing. The law of equitable estoppel prevents such

machinations.

## II. Facts

The following facts are reproduced word for word from

Mr. Mace's Declaration found at Exhibit B.


In addition, other evidence supports Plaintiff's account.

At Exhibit I is an extract of Mr. Mace's deposition. At pages

178-79 he explains that despite his monetary concerns

expressed in 2002 correspondence he refrained from speaking

to Defendant for months because a psychologist, Dr. Graham,

thought it not beneficial to Defendant. Also, in his deposition

at pages 183, 185 and 195 Mr. Mace testified in perfectly in

-2-

line with his Declaration by stating that his phone
conversations to Defendant ended in the first half of 2002.
Page 195 of his deposition is especially significant since there
Mr. Mace makes it clear that although he last spoke to Plaintiff
in May or June of 2002, he still received voice messages from
Defendant promising to pay.  Also, in July and August,
Defendant made promises to pay in response to learning that
IFA might well obtain financing.  (Exh. F, Dr. Graham
Declaration; Exh. L, Koenig Declaration with 12 August 2002
letter attached.)

## III.  Law & Argument
### A.  Law of Summary Judgment

Summary judgment is an extreme remedy, and should be
invoked with caution.  Willis v. Cheek, 387 A. 2d 716, 719
(D.C. 1978).  All inferences are to be made in the opposing
party's favor; any doubt regarding whether an issue of fact has
been raised is enough to preclude summary judgment.
International Underwriters, Inc. v. Boyle, 365 A 2d 779, 782
(D.C. 1976).  Summary judgment is appropriate when there are
no triable issues of fact.  If the opposing papers reveal one
issue of disputed material fact, summary judgment must be
denied. District of Columbia v. Pierce Assocs., 527 A. 2d 306,
312 (D.C. 1987); Nader v. de Toledano, 408 A. 2d 31, 47 (D.C.
1979), cert denied, 444 U.S. 1078 (1980).

### B.  Certainty of Contract

Defendant argues that the contract as described by
Plaintiff was not certain as to its essential terms and so not

-3-

enforceable. Defendant's main argument is that since no one
knew exactly when Defendant's divorce litigation would
resolve itself; since no one knew this termination date, no one
knew exactly when payment would become due, exactly how
much work Plaintiff would have done for Defendant by that
date and exactly how many expenses Plaintiff would have
incurred by that date. In support of his argument, Defendant
cites to a series of cases where parties entered into negotiations
to form a contract, and one party sued claiming the right to
carry out the contract, but the court found no meeting of the
minds. The cases do not address the situation before the
Court—The contract was actually completed over a four-year
period. Here, the parties pegged payment to a specific future
event that would definitely occur but whose exact date is
unknown and the parties performed under the contract for
years, the Defendant is only claiming the contract did not exist
when it came time for him to pay. Defendant's assertion that a
contract end date cannot be pegged to an uncertain but
definable date is wholly unsupported by any precedent or even
by common sense. Defendant's legal citations do not address
at all the circumstance of years of performance where courts
look to conduct to ascertain a contract's terms and are loath to
find a contract not certain enough to enforce.

A basic principle to keep in mind when faced with a
claim that a contract was not certain has been stated by the
District of Columbia Court of Appeals: "The requirement of
definiteness cannot be pushed to extreme limits. All
agreements have some degree of indefiniteness and some
degree of uncertainty. All the terms contemplated by the

agreement need not be fixed with complete and perfect
certainty for a contract to have legal efficacy." Rosenthal v.
Nat. Produce Co., Inc., 573 A.2d 365, 370 (1990)(citations
omitted). District of Columbia courts routinely look to
hornbooks in such contract interpretation, including to the
Restatements (Second) of Contracts (1979). See, e.g., Virtual
Development & Defense, Int., Inc. v. The Republic of
Moldova, 133 F.Supp.2d 9, 16 (D. D.C. 2001) (cited to by
Defendant). As it is, Section 33 of the Restatements addresses
itself to the requirement of certainty of terms. The comments
provide instruction germane to the circumstance of
performance under the Mace-Domash contract: **"[T]he
actions of the parties may show conclusively that they have
intended to conclude a binding agreement, even though one
or more terms are missing or are left to be agreed upon. In
such cases courts endeavor, if possible, to attach a
sufficiently definitely meaning to the bargain."** (Comment
a. Certainty of terms.) The next paragraph continues: "An
offer which appears to be indefinite may be given precision by
usage of trade or by course of dealing between the parties. ... .
Where the parties have intended to conclude a bargain,
uncertainty as to incidental or collateral matters is seldom fatal
to the existence of the contract."

