# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Peter M. Mace<br><br>  Plaintiff,<br><br>vs.<br><br>Larry A. Domash<br><br>  Defendant | Case No. 1: 05-02244 (HHK)<br>Judge Henry H. Kennedy, Jr. |

## Declaration of Peter M. Mace

I, Peter M. Mace, do hereby depose and say:

1.  I am over the age of 18 and am competent to testify and to make this declaration and make this declaration from personal knowledge. I am the Plaintiff in the above-captioned matter.

2.  In the 1980s myself and several business associates began working to establish a start-up insurance company called Investors Fidelity of America, Inc. ("IFA"). In the years leading up to April 1999 I lived a modest and frugal life on a family inheritance, with a stable level of outlays, including providing assistance to a niece. Mr. Larry Domash, a money manager, had taken some steps to help in obtaining start-up financing with the hope of him eventually managing IFA's money. In April 1999, I telephoned him and told him that my personal financial resources had come to an end, that I would have to cease work on IFA and obtain full-time employment

*Declaration of Peter Mace—Page 1 of* 11

and that I would no longer be able to provide support to him in his personal matters and in his divorce litigation.

3.  In exchange for me continuing to work to get IFA up and running and to help him with his personal issues and with his divorce litigation, he offered to take care of three categories of expenses: (1) expenses made on behalf of Mr. Domash; (2) expenses incurred to support myself and send money to my niece; and (3) expenses I incurred on behalf of IFA. I accepted and we agreed that since I had no source of immediate funds other than approximately ten credit cards and since he wanted to maintain as much liquidity as possible during the divorce, he would reimburse me for all the credit card debt at the earlier of his divorce litigation ending, or IFA becoming viable and having him manage its investments. I knew it was his aspiration to start his own money management firm and had discussed his hope with the other IFA principals and we agreed to contract with Mr. Domash for him to manage the money when IFA became viable. In reimbursing me for credit card debt, Mr. Domash was also to pay any interest and other charges related to the underlying expenses.

4.  In the following months and years I upheld my end of the bargain (1) by supporting his emotional

health including by communicating with him by phone many times per week if not daily; (2) by working to promote IFA; (3) by continuing to live in the same frugal and modest way and by supporting my niece at the same level as before; (4) by assisting with his divorce litigation in several ways including by paying debts owed to vendors and by communicating with his many and various lawyers; and (5) by keeping Mr. Domash apprised of my work and of the circumstances of the mounting credit card debt.

5.  In 2002, my relationship with Mr. Domash began to change. In early 2002 I noticed a worsening of Mr. Domash' emotional state. Throughout 2002, Mr. Domash communicated with me less-and-less frequently as the months went on and less-and-less asked me to provide emotional support. In 2002, Mr. Domash owed substantial debts to Dr. Graham and myself. During these months the credit card debt had grown to an unmanageable amount with interest and finance charges mounting.

6.  To attempt to get Mr. Domash's attention about his obligations to me and Dr. Graham, I started communicating my concerns to him. Also, I did communicate my concerns to Dr. Graham as well,

including in the communications seen at Exhibits E, I, J, K, L, M, N, and O of the Summary Judgment Motion. However, knowing that Mr. Domash frequently undergoes wide mood swings, I had no reason to believe that he would not come around and honor his obligations once he became more emotionally stable. I believed Mr. Domash to be an intelligent man and quite helpful and willing to uphold his obligations when emotionally stable. He at no time before November 24, 2002 ever indicated he would not pay me, although he did start saying that he would not pay a litigation vendor, BEK TEK and Dr. Graham, and he ceased acknowledging the debt at times.

7. Rather, in the first half of 2002 he assured me several times that he would honor the agreement. Also, he left voice mail messages several times in 2001 and well into 2002 assuring me that he would pay. I played some of these messages to business associates, including to Darryl Wright and to Steve Killion. In the later months of 2002, he dramatically reduced communication with me.

