# EXHIBIT U

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - -

PETER M. MACE,



                    Plaintiff,

                                    Case No. 1:05CV02244(HHK)

        v.

LARRY A. DOMASH,


                    Defendant.



- - - - - - - - - - - - - - - - - - - - - - - - -


            DEPOSITION of GEORGE A. GRAHAM, JR.,
Ph.D., taken at the instance of the Defendant, under and
pursuant to the Federal Rules of Civil Procedure, and the
acts amendatory thereof and supplementary thereto, before
me, KIM M. PETERSON, CM, Registered Professional Reporter
and Notary Public in and for the State of Wisconsin, at
the law offices of Meissner, Tierney, Fisher & Nichols,
S.C., 111 East Kilbourn Avenue, Milwaukee, Wisconsin, on
the 2nd day of April, 2007, commencing at 9:30 o'clock in
the forenoon.

GEORGE A. GRAHAM, JR., Ph.D. - 4/2/07

1          I'm interested in as a possible business?  Yes.

2     Q    Do you stand to gain financially if Mr. Mace was

3          to recover from Mr. Domash in this matter?

4     A    Only for my expense.

5     Q    So is your -- are your expenses being reimbursed

6          contingent on Mr. Mace recovering from Mr. Domash?

7     A    Probably.

8     Q    Have you discussed that with Mr. Mace?

9     A    Yes, in the sense that he doesn't have a lot of

10         money, as I understand.

11    Q    What has he said specifically about reimbursing

12         you for your expenses?

13    A    He said if you'll be called as a witness, I will

14         cover that for you.

15    Q    Is he covering any expenses in connection with

16         your appearance today?

17    A    I don't know.

18    Q    You haven't discussed that with him?

19    A    What would be my expenses today?

20    Q    Again, my question stands.  Is he covering any of

21         your expenses in connection with your appearance

22         today?

23    A    If you're referring to that I have counsel with

24         me, yes.

25    Q    Mr. Mace is paying for that counsel?

11

GEORGE A. GRAHAM, JR., Ph.D. - 4/2/07

1    A    If it's successful.  He is only paying for the
2         expenses of my cost of being involved.
3    Q    Do you have a written agreement with Mr. Mace in
4         that regard?
5    A    No.
6    Q    So it's just an oral understanding?
7    A    Yes.
8    Q    When did that conversation take place?
9    A    Probably shortly after I got the request for a
10        deposition.
11   Q    What was said during that conversation?
12   A    Pardon?
13   Q    What was said during that conversation?
14   A    Well, I don't know what was said.  I don't know
15        what you're asking about what was said in that
16        conversation.
17   Q    What did Mr. Mace say in that conversation to you?
18                 MS. O'CONNOR:  Which conversation?
19   BY MR. BROOKS:
20   Q    The conversation you just talked about that
21        happened after you received the subpoena.
22   A    After I received the subpoena?  I called him, made
23        him aware of it, and I said is it necessary.  He
24        said I feel it is.  And I said that's going to
25        take my time and money, and he said I understand.

HALMA-JILEK REPORTING, INC. (414) 271-4466

12

GEORGE A. GRAHAM, JR., Ph.D. - 4/2/07

1    He said if we're successful I will cover that,
2    your expenses.  Strictly the expenses.
3  Q  How did you respond?
4  A  Obviously.  That's very rhetorical.  How did I
5    respond?  I'm here, aren't I?
6  Q  What did you say to Mr. Mace?
7  A  Yes, that's fine.
8  Q  Anything else?
9  A  Not that I remember.
10  Q  Did you talk to Mr. Trevelline about this
11    deposition?
12  A  He sent me a letter asking me to find counsel and
13    correspond with counsel.  I have not talked to
14    Mr. Trevelline directly.
15  Q  Did you bring a copy of that letter with you
16    today?
17  A  I have it in a file.  I didn't bring it with me
18    today.  Yes, I do have it.
19  Q  And he asked you to find counsel?
20  A  He asked me he would like to talk to my counsel on
21    the basis of this.
22  Q  Anything else in the letter that you recall?
23  A  Nothing other than the fact that if you provide me
24    counsel, I will talk with that individual.
25  Q  Turning back to your letter of April 30, 2006, did

HALMA-JILEK REPORTING, INC. (414) 271-4466

GEORGE A. GRAHAM, JR., Ph.D. - 4/2/07

1           Mr. Domash owed him money?

2    A      No.  Nothing specific that I know of.

3    Q      In early September 2000 did you have an

4           understanding that there was a contract between

5           Mr. Domash and Mr. Mace?

6                    MS. O'CONNOR:  Objection.  Form.

7                    THE WITNESS:  Did I have an

8           understanding?  No, and I don't suppose that there

9           was, but that was not unusual in terms of later

10          behavior by Mr. Domash.  I had the same kind of

11          thing represented to me when I'd send him

12          billings.

13   BY MR. BROOKS:

14   Q      Well, in early September 2000 did you have an

15          understanding that there was any sort of financial

16          agreement between Mr. Mace and Mr. Domash?

