# EXHIBIT V

DEPOSITION OF PETER M. MACE
CONDUCTED ON WEDNESDAY, FEBRUARY 21, 2007

1 (Pages 1 to 4)

---

Page 1

```
 1    UNITED STATES DISTRICT COURT
 2    FOR THE DISTRICT OF COLUMBIA
 3
 4   - - - - - - - - - x
 5   PETER M. MACE,              :
 6        Plaintiff,              :
 7        vs.              : Case No. 1:05CV02244 (HHK)
 8   LARRY A. DOMASH,             :
 9        Defendant.              :
10   - - - - - - - - - x
11
12        Deposition of PETER M. MACE
13             Washington, D.C.
14        Wednesday, February 21, 2007
15             9:44 a.m.
16
17
18
19
20   Job No.: 1-97081
21   Pages: 1 - 254
22   Reported by: Sarah M. Bickel
```

Page 2

```
 1        Deposition of PETER M. MACE, held at the
 2   offices of:
 3        Employment Law Group
 4        888 17th Street, N.W.
 5        Suite 900
 6        Washington, D.C. 20006
 7        (202) 331-2883
 8
 9
10
11
12
13
14
15        Pursuant to agreement, before Sarah M.
16   Bickel, Court Reporter and Notary Public in and for
17   the District of Columbia.
18
19
20
21
22
```

Page 3

```
 1                A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3        MICHAEL J. TREVELLINE, ESQ.
 4        Law Offices of Michael J. Trevelline
 5        1823 Jefferson Place, N.W.
 6        Washington, D.C. 20036
 7        (202) 737-1139
 8
 9
10
11   ON BEHALF OF THE DEFENDANT:
12        DOUGLAS S. BROOKS, ESQ.
13        Kelly, Libby & Hoopes
14        175 Federal Street
15        8th Floor
16        Boston, Massachusetts 02110
17        (617) 338-9300
18
19
20
21   ALSO PRESENT: Larry A. Domash
22
```

Page 4

```
 1            C O N T E N T S
 2   EXAMINATION OF PETER M. MACE          PAGE
 3        By Mr. Brooks                      6
 4
 5
 6
 7            E X H I B I T S
 8         (Retained by Counsel)
 9   MACE DEPOSITION EXHIBIT              PAGE
10   No. 1                                 30
11   No. 2                                 76
12   No. 3                                 80
13   No. 4                                 83
14   No. 5                                 90
15   No. 6                                 94
16   No. 7                                100
17   No. 8                                109
18   No. 9                                114
19   No. 10                               121
20   No. 11                               127
21   No. 12                               132
22   No. 13                               134
```

**Page 13**

1  Q What is your current address?
2  A It's apartment 209, 4701 Connecticut
3  Avenue, Northwest Washington, D.C. 2008.
4  Q How long have you lived there?
5  A Since 1980.
6  Q Who do you live there with?
7  A My wife.
8  Q And how long have you been married?
9  A Since 1980.
10 Q What's your wife's name?
11 A Vicky.
12 Q Do you have any kids?
13 A No, we had an ectopic pregnancy. She
14 almost died twice. We never adopted.
15 Q I'm sorry to hear that.
16     MR. TREVELLINE: Let me stop. I need to
17 take a break and get some water.
18     (Off the record.)
19     BY MR. BROOKS:
20 Q Mr. Mace, the name of the insurance
21 company that you tried to get going was Investors
22 Fidelity of America?

**Page 14**

1  A Yes.
2  Q Do you often refer to it as IFA for short?
3  A Yes.
4  Q Can we agree that if we say IFA, we're
5  talking about Investors Fidelity of America?
6  A Yes.
7  Q What year did you -- what year did IFA
8  begin as a concept for you?
9  A I believe 1986.
10 Q At that time, what were you trying to do
11 for IFA?
12 A We were trying to give it life.
13 Q When you say "we," who is we?
14 A A number of people who were involved in
15 putting the company together.
16 Q Who are the names of those people?
17 A Gene Sierzant, Gary LeClair, myself, Yorke
18 Roberts was a part of it, he's now deceased.
19 Q What year was IFA incorporated?
20 A I believe 1986.
21 Q What was the purpose of IFA?
22 A It was to create the premier life and

**Page 15**

1  annuity company in the United States.
2  Q How would you describe your experience in
3  the field at that time?
4  A I had experience selling insurance. And I
5  had experience in acting as a brokerage manager,
6  dealing with hundreds of different insurance agents.
7  Q This was your first attempt to start your
8  own company?
9  A Yes.
10 Q Other than IFA, have you ever tried to
11 start any other insurance companies?
12 A Yes.
13 Q Can you describe that.
14 A Yorke Roberts asked me to help him form
15 his own company and I mentioned the bank earlier.
16 Q After you incorporated IFA in 1986, were
17 there any points in time that you tried to start
18 another insurance company?
19 A No.
20 Q Okay. So from 1986, it's been all IFA?
21 A Yes.
22 Q In 1986, did IFA own or lease any

**Page 16**

1  computers?
2  A At the time did it own or lease any
3  computers? No.
4  Q At the time IFA was incorporated, did it
5  have any assets?
6  A Minimal assets.
7  Q What were those minimal assets?
8  A Whatever we needed to meet, whatever the
9  statutory minimum was. It was a concept.
10 Q Did it ever become more than a concept?
11 A No.
12 Q So from 1986 or whenever it was
13 incorporated to the present, it's always been a
14 concept?
15 A Uh-huh.
16 Q Was IFA shut down at some point?
17 A Yes.
18 Q When?
19 A I believe October of 2004.
20 Q Why was it shut down?
21 A Because I was no longer able to work on
22 it.

### Page 255

VOLUME II
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-----------------------------------x
PETER M. MACE,                          :
      Plaintiff                    : Case No.
    v.                                  : 1:05CV02244 (HHK)
LARRY A. DOMASH,                        :
      Defendant                    :
-----------------------------------x

Deposition of PETER M. MACE - VOLUME II
Washington, D.C.
Thursday, February 22, 2007
2:00 p.m.
Job No.: 1-97084
Pages: 255 - 372
Reported by: Alda Mandell, RPR

### Page 256

Deposition of PETER M. MACE, held at the offices of:

    EMPLOYMENT LAW GROUP
    888 17th Street, Northwest
    Suite 900
    Washington, D.C. 20006
    (202)331-2883

Pursuant to agreement, before Alda Mandell, Registered Professional Reporter and Notary Public of the District of Columbia.

### Page 257

APPEARANCES

ON BEHALF OF PLAINTIFF:
    MICHAEL J. TREVELLINE, ESQUIRE
    1823 Jefferson Place, Northwest
    Washington, D.C. 20036-2504
    (202)737-1139

ON BEHALF OF DEFENDANT:
    DOUGLAS S. BROOKS, ESQUIRE
    KELLY, LIBBY & HOOPES
    175 Federal Street
    Eighth Floor
    Boston, Massachusetts 02110
    (617)338-9300

Also Present: LARRY A. DOMASH

CONTENTS
EXAMINATION OF PETER M. MACE     PAGE
    By Mr. Brooks     259

### Page 258

EXHIBITS
(Attached to the Transcript)

| DEFENDANT'S | | PAGE |
|---|---|---|
| 25 | Fax - 5/13/02 - Brett to Stein | 308 |
| 26 | Letter - 5/24 - Brett to Larry | 312 |
| 27 | Organizational Chart | 328 |
| 28 | Document Bates stamped Graham 1776 | 331 |
| 29 | Letter - 5/14/02 - Mace to MBNA | 338 |
| 30 | Letter - 6/16/00 - McSweeny to Mace | 348 |
| 31 | IFA's Financial Team | 354 |
| 32 | Complaint | 361 |

267

1  A  I mean he needs to -- he needs to address
2  his responsibilities and he needs to go back and get
3  the kind of care that he talked to George Graham about
4  getting.
5  Q  But what does folding under pressure mean?
6  A  It means that we had to confront him about
7  his behavior.
8  Q  Okay. If I can turn your attention to the
9  first paragraph in the PS section.
10  A  Yes, sir.
11  Q  The third line down beginning with the
12  sentence that reads, just before he left he told me it
13  covered 8,000 square feet. After he got to New York
14  he told me he had sold it and made a tidy profit. Did
15  you know about this? Where did he get the money to
16  buy an 8,000 square foot home? Were you referring to
17  Mr. Domash on that?
18  A  I was indeed. Yes, I was, Mr. Brooks.
19  Q  When did you find out all of this
20  information that I just read onto the record?
21  A  I couldn't tell you, sir. I don't recall.
22  Q  Well, when --

268

1  A  When did Larry -- well, clearly Larry --
2  from this he had left Susquehanna Partners in
3  Pennsylvania.
4  Q  And when had he done so?
5  A  I'm sorry. I can't tell you, sir. I would
6  have to look at the notes. I don't remember. So he
7  would have been -- he would have been in New York.
8  Q  Would you agree that happened before
9  January 1st, 2002?
10  A  Yes, sir. I would.
11  Q  Thank you.
12  A  But it was not something that -- I learned
13  of this -- my recollection is that I learned of this
14  quite late.
15  Q  Well, I'm sorry, sir. Does it not say just
16  before he left he told me it covered 8,000 square
17  feet?
18  A  Yes. It does say that. And then after he
19  got to New York he told me he'd sold it and made a
20  tidy profit. I'm not trying to be argumentative. I
21  think that they were two different --
22  Q  I understand what you're saying. You're

269

1  saying you knew for a while it was 8,000 square feet
2  but you're not sure you learned that he made a tidy
3  profit?
4  A  Yes. I thought he was living in an
5  apartment. I just didn't know.
6  Q  Did he tell you that he made the tidy profit
7  during a phone conversation?
8  A  I can't answer that, sir. I don't know. He
9  could have said that to me in one of the trips that I
10  took.
11  Q  But either over the phone or in person?
12  A  Yes. Over the phone or in person. I
13  never -- I have no recollection of ever having
14  received anything in writing from Larry about this.
15  Q  Sir, yesterday I believe you testified that
16  the contract didn't have a provision one way or
17  another about whether you had to send Mr. Domash your
18  credit card statements, is that correct?
19  A  Yes. That's true.
20  Q  Did you in fact ever send Mr. Domash any
21  credit card statements?
22  A  No. I did not, sir.

270

1  Q  Did you send him any other sort of breakdown
2  in writing of the alleged amount of money that he owed
3  you?
4  A  No, I did not. No, I did not.
5  Q  At some point Mr. Domash gave you power of
6  attorney?
7  A  Yes, he did.
8  Q  Did you ever do anything for Mr. Domash in
9  that regard, pursuant to that power of attorney?
10  A  Yes, I did.
11  Q  What did you do for him?
12  A  We used it with Tim Hughes who helped Larry
13  deal with an issue about a dispute over a payment that
14  was allegedly due to some attorneys that Larry was
15  working with.
16  Q  When was that?
17  A  I don't recall, sir. I'd have to go back
18  and look at the date of that. And we also used it
19  with I believe Val Diviacchi. And that was to help
20  Larry on another legal matter also.
21  Q  Anything else?
22  A  Off the top of my head, I don't believe so.