 The law Defendant cites to discuss contracts in the very
early stages of negotiations and performance where the court is
left to guess what future performance was meant. For example,
Defendant's main citation, Virtual Development & Defense,
Int., Inc. v. The Republic of Moldova, 133 F.Supp.2d 9, 16 (D.
D.C. 2001) specifically speaks of "performances to be rendered

by each party." <u>Virtual Development & Defense, Int., Inc.</u> 133
F.Supp.2d at 17. The case at hand is quite different where the
entirety of the contract—almost four years of performance!—
has been completed, except for Defendant paying!

These precepts of the <u>Restatement</u> and of District judicial
decisions bear on Defendant's six protestations. His third
protestation is that he thought it unclear exactly what the credit
card charges would amount to. Plaintiff kept Defendant
informed that he was continuing to live frugally, continuing to
send the same small payments to his niece, continuing to make
payments to Defendant's litigation vendors, and that the
charges were mounting and had mounted to certain amounts.
Thus, even if the Court determined that in April 1999 it was
unclear exactly what charge would be incurred, the term was
later supplied by the conduct of the parties. Defendant has
never produced or even alleged any communication during the
4 ½ years of the contract that he disapproved of any of the
mounting charges. The Court is constrained to accept the fact
as alleged by Plaintiff.

However, it was not unclear in April 1999 what the
charges would be. The four categories of reimbursable
expenses were defined. Indeed, from Plaintiff's account of his
pre-April 1999 living expenses communicated to Defendant,
they were highly predictable. Since no expenses on behalf of
IFA were incurred, that category is not an issue. The only
uncertain category were the payments made to Defendant's
litigation vendors. Granted litigation costs may vary widely,
but if the a promise to pay litigation costs are voidable as
inherently uncertain, then many a legal fee agreement is

unenforceable.

These precepts also bear on Defendant's fifth protestation, Defendant claims the manner of Plaintiff's performance was uncertain. Plaintiff was in constant contact for almost the entire 4 ½ years with Defendant, with Defendants' lawyers, with Defendant's litigation vendors. Defendant nowhere denies this. Especially notable is that Defendant nowhere denies the multiple-times-per-day telephone communication between the parties. Even if denied, the Court is constrained to credit Plaintiff's account. Defendant has never presented nor alleged any communication during the 4 ½ years expressing unhappiness with Plaintiff performance. Only when it has become time to pay does Defendant state he was uncertain as to Plaintiff's role. In fact, Plaintiff's work after April 1999 was no different than the several months prior so that his role was completely understood in April 1999.

These precepts also bear on Defendant's sixth protestation, Defendant finds it vague what was meant that he would be given the opportunity to manage IFA's money. The exact term was "left to be agreed upon." However, the Court is constrained by the contract interpretation principles to make an effort "to attach a sufficiently definite meaning to the bargain." The parties agreed to make best efforts to negotiate an eventual fair compensation package for Defendant. The eventuality of such was too distant and remote to negotiate such before start-up funding had even been obtained. A promise to make best efforts to bargain in good faith are enforceable, especially where compensation paid to a money manager does not vary

greatly according to industry usage.

But most importantly, since IFA never obtained funding, the term does not have to be defined. At section 33 to the Restatement under comment b entitled "Certainty in basis for remedy" states:

> Where the parties have intended to make a contract and there is a reasonably certain basis for granting a remedy, the same policy supports the granting of the remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due to the plaintiff; uncertainty may preclude one remedy without affecting another. .... .
>
> Thus the degree of certainty required may be affected by the dispute which arises and by the remedy sought. Courts decide disputes before them, not other hypothetical disputes which might have arisen.

And Illustration 1 under comment b is particularly helpful:

> A agrees to sell and B to buy goods for $2,000, $1,000 in cash and the "balance on installment terms over a period of two years," with a provision for liquidated damages. If it is found that both parties manifested an intent to conclude a binding agreement, the indefiniteness of the quoted language does not prevent the award of the liquidated damages.

Defendant waives before the Court the specter of a hypothetical dispute concerning what would happen if IFA found start-up capital, sold insurance, had money to invest, attempted to negotiate with Defendant in good faith an arrangement to manage the money, and the negotiations broke down. Defendant declines to inform the Court exactly which hypothetical term would be in dispute. The Court need not resolve such a dispute, just as it need not decide what the "balance on installments terms" would be in the illustration

quoted above. Courts do routinely disregard such hypothetical issues. For example, where a news director interviewed for such a position at defendant television station, negotiated terms with the station and then sued for breach, the court disregarded protestations of a hypothetical dispute:

> We conclude that the terms of the alleged contract are sufficiently specific to meet this standard. Browne testified that, when asked by Rose to state what he wanted, he gave a salary range between $75,000 and $125,000 and mentioned several specific fringe benefits. This evidence is adequate to allow a jury to determine that the contract would have been breached by payment below $75,000 or by failure to provide Browne with those benefits. The fact that the exact salary amount (if benefits were not pinned down is not sufficient to defeat a finding that a contract was made absent any evidence that the missing terms were material to the parties.

Browne v. Maxfield, 663 F.Supp. 1193, 1198 (E. D. Pa. 1987).

For his fourth protestation, Defendant claims he has no way of determining the interest rate on the debt he owes. The answer is quite simple: He owes what the credit card companies are charging Plaintiff. Plaintiff has never claimed the right to charge any additional interest on the debt.

For his first protestation, Defendant claims he does not know when he should begin making payments and how many payments he should make. The answer to the his question "when" is quite simple: when the divorce litigation ended, that is quite some time ago. He is in the position of a plaintiff claiming he does not understand when he should pay his lawyer his contingency fee. He merits the same answer: when the litigation ends. The amount he should pay is the amount owing and demanded in discovery responses ($277,523.59),

just as in the above-quoted illustration.

For his second protestation, Defendant claims he does not know how long the contract would last for. Simple answer: until the divorce litigation ended or as Plaintiff put it "until the dust settled on the divorce litigation," again the same answer a lawyer would tell his client responding to an inquiry about when his services would end. (From the tenor an content of Defendant's protestations, one begins to understand why Defendant went through such a long list of lawyers on his divorce litigation.)

## C. Statute of Limitation

### 1. Is Domash Entitled to Have his Cake and to Eat it Too?—Facts of Defendant's Argument

Plaintiff argues that under a "discovery theory" of statute of limitations that Plaintiff "discovered" in 2002 that Defendant was defrauding Plaintiff and so the statute of limitations began to run before 18 November 2002, three years before the 18 November 2002 filing of the complaint. This is an have-your-cake-and-eat-it-too argument. Defendant argues that the statute of limitations began to run when Plaintiff started to express suspicion of Defendant earlier in 2002 (the cake), but at the same time Defendant never sent Plaintiff notice that Defendant was denying the agreement until 24 November so that he could take advantage of the agreement if IFA obtained financing (eating the cake too).

On 24 November 2004 Defendant sent Plaintiff denying the contract for the first time. (Exh. C, 24 November 2002 Domash letter.) Plaintiff worked until 2 December 2002 to establish IFA while laboring under and fully intending to honor

his and IFA's obligation to hire Defendant to manage IFA's money. (Exh. B, Mace Declaration at ¶ 7.) The 2 December date is the date the 24 November 2002 letter from Defendant was received. Even as late as 30 October 2002, Plaintiff discusses in a letter the fact that Defendant will be managing IFA's money. (Exh. E to Summary Judgment Motion, 30 October 2002 letter of Mace to Domash.) If on 24 November 2002 start-up financing for IFA came through and it started operating and Defendant upon learning this promptly paid Plaintiff under the agreement so that he could have the opportunity to manage investment for IFA, then IFA would have been obligated to hire Defendant. Defendant would have had this right since he refrained from sending the 24 November letter and had stated that he would pay, statements made even as late as July and August 2002, statements made after learning of IFA's promising prospects for obtaining financing. (Exh. F, Dr. Graham Declaration; Exh F. Koenig Declaration and attached 12 August 2002 letter of Domash.) Plaintiff explains in detail the 2002 financial prospects and Defendant's knowledge of them in his declaration at ¶¶ 8-12.

Defendant apparently refrained from sending the 24 November letter until he thought it doubtful that IFA would succeed in obtaining financing. Defendant retained benefits of the bargain through 24 November. He did so knowingly, with his eyes wide open.

Moreover, Defendant in 2002 further mislead Plaintiff by telling Plaintiff that he had financial difficulties, thus extracting a forbearance from Plaintiff, a forbearance Defendant now attempts to use to support a statute of limitations defense. For

example, in a 17 January 2002 letter from Plaintiff that Defendant attaches as his Exhibit I, on the first page, Plaintiff states: "This enterprise should fix Larry's financial situation for life and give him some much needed emotional breathing room while the case winds down [referring to Defendant's domestic litigation]. While he is still employed by Fleet his own financial situation is not the best. Last week you may have read that institution intends to let 20% of its employees go and announced that the firm would be paying no bonuses this year."

Plaintiff cannot emphasis enough the significance of the 24 November letter; Plaintiff cannot emphasis enough that the 24 November letter makes no reference to prior notices that Defendant was breaching the agreement. The letter does not state "Mr. Mace, as I said to you several months ago by phone and email, I will not be reimbursing you." No, Defendant made a calculated decision to retain the expected benefits of a contract with a successful IFA by not earlier notifying Plaintiff that he intended to breach the agreement. As seen below, Defendant is now estopped from arguing that Plaintiff had prior suspicions of Defendant's fraud and so should have investigated thus starting the statute of limitations. As exhibits to his own motion, he attaches communications from Plaintiff to Defendant keeping Defendant informed of the possibilities of obtaining financing. (See especially the 30 October 2002 letter at pages 2-3, Exhibit E to Motion.)

**2. Law of Defendant's Have-Your-Cake-And-Eat-It-Too Argument; Law of Estoppel and Self-Concealing Injury**

-12-

Since Plaintiff has invoked the discovery exception, he would normally have the burden of persuasion on that issue. Minebea Co., Ltd. 444 F. Supp. 2d at 175. However, the evidence is that the injury was self-concealing by nature. In addition, Defendant concealed the injury. Under either of these facts, Defendant maintains the burden of persuasion (Minebea Co., Ltd. 444 F. Supp. 2d at 175), a burden he has not carried.

**Injury Concealed by Defendant/Estoppel.** In response to Plaintiff's 2002 concerns, Defendant assured Plaintiff that Defendant would pay. (Exh. B, Declaration of Peter Mace at ¶ 7; Exh. F, Declaration of Dr. Graham; Exh. L Koenig Declaration and attached 12 August 2002 letter of Domash.) "[D]espite rumors to the contrary, a reasonable person has every right to believe that persons of 'high integrity' will carry out their contracts." Fishman v. Estrin, 501 F. Supp. 208, 211 (D.D.C. 1980). In a similar oral contract case, the District of Columbia Court of Appeals has stated: "[Defendant] would be estopped from asserting the statute of limitations as a bar to [Plaintiff's] claim if he had done anything that would tend to lull [Plaintiff] into inaction and thereby permit the statutory limitation to run against him." Dilbeck v. Murphy, 502 A.2d 466, 470 (1985) (citation omitted). The court made it clear that the plaintiff would survive summary judgment where: "The party opposing the motion need only show that there is sufficient evidence supporting the claimed factual issue to require a jury to resolve the parties' differing versions of the truth." Dilbert, 502 A.2d at468 (citation omitted). The D.C. Circuit has also addressed the estoppel question in the statute of limitation context. It praised the trial judge for submitting

the question to the jury: "It seems clear to us that the court, with commendable prudence in terms of efficient judicial administration, submitted the estoppel issue to the jury ... despite its doubts about the adequacy of the evidentiary showing ... ." Brown v. Lamb, 414 F.2d 1210, 1212 (1969). And the plaintiff's estoppel evidence was indeed farfetched since he claimed he believed the defendant's assurance of payments, not for a few months as Mr. Mace states, but for years and even filed suit on the same facts in Ohio much earlier. Brown, 414 F.2d at 1212.

Messrs. Mace and Domash certainly have differing views of the truth. However, Mr. Mace has provided the Court a detailed account of his knowledge, consistent and coherent, with references to documents and supported by Declarations of third-parties. Defendant has stated no facts other than an answer consisting of general denials and a brief declaration consisting of a general denial. Defendant has declined to explain why he allowed Plaintiff to work with his lawyers for years, to telephone him so many times, to correspond with him so often over a four year period. Defendant refusal to provide the Court with any facts or explanation weighs heavy on his summary judgment motion. It would be improper for this Court to find no disputed issue of material fact exists where Defendant has declined to provide any explanation for Dr. Graham's declaration of a promise in July 2002, explanation for Mr. Koenig's declaration and Defendant's 12 August 2002 letter promising to pay, Mr. Killion's declaration, explanation for Mr. Wright's declaration, explanation for Mr. Mace's declaration and an explanation for correspondence showing

IFA's financial prospects in 2002 and Mr. Domash's response to them. At the least, an issue of material fact exists on whether Mr. Domash indeed refrained from sending the 24 November letter so to obtain the possible benefits of IFA obtaining financing.

Also, significant circumstantial evidence supports Plaintiff's account that he was working on Defendant's mental health issues in 2002 and still believed Defendant to be a participant in IFA, despite Plaintiff's clear suspicions. Plaintiff's 2002 correspondence (Exhibits E, I, J, K, L, M, N & O to Summary Judgment Motion) are filled with references to Defendant's continued role in IFA. For example at Exhibit N, on page 4 (bates-stamp Graham2365) of a 27 October letter Plaintiff refers says that "expect to run IFA's money." The letter is all about working with Defendant as a part of IFA. However, most significant is Exhibit D, the 26 December 2002 letter of Mr. Mace to Dr. Graham. In that letter, the tenor and content is completely different. There is now no question of working with Defendant or expecting any voluntary payment from it. It is only a question of a lawsuit.

Estoppel of statute of limitations defenses would apply to all the causes of action. Estoppel of statute of limitations defenses do apply to fraud claims. Personal Answering Service, Inc. v. C&P Telephone Co., 565 A.2d 55, 67 (D.C. App. 1989). Under unjust enrichment claims, the statute of limitations begins to run when both plaintiff rendered his last service and compensation has been wrongfully denied. News World Communications, Inc. v. Thompsen, 878 A.2d 1218, 1225 (2005). The compensation was to come due when the

divorce litigation ended and finances stabilized and so is
governed by the same analysis as above. In addition, evidence
exists that benefits conferred clear up until 24 November since
he would benefit from Defendant's work in obtaining financing
for IFA.

    **Self-Concealing by Nature.** The contract provided that
Defendant would pay when his divorce litigation ended. He
was in possession of those facts, not Plaintiff. (Since IFA
never became viable, the term that triggered Defendant's
repayment obligation was the ending of the divorce litigation
and financial stability.) In 2002 when it was apparently
winding down, he started to cease to consult with Plaintiff and
to employ his services. (Exh. I to Summary Judgment Motion,
17 January 2002 Mace letter discussing winding down of
domestic litigation and Domash financial woes near bottom of
page 1; Exh. B, Declaration of Peter Mace at ¶ 5.) Exhibits E,
I, J, K, L, M, N, and O of Defendant's Motion (Mace
correspondence about Defendant' finances) show that Plaintiff
could only in 2002 repeat what he had been told by Defendant
about Defendant's litigation and financial situation. Plaintiff
was left to repeating Defendant's representations and
Plaintiff's suspicions and guesses. Defendant has not put on
any evidence at all that his divorce litigation never ended nor
that his finances never stabilized. In fact, such may not have
happened well into 2003. Where Defendant has failed to put
on any evidence that his divorce litigation ended before the
statute of limitations period and that his finances stabilized,
Defendant has failed to carry his "discovery rule" burden of
persuasion.

**"Discovery Rule Cases in Business Cases Rather than Medical Malpractice Cases.** Moreover, the discovery rule is applied quite differently in business enterprise cases than in the medical malpractice cases Defendant cites to exclusively. Business enterprise injuries evolve, accrete and ultimately ripen into actual injurious breach over a long course of mutual interactions, understanding and negotiations between the parties. This has the effect of making the determination of the exact commencement date from which the applicable statute of limitations should be calculated considerably more indeterminate.

A plaintiff knowing that he has suffered a physical injury at a specific point in time and then being held to have a three-year period thereafter in which to exercise due diligence in making inquiry as to the relevant claims to be consequently filed is one matter. It is quite another matter to be in a business relationship where commonly the associates entertain doubts and questions about their partners or differences between the parties arise. Such doubts and differences are not to be seized upon as the start of a statute of limitations under the discovery rule.

Fortunately for Mr. Mace in this case, the District of Columbia Court of Appeals has very recently rendered a decision which this court may use as sure and steady guidance through the shoals of the Defendant's business injury statute of limitations obfuscations. In <u>EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.</u>, 940 A.2d 996 (2008), the appeals court reverses a trial court award of summary judgment in favor of the defendant/appellees on the issue of statute of limitations.

The Eastbanc facts entail two business entities engaged in a series of negotiations and understandings over the course of several years regarding what was, in effect, a right-of-first-refusal held by the defendant/appellees on property which the plaintiff/appellants wished to acquire. Ultimately, the defendant/appellees exercised their right-of-first-refusal against the plaintiff/appellants who thereupon filed suit on a breach of contract claim.

Before the trial court, however, the defendants successfully argued that the injurious breach in question should be dated not to the date the defendant/appellee actually exercised their right-of-first refusal against the plaintiff's interest, but rather to dates of earlier conduct in the business relationship. At the outset of its reversal, the court noted:

> A cause of action for breach of contract accrues, and the statute of limitations begins to run, at the time of the breach . . . ." 1 CALVIN W. CORMAN, LIMITATION OF ACTIONS, § 7.2.1, at 482 (1991); accord, Bembery v. District of Columbia, 758 A.2d 518, 520 (D.C. 2000) ("[I]n an action for breach of a contract or lease the statute of limitations runs from the time of the breach."). A contract is breached if a party fails to perform when performance is due. 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 943 (interim ed. 2002). Under modern contract principles, an aggrieved party also may be entitled to sue prior to breach if the other party has anticipatorily repudiated the contract. See, e.g., Roehm v. Horst, 178 U.S. 1, 13, 20 S. Ct. 780, 44 L. Ed. 953 (1900); 23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63:32 (4th ed. 1993). "The aggrieved party is entitled to sue either when the anticipatory repudiation occurs or at the later time for performance under the contract. The time of accrual consequently depends on whether the injured party chooses to treat the anticipatory repudiation as a present breach." 1 CORMAN, § 7.2.1, at 488. In essence, this

rule gives the plaintiff an option -- sue now (if the contract has been repudiated in anticipation of nonperformance) or [**19] sue later (at the time of nonperformance).

Eastbanc, 940 A.2d at 1004.

In this case, the contract at issue was clearly repudiated in anticipation of nonperformance by the Defendant in his letter dated November 24, 2002. And, in turn the Plaintiff chose to sue on that repudiation and, most importantly, the Plaintiff timely filed his Complaint well within the 3-year period following the Defendant's letter of repudiation/anticipatory breach, i.e. the Plaintiff timely filed on November 18, 2005.

Also very importantly to be noted in Eastbanc is the Court's comment on the matter of the type of differences of opinion, mutual suspicions, etc. that can take place between business partners that do not, however, rise retrospectively to accrual of action milestones. Rejecting the trial court's treatment of arguably such a intermittent "falling out" between ongoing partners, the appeals court states:

> [The trial court's] analysis erroneously equates knowledge of a repudiation with an election to treat it as a breach. It also confuses what Mr. Lanier could have done with what he was obliged to do.

Eastbanc, 940 A.2d at 1008.

Similarly here, the Defendant asks this court to confuse what the Plaintiff could have done when he began to be suspicious or apprehensive in regard to the Defendant's performance and what he was obliged to do in terms of timely filing a Complaint. On the contrary, the Plaintiff only became definitely "obliged" when he received the Defendant's absolute letter of repudiation dated November 22, 2002. And the

Plaintiff wholly fulfilled his obligation by filing his Compliant

within the applicable three-year period commencing to run

thereupon, i.e., on November 18, 2005.

### D. Unjust Enrichment

The Defendant primarily argues in regard to Mr. Mace's

quantum meruit claims that " ... an unjust enrichment claim

cannot stand if the underlying breach of contract claim

founders." (Defendant's Brief at p. 35.)

However, the courts have held that there is a clear

distinction between a breach of contract claim and a quantum

meruit claim. As set forth in <u>Union Labor Life Insurance</u>

<u>Company v. The Sheet Metal Workers National Health Plan,</u>

1991 U.S. Dist. LEXIS 13613 (D.D.C. Sept. 30, 1991)

(unreported decision reproduced at Exhibit M):

> Counts five and six of plaintiff's complaint are
> equitable claims for quantum meruit and unjust
> enrichment. Plaintiff brings these claims in the event
> that the court determines that no contract exists
> between plaintiff and defendant. Under the laws of both
> the District of Columbia and Virginia, a claimant is
> entitled to recover the benefits it conferred upon a
> defendant under the theories of quantum meruit and
> unjust enrichment so long as the benefits were not
> given gratuitously.
>
> The District of Columbia Court of Appeals, in
> <u>Brown v. Brown</u>, 524 A.2d 1184, 1186 (App. D.C.
> 1987), stated that "a promise to pay will be implied in
> law when one party renders valuable services that the
> other party knowingly and voluntarily accepts." The
> court in Brown continued to note that claims based on
> implied contracts are not really contract claims, but are
> rather equitable claims brought in order to avoid unjust
> enrichment. Id. (citing <u>Bloomgarden v. Cooper</u>, 479
> F.2d 201, 208 (D.C. Cir. 1973). Under District of
> Columbia law, a claimant may recover on an implied
> contract as long as the services it provided were not

> rendered gratuitously. Id. at 1186-87. The court stated
> that "absent a presumption of gratuity, there is a virtual
> presumption of a (quasi) contract--a contract implied in
> law--premised on unjust enrichment theory." Id. at
> 1187.

Union Labor Life Insurance Company at *10-11.

To recover on such a claim, a plaintiff "must show that [the defendant] was unjustly enriched at [plaintiff's] expense and that the circumstances were such that in good conscience [the defendant] should make restitution." Vreen v. Clayborne, 623 A.2d 1190, 1194 (D.C. App. 1993).

The Plaintiff's Unjust Enrichment/Quantum Meruit Claim Stands On Plaintiff's Evidence Demonstrating that Defendant Benefited From Plaintiff's Services

Plaintiff's complaint, answers to discovery, and affidavit (Exh. B, Mace Declaration at ¶¶ 16-17) fully support a unjust enrichment/quantum meruit claim for $182,000 in wages foregone or $179,539.29 in the hourly value of the work performed. (Exh.. B, Mace Declaration at ¶¶ 16-17.) On quantum meruit claims, courts allow evidence of several different valuation methods to determine the reasonable value of the services provided. IBF Corp. v. Alpern, 487 A.2d 593, 597-98 (D.C. App. 1985). The Court could well credit either method of establishing quantum meruit value.

**E. Quantum Meruit**

Count III of the Plaintiff's Complaint is entitled "Unjust Enrichment – Quantum Meruit." It alleges in part: "In making expenditures after April, 1999 in support of the development of IFA and D & A and the management of Defendant's personal legal problems , Plaintiff conferred a benefit upon Defendant."

(Complaint at ¶ 23.)

Count III is entitled "Unjust Enrichment – Quantum Meruit." It alleges in part: "In making expenditures after April, 1999 in support of the development of IFA and D & A and the management of Defendant's personal legal problems , Plaintiff conferred a benefit upon Defendant." (Complaint at ¶ 23.) This type of quantum meruit claim is called quasi-contract or unjust enrichment. Vreen v. Clayborne, 623 A.2d 1190, 1193-94 (D.C. App. 1993). To recover on such a claim, a plaintiff "must show that [the defendant] was unjustly enriched at [plaintiff's] expense and that the circumstances were such that in good conscience [the defendant] should make restitution." Id. at 1194.

Plaintiff's complaint, answers to discovery, and declaration (Exh. B, Mace Declaration at ¶¶ 17-18) make out just such a claim for $182,000 in wages foregone or $179,539.29 in the hourly value of the work performed. On quantum meruit claims, courts allow evidence of several different valuation methods to determine the reasonable value of the services provided. IBF Corp. v. Alpern, 487 A.2d 593, 597-98 (D.C. App. 1985). The Court could well credit either method of establishing quantum meruit value.

**F. Statute of Frauds**

In lieu of a independently supportive argument, with respect to the Plaintiff's Statute of Frauds claims, Defendant refers back only to his arguments "… as set forth … in the discussion regarding his unjust enrichment claim …" regarding the Plaintiff's alleged inability or failure to establish that

Defendant received any direct or personal benefit from the Plaintiff. Defendant Brief at p. 41.

On the contrary, however, Plaintiff has fully set forth the extent of the benefit conferred upon the Defendant, i.e. Plaintiff's complaint, answers to discovery, and declaration fully support a claim for $182,000 in wages foregone or $179,539.29 in the hourly value of the work performed.

As acknowledged by the Defendant, the Statute of Frauds claim is enforceable if the "leading object" of the promisor was to obtain a direct, personal benefit (citing <u>Hudson v. Ashley</u>, 411 A.2d 963, 967 (D.C. 1980)." (Defendant's Brief at p. 41)

In this regard Plaintiff has repeatedly alleged and evidenced that a major portion of the benefit conferred upon the Defendant consisted of the hours of work the Plaintiff performed for the "direct, personal" benefit of the Defendant in regard to the Defendant's divorce proceedings.

The Plaintiff's services for the direct, personal benefit of the Defendant in regard to Defendant's divorce proceedings included assisting the Defendant in finding legal counsel, assisting the Defendant in obtaining evidence in regard to Defendant's divorce litigation, assisting Defendant in communicating with his divorce litigation attorneys.

## IV. Conclusion

WHEREFORE, since so many facts are in dispute, the Court should deny the Motion for Summary Judgment.

Respectfully submitted,

Dated: 18 August 2008    Signed:    /s/  Michael Trevelline
                                      Michael J. Trevelline, DC Bar # 437454
                         Address:     1823 Jefferson Place, NW

Washington, DC 20036-2504
Telephone:    (202) 737-1139/Fax:  (202) 775-1118
Email:        mjt@mjtlegal.com

Attorney for **Plaintiff Peter M. Mace**

## Certificate of Service

I hereby certify that the **foregoing** this **18 August 2008** was served by electronic case filing through the Court.

_____/s/__Michael Trevelline_____
Michael J. Trevelline

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Peter M. Mace                            )
                                         )
        Plaintiff,                       )
                                         )        Case No. 1: 05-02244 (HHK  DAR)
            vs.                          )        Judge Henry H. Kennedy, Jr.
                                         )
Larry A. Domash                          )
                                         )
        Defendant                        )
                                         )

# Index of Exhibits

## Tab  Description

A.  Statement of Facts in Dispute .......................................................

B.  Peter Mace Declaration ...............................................................

C.  24 November 2002 Domash Letter ...............................................

D.  26 December 2002 Mace Letter ....................................................

E.  Graham Deposition Transcript Extract.........................................

F.  Graham Declaration......................................................................

G.  Wright Declaration.......................................................................

H.  Killion Declaration .......................................................................

I.  Mace Deposition transcript Extract .............................................

J.  18 April 2002 Mace Letter............................................................

K.  4 June Mace Letter........................................................................

L.  Koenig Declaration........................................................................

M.  Unreported Decision of Union Labor Life Ins. Co. v. The
    Sheet Metal Workers National Health Plan................................