8. Throughout 2002, IFA found several prospects for financing and always communicated the fact of such prospects to Mr. Domash. The greatest was in the summer of 2002 when a Dr. Lee, a Republic of South

*Declaration of Peter Mace—Page 4 of* 11

Korea financier, met with us and showed interest. I communicated the facts of this to Mr. Domash as seen at Defendant's Exhibit E, my 30 October letter, on page 2. In addition, in 2002, Mr. John Stein, one of IFA's participants, made contacts with several moneyed interests, including with The Carlyle Group in April and Cox Communication in April. I told Mr. Domash of these attempts and he expressed hopefulness. I attach as Exhibit J a letter I wrote on 18 April 2002 to Mr. Domash summarizing some of these attempts to obtain financing.

9. Also, in 2002, Mr. Stein found an opportunity for IFA to obtain capital through Crisis Management Worldwide, Inc. As well I told Mr. Domash of this and he again expressed support; however, he was angry that he was not invited to a June 2002 meeting with Crisis Management's chief operating officer. On the last page of my June 24, 2002 letter to Mr. Domash (Exh. K to Summary Judgment Motion), I even address his anger at not being invited, saying "Mr. Stein can invite who he wants to a meeting he calls." I attach as Exhibit K a 4 June 2002 letter I wrote to Mr. Domash telling him of the upcoming 13 June meeting with Crisis Management.

10. I knew that Mr. Domash was greatly interested in starting his own money management firm and

*Declaration of Peter Mace—Page 5 of* 11

so would come around and show interest in IFA and honor our agreement as soon as IFA obtained financing. In the letters I wrote to him in 2002, I continually assured him that that would happen. His July 2002 reassuring phone call to Dr. Graham also seemed a response to IFA being on the verge of obtaining financing.

11. The likely prospects that IFA had of obtaining financing in 2002 described above seemed to have temporarily revived Mr. Domash's interest. In July 2002, Mr. Domash spoke with Dr. Graham and assured him that he would be paying both Dr. Graham and myself. (See Dr. Graham's Declaration at Exh. F.) I was greatly relieved when Dr. Graham told me this. I then wrote Mr. Domash a letter thanking him for the call. It is dated 10 July and is found at Exhibit M to the Summary Judgment Motion. I did acknowledge in that letter that he had in the past said that he did not owe BEK TEK and Dr. Graham money, but he now was acknowledging that he did owe them and me money. I did indicate that he at one point indicated that he did not owe me money, but he had never said so directly, it was only seemed to be implicitly indicated by not paying. In my deposition, I was never asked about this communication with Dr. Graham. I was only asked about communications directly with Mr.

*Declaration of Peter Mace—Page 6 of 11*

Domash.

12.     In addition, in August Mr. Steve Killion of BEK TEK told me that Mr. Domash had sent a letter to BEK TEK stating that he would reimburse me at least for the money I had paid BEK TEK. (Exh. L, Koenig Declaration with attachments.) In the fall of 2002, as I remember it, I had at least these two assurances from others—Dr. Graham and BEK TEK—that Mr. Domash had confirmed he would pay me.

13.     Then, I received the 24 November letter, received on 2 December. It is attached as Exhibit C to the Opposition to Summary Judgment Motion. This was the first communication from Mr. Domash I ever received denying the agreement. I then knew that he had no intention to pay and that he had lied to Dr. Graham a few months before in July when assuring us of payment. In response, I wrote Dr. Graham a letter dated 26 December. It is attached as Exhibit D to the Opposition to the Summary Judgment Motion. As you can see, in that letter I no longer discuss working with Mr. Domash as I had in prior communications to Mr. Domash and Dr. Graham.

14.     Also, my work on behalf of IFA (done until I received the 24 November letter) was all done in part to aid Mr. Domash. I at no time intended not to have Mr.

*Declaration of Peter Mace—Page 7 of* 11

Domash manage IFA's money until I received the 24 November letter. My 2002 correspondence that Mr. Domash attaches to his motion as Exhibits E, I, J, K, L, M, N, & Q references Mr. Domash managing IFA's money. For example, in my 30 October 2002 letter (Exhibit E to Summary Judgment Motion), I specifically discuss Domash and Associates and say that "I'd expect you to run IFA's money." When I testified in my deposition that I last conferred a benefit on Mr. Domash earlier in 2002, I meant that I last helped him directly with his mental health issues and his divorce litigation earlier in 2002. To me, to "confer a benefit" means to directly assist someone.

15. Upon further reflection, I now believe that conferring a benefit should also include to continue to work to make IFA viable while laboring under the obligation to hire Mr. Domash once viable. This is a little more remote than my direct assistance and so I did not mention it in my deposition. Nevertheless, it is assistance as well. If he had honored the agreement up through the date I received the 24 November letter, I would have honored my end of the bargain and given Mr. Domash the contract to manage IFA's money. This is clearly seen in the 30 October letter and elsewhere.

16. Following 24 November 2002, when Mr.

*Declaration of Peter Mace—Page 8 of* 11

Domash told me he would not honor the contract, I ceased working for him. Later, when I was unsuccessful with getting the start-up business up and running, I sought and obtained full-time employment. I became employed as a security officer by a government contractor, with my duty title being Elite Team Security Officer or informally deputy project manager for the site. My salary in that position was approximately $52,000 per year. If Mr. Domash had not induced me to work full-time for him and the business start-up in April 1999, I would have sought similar full-time employment then. In April of 1999, the start-up business was too far from obtaining financing for me to risk continued full-time devotion to it. I would have sought full-time employment. My wife owns our home so that I have no mortgage obligations. I live modestly and have very little expenses. At a salary of $52,000 per year I could have paid off the $37,069.93 in credit card debt rather promptly. However, I could not possibly manage the over $250,000 in credit card debt I am now carrying on such a salary.

17.     I worked full-time for Mr. Domash under the terms of our agreement for forty-two months (three & one-half years), mostly attending to Mr. Domash's divorce litigation and providing him emotional support. I worked

a minimum of forty hours per week for the forty-two months of the contract. This three & one-half years of service represents at $52,000 per year $182,000 in lost income I would have earned elsewhere. Attached to this Declaration is an extract of my answers to interrogatories where I detail the many services I provided to Mr. Domash. I have a juris doctorate degree and so am qualified to act as a paralegal and qualified to help a busy executive such as Mr. Domash manage his many lawyers and legal problems. During the years of my service to him, I managed at least eight different lawyers that he employed on his divorce litigation. As well I communicated with and managed his relations with other professionals such as private investigators and forensic experts. From approximately June of 1998 to June of 2001 I provided theses services in support of the divorce and child custody litigation and the emotional support. During this period of time, I devoted on average a minimum of thirty hours per week to his divorce and child custody matters. After June of 2001, I devoted most of my time to the start-up business, but did continue to devote time to his emotional support and to his legal matters.

  18.  I would also like to point out to the Court

other relevant documents. At Exhibit E is page 17 of Dr. Graham' Deposition where he confirms that I worked to keep Mr. Domash emotionally stable. At Exhibit F is Dr. Graham's Declaration confirming Mr. Domash assured him in July of 2002 that all would be well. At Exhibit G is Mr. Wright's Declaration stating that I did play for him voice mail messages from Mr. Domash promising to honor the agreement. At Exhibit H is a similar Declaration from Mr. Steve Killion stating that he also heard these messages and that the last one may have been as late as 2003, although I believe this would have probably have been in 2002.

19. I declare under penalty of perjury that the foregoing is true and correct

Executed on this 13th day of August, 2008, at Washington, D.C.

_Peter M. Mace_
Peter M. Mace

   *6.* State the basis for your contention in paragraph 23 of the Complaint that you conferred a benefit on the Defendant by (1) identifying all facts or information supporting your contention, (2) identifying all documents supporting or concerning your contention, and (3) identifying all persons possession knowledge of facts or information supporting the contention, and summarizing the facts or information each such person possesses.

   **Answer:** The assistance I supplied to Mr. Domash consisted of the following: (1) I provided him with extensive emotional support by speaking with him on the telephone during all times of the day or night from September 1998 to November 2002. I would estimate that he called me approximately two times per day on average during this time in order to receive emotional support. (2) On his behalf I communicated to his domestic relation lawyers including: Mr. Paul Perocchi, Ms. Chouteau Merrill, Mr. Edward Barshak, Mr. Val Diviacchi, Mr. Joseph Walsh, and Mr. Paul Kelly. (3) On his behalf I arranged litigation support for his domestic relation litigation including: locating, hiring and managing Bet Tek to provide analysis of tape recordings, as well I actually paid part of the Bet Tek bill myself. (4) I paid part of Mr. Diviacchi's bill. (5) I contacted several psychologists and psychiatrists regarding his legal situation. (6) I acted as a "switchboard" facilitating communication between all parties regarding his domestic relations litigation. (7) I kept Dr. Graham informed and engaged in the process of supporting Mr. Domash during his domestic relations litigation, something of immense importance. (8) I developed a friendship with Mr. Steve Killion of Bet Tek that assisted Mr. Domash by way of receiving advice from Mr. Killion and passing it on to Mr. Domash. (9) I worked with Mr. Steve Shar, Mr. Domash's trust lawyer, to resolve particularly bitter family disputes that erupted between Mr. Domash and his two brothers. (10) I worked with Mr. Tim Hughes, Esq., who represented Mr. Domash in a dispute over fees owed to Mr. Perocchi's law firm. (11) I traveled to Boston and New York for meetings with lawyers. (12) I accompanied Mr. Domash to many court proceedings in Boston concerning child custody matters. (13) I worked many, many hours and did my best to get IFA off of the ground so that Mr. Domash could form D&A.

   The financial records found at bates-stamped Mace 185-1535 contain the record of expenditures I made on his behalf or expenses I incurred in helping him. As explained above, with the help of a bookkeeper or accountant I will provide a further breakdown of these. Other documents reflecting help I provided to Mr. Domash include Mace 32, showing that I had authority to act on his behalf; Mace 59-71, showing I was privy to his family law

*Answers to Interrogatories—Page 6*

litigation and so assisted him; Mace 110-120, showing I assisted him with one of his family law litigators; Mace 180-184, showing I obtained litigation support for him and actually paid part of the bill on his behalf out of my own funds.

The witnesses with knowledge of the assistance I provided to Mr. Domash are George A. Graham, Jr., Ph.D.; Darryl R. Wright; Steve Killion; Bruce E. Koenig; Gene E. Sierzant; Tex Hunt; Judy Arellano; Bernice Pentoney; Chris Dowell, Ph.D., Paul Perrochi, Chouteau Merrill; Edward Barshak; Joseph Walsh; Val Diviacchi; Paul Kelly; Tim Hughes; and Ron Mysleviec.

7. Describe in detail the involvement and relationship that Graham Capital International had with IFA and/or D & A, identifying all documents concerning this relationship and all persons possessing knowledge of facts or information regarding this relationship.

**Answer:** Schematics of the relationship is found at the documents bates-stamped Mace 108, 006, 011 and 1638. The original idea was Gene Sierzant's. The formation of Graham Capital was a means to integrate and provide unified leadership to the various divisions of the company as they emerged over ten to fifteen years. Graham Capital International never was formed. We, meaning Greorge Graham, Larry Domash, Gene Sierzant and myself, decided that IFA could be owned by a holding company called Graham Capital International. This was discussed during the late summer of 2000. Darryl Wright and Tex Hunt helped significantly to shape the discussion that lead to pursuing this option. D&A was never contemplated to have an ownership relationship with IFA or Graham Capital, rather D&A would be a vendor to IFA providing financial services.

8. Describe in detail each communication you had with Defendant concerning IFA, D & A, or any other issue referenced in the Complaint by (1) identifying the content, date and location of each such communication, (2) identifying whether any other person was present during these communications, and (3) identifying all documents concerning these communications.

**Answer:** The communications I had with Mr. Domash were overwhelmingly telephonic. This is so since that is how he preferred to communicate. We never used email. He did mail us large files sometimes, numbering several hundred pages per shipment. Often we would receive this mail unexpectedly with no explanation as to its significance or context. Parenthetically, sometimes he told us to expect certain documents via mail and

*Answers to Interrogatories—Page 7*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Peter M. Mace )<br>    Plaintiff, )<br>        vs. )<br>Larry A. Domash )<br>    Defendant ) | Case No. 1: 06-02244 (HHK)<br>Judge Henry H. Kennedy, Jr.<br>Next Event: Discovery Completion Date 5 February 2007 |

**To:**     **Defendant Larry A. Domash**
            c/o Adam Augustine Carter, Esq.
            **Attorney for Defendant**

**From:**   **Plaintiff Peter M. Mace**
            c/o Michael J. Trevelline, Esq.
            **Attorney for Plaintiff**

ORIGINAL

### Plaintiff's Response to
### Defendant's First Set of Interrogatories

Now comes the **Plaintiff** to answer the interrogatories of the **Defendant** in the number and order propounded.

## General Objections

A. **Plaintiff** objects to each Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client, work product or other privileges; such information will not be produced. The inadvertent revelation of any such privileged information shall not be deemed a waiver of any applicable privilege or doctrine with respect to that information or the subject matter thereof.

B. **Plaintiff** objects to each Interrogatory to the extent it seeks information that is readily available to the requesting party from that party's own records. Recitation of such information would, therefore, be unduly burdensome.

C. **Plaintiff** objects to each Interrogatory to the extent that it is unreasonably vague, overly-broad, repetitious or unduly burdensome.

D. **Plaintiff** objects to each Interrogatory to the extent it seeks information not in its possession, custody or control or that of its agents or representatives.

E. **Plaintiff** reserves the right to object to the relevancy, materiality or admissibility of any information provided in this Answer, at trial, or any other evidentiary proceeding.

F. **Plaintiff** reserves the right to supplement its responses upon discovery of additional, responsive information.

## Answers

1. Describe in detail each and every expenditure you made

*Answers to Interrogatories—Page 1*

Glossberg reference was essentially a reference to Mr. Domash, who was then employed by Gofen and Glossberg. The following insurance companies were also contacted: Firemans Fund, TransAmerica, Lincoln National, Pacific Life, Midland National, Allianz. As well we did discuss raising capital with the consulting firms of Firemark and Conning & Co. I am not aware of a single instance in which the name Larry Domash enhanced our prospects, and in only two instances, that of Scott Ketner and Walter Kass, did it ever come up. The document bates-stamped Mace 109 shows his name was mentioned to David Prokupek, Leon Wright and George Cochran, but ultimately his name had an impact far different than that of being helpful.

A document entitled "Overview of Financial Skills" (Mace 1653-55) was written for John Martin concerning D&A. Mr. Domash promised to draft a similar document for John Stein, but never did. The story of IFA's attempt to obtain financing from Bank of America can be seen in the documents bates-stamped Mace 008-009 and 022-031. Crises Management International, Sonny Lee, Asset Allocation & Management, Tom Bystryk, Dan Harshberger, Randy Zeller, Peter Marshall, Jack Grimes and Bob Chicoski had the offering memorandum and executive summary.

The documents bates-stamped Mace 033 and 049 also answer this interrogatory.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _14 December 2006_.

_____
Peter M. Mace

As to objections,

Respectfully submitted,

Dated: _14 Dec 06_   Signed: _____
                    Michael J. Trevelline, DC Bar # 437454
          Address:   1823 Jefferson Place, NW
                    Washington, DC 20036-2504
          Telephone: (202) 737-1139/Fax: (202) 775-1118
          Email:    mjt@mjtlegal.com