17   A      I've already said no, but oftentimes in business

18          and presentation there's the expectation.

19   Q      Did Mr. Mace tell you what that expectation was

20          based on?

21   A      I didn't have to be told.  I knew his behavior

22          because of the contacts he had with me.

23   Q      The contacts that who had with you?

24   A      The phone calls that kept me appraised of his

25          contacts with Larry and his support for Larry to

24

GEORGE A. GRAHAM, JR., Ph.D. - 4/2/07

1   Q    I'll ask you to turn your attention to page 44 of
2        that transcript.
3   A    Um-hum.
4   Q    Do you remember being questioned by Attorney Mark
5        Cooper in this case?
6   A    Oh, yes.  Yes.
7   Q    Again, turning your attention to page 44, start
8        with line 5.
9                "Answer.  I think Brett was in the
10       decision.  Larry wanted it.
11               "Question.  Brett whom?
12               "Answer.  Brett Mace, M-A-C-E. he's a
13       friend and a colleague of -- no, that's not true.
14       He's a friend.  I don't think they ever had a
15       business association.  They met through business,
16       but he's a very close friend to him.  His lawyer
17       in Washington, or is it Virginia, I met him twice
18       and know very little about him."
19               Did I read that correctly?
20  A    Um-hum.
21  Q    As of October 23rd, 2000, one month after your
22       conversation with Mr. Mace in early
23       September 2000, was that a true answer?
24               MS. O'CONNOR:  Why don't you give us a
25       minute to read a little bit more of this page.  Is

25

GEORGE A. GRAHAM, JR., Ph.D. - 4/2/07

1          that okay?

2                    MR. BROOKS:  Sure.  That's fine.

3                    THE WITNESS:  Your question?

4                    MR. BROOKS:  Can you read it back?

5                    (Record read.)

6                    THE WITNESS:  Is that a true -- I'm

7          sorry.  I missed the last part of the sentence.

8                    (Record read.)

9                    MS. O'CONNOR:  Do you understand the

10         question?

11                   THE WITNESS:  No, I don't.

12    BY MR. BROOKS:

13    Q    As of October 2000 --

14    A    Um-hum.

15    Q    -- is it true that you did not believe Mr. Mace

16         and Mr. Domash had a business association?

17    A    Yes.  I said that and I implied by that that there

18         was no contract at all, but that doesn't mean that

19         they hadn't talked about a number of things.

20         Isn't that true, Larry?  You can't answer, I'm

21         sure.

22                   MR. BROOKS:  I don't think I need to

23         tell you not to answer that, do I?

24    Q    If I can turn your attention back to Exhibit 1.

25    A    Um-hum.

46

GEORGE A. GRAHAM, JR., Ph.D. - 4/2/07

1          meeting?

2    A    That wasn't a focus.  As I say, it was a throw-off

3          line, which was an assurance line, that happened

4          at least these three times with witnesses there.

5    Q    During that September 21, 2000 meeting do you

6          remember Mr. Mace acknowledging that Mr. Domash

7          owed him money?

8    A    There wasn't a question of acknowledging it.  It

9          wasn't a formal arrangement.  It was a throw-off

10         line hey, really appreciate everything that's

11         being done, we'll take care of this.

12             MS. O'CONNOR:  Can we take another

13         break so he can get some more water?

14             MR. BROOKS:  Oh, sure.

15             (Recess taken.)

16   BY MR. BROOKS:

17   Q    Okay.  Aside from the examples you listed in your

18         letter of April 30, 2006, are you aware of any

19         other instances where Mr. Mace -- where Mr. Domash

20         promised to repay Mr. Mace?

21   A    Oh, probably, but I didn't them and I thought this

22         was enough.

23   Q    Sitting here today do you recall any others?

24   A    No.  I think it was always an assumption.  I

25         mean -- I mean, partially, no, but there was

47

GEORGE A. GRAHAM, JR., Ph.D. - 4/2/07

1       always an assumption that he would cover the
2       expenses, which I didn't know what they were.
3  Q   What was the -- Strike that.  During the meeting
4       of April 17, 2001 referenced in your letter, what
5       specifically do you recall Mr. Mace saying about
6       the money Mr. Domash owed him?
7  A   About the same thing.
8  Q   Did Mr. Mace refer to it as a growing amount of
9       money?
10  A   I think that conversation was with me, that
11      statement.  Mace told me that this is getting to
12      be a high bill.
13  Q   What else did he tell you about that?
14  A   Just that.
15  Q   Did he appear concerned about it?
16  A   Somewhat rhetorical.  Most people are concerned
17      about -- To the degree, I don't know because we
18      didn't sit down and focus on that.  That was never
19      our intent when that discussion came up.
20  Q   Leaving aside what most people would have felt,
21      did Mr. Mace appear concerned to you?
22  A   I would answer it in the same context.  On a
23      normal scale most people are concerned about money
24      like anyone else.  He wasn't desperate or
25      anything.  He was troubled by it because it, I

HALMA-JILEK REPORTING, INC. (414) 271